# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
### NORTHERN DIVISION

**INDIGO WILLIAMS,**
*on behalf of her minor child J.E.*, et al.                                **PLAINTIFFS**

**v.**                                                                      **CIVIL ACTION NO: 3:17-cv-404**

**GOVERNOR PHIL BRYANT et al.**                                            **DEFENDANTS**

## MEMORANDUM IN SUPPORT OF MOTION TO DISMISS

### I.  INTRODUCTION

Under the Mississippi Constitution of 1868, the right to a public education was guaranteed for only "four months in each year."[1] Despite this limited guarantee, which came on the heels of the tragic Civil War era, the Constitution of 1868 is where the Southern Poverty Law Center[2] seeks to return.

To accomplish this endeavor, the SPLC attempts to repurpose a congressional act from 1870 that seated representatives from the State of Mississippi to Congress after the Civil War and after congressional reconstruction and military supervision of the former confederate states had ceased.[3]

---

[1] "A public school, or schools, shall be maintained in each school district, at least four months in each year." *See* MISS. CONST. of 1868, art. 8, § 5.

[2] The Plaintiffs are Indigo Williams, on behalf of her minor child J.E.; Dorothy Haymer, on behalf of her minor child, D.S.; Precious Hughes, on behalf on her minor child, A.H.; and Sarde Graham, on behalf of her minor child, S.T. Because the case is spearheaded by the Southern Poverty Law Center, the Plaintiffs are collectively referred to as either the "Plaintiffs" or the "SPLC."

[3] The Military Reconstruction Act and its amendments and implementing statutes are referred to generally as the "Reconstruction Acts" and/or the "Readmission Acts." The basic framework was established by Act of Mar. 2, 1867, ch. 153, 14 Stat. 428, amended by Act of Mar. 23, 1867, ch. 6, 15 Stat. 2, amended by Act of July 19, 1867, ch. 30, 15 Stat. 14, amended by Act of Mar. 11, 1868, 15 Stat. 41. *See also* 12 Op. Att'y Gen. 182 (1867), available at 1867 WL 2127 (addressing the powers and duties of military commanders under the Reconstruction Acts). Congress then declared, in a series of acts, that particular states had satisfied the requirements established in the earlier laws. *See* Act of June 22, 1868, ch. 69, 15 Stat. 72, 73 (readmitting Arkansas); Act of June 25, 1868, ch. 70, 15 Stat. 73, 73-74 (readmitting, subject to their ratification of the Fourteenth Amendment and conditioned upon their continued compliance in refraining from withdrawing the right to vote from any citizen or class thereof, North Carolina, South Carolina, Louisiana, Georgia, Alabama, and Florida); Act of Apr. 10, 1869, ch. 17, 16 Stat. 40, 41 (authorizing referenda on new constitutions in Mississippi, Texas and Virginia); Act of Dec. 22, 1869, ch. 3, 16 Stat. 59, 60 (addressing reconstruction of Georgia); Act of July 15, 1870, ch. 299, 16 Stat. 363, 363-64 (declaring that Georgia was entitled to representation in Congress); Act of Jan. 26, 1870, ch. 10, 16 Stat. 62, 62-63, amended by Act of Feb. 1, 1870, ch. 12, 16 Stat. 63 (declaring Virginia's readmission to representation in Congress); Act of Feb. 23, 1870, ch. 19, 16 Stat. 67, 67-68 (readmitting Mississippi); Act of Mar. 30, 1870, 16 Stat. 80, 80-81 (Texas).

Known as the Readmission Act, the law's sole purpose was to give Mississippi a voice at the U.S. Capitol in the wake of the tumultuous war.

The SPLC, however, removes this century-old Act from the era of which it was a part and distorts its very terms. For example, in the opening paragraph of its complaint, the SPLC paternalistically proclaims that Mississippi is violating the Act that governed the State's "readmission to the United States."[4] But this gets both history and the law all wrong. The Readmission Act was not a compact under which Mississippi, after the Civil War, was readmitted to the Union.  As the Supreme Court long ago ruled, confederate states were never out of the Union—thus there was no necessity for readmission. *See Texas v. White*, 7 Wall. 700, 74 U.S. 700 (1868).[5]

What is more is that the congressional reconstruction measures enacted following this Country's bloodiest war, including the Acts that re-seated representatives from the former confederate states in Congress, always have been considered to be matters within the exclusive domain of the political branches. As the court in *Butler v. Thompson*, 97 F. Supp. 17, 20 (E.D. Va.), *aff'd,* 341 U.S. 937 (1951) aptly reasoned when a plaintiff attempted to manipulate the terms of Virginia's nearly-identical Readmission Act: "Such a matter is one peculiarly within the domain of Congress itself, since it only purports to set up a condition governing Virginia's right to admission to representation in Congress."

No matter: the SPLC now seeks to refashion the Readmission Act into a contorted federal mandate that would place the State of Mississippi in a straitjacket so far as the educational provisions of the State's Constitution are concerned. The complaint asks this Court to issue a declaratory

---

The Reconstruction Act did not affect Tennessee, which was exempted from Military Reconstruction. *See* Act of Mar. 2, 1867, ch. 153, 14 Stat. 428, 428-29 (omitting Tennessee from the rebel states).

[4] *See* Pl. Compl. at ¶ 1.1

[5] *E.g., Butler v. Thompson*, 97 F. Supp. 17, 20 (E.D. Va.), *aff'd,* 341 U.S. 937 (1951) ("Nor was th[e] [Readmission] Act a compact under which Virginia, after the Civil War, was readmitted to the Union. The Supreme Court has ruled that the Confederate States were never out of the Union and, hence, there was no necessity for readmission. *State of Texas v. White*, 7 Wall. 700, 74 U.S. 700, 19 L.Ed. 227.")

judgment that Section 201 of the Mississippi Constitution was adopted in violation of the Readmission Act; that the 1960, 1934, and 1890 versions of Section 201 were void *ab initio*; and that Article VIII, Section 1 of the Constitution of 1868 remains legally binding.

For many reasons—most of which are obvious, the SPLC's lawsuit and its requested relief finds solid footing in no law. Specifically, there are at least six immediate reasons why dismissal of the instant lawsuit is required: (1) The claim is barred by the political question doctrine; (2) The Act is not privately enforceable; (3) Plaintiffs lack Article III and prudential standing; (4) The SPLC's claim collides with the Eleventh Amendment and core principles of federalism; (5) The claim runs afoul of the statute of limitations; and (6) The claim fails on the merits and is a non-starter.

At the end of the day, it should go without saying that education is of the utmost importance to all of the State Defendants and this State's citizenry. And, of course, there is always room for improvement in this area in the State of Mississippi. But the tactics utilized by the SPLC in this lawsuit are not, and could not be, the answer. Indeed, it is hard to imagine a more perverse request for intervention by the federal judiciary, as the relief requested would serve to hold captive not only a sovereign state's constitution, but also profound notions of federalism. There are numerous paths for dismissal, and this Court should follow one (or all) of them.

## II.  BACKGROUND INFORMATION

The events leading up to the passage of the Readmission Act are no doubt tumultuous. After the Union victory in the Civil War in 1865, the process of rebuilding the South during the Reconstruction Period began.  However, President Abraham Lincoln and the so-called "Radical

Republicans" in Congress did not always agree on the best method to promote reconstruction.[6] Essentially, Lincoln preferred a "more moderate approach" than did some members of Congress.[7]

After Lincoln's assassination, Andrew Johnson became President and began his reconstruction attempts in the former confederate states. Like Lincoln, Johnson took the position that it was individuals who had rebelled and not the states. Thus, thought Johnson, the states could quickly be brought back into a proper relationship with the Union. In May 1865, Johnson issued two proclamations that would go far to define his approach to reconstructing the South.[8]

Essentially, through these proclamations, Johnson granted amnesty to former confederates who owned less than $20,000 worth of property, and other ex-confederates could petition for presidential pardons.[9] Johnson's plan required the states to convene conventions to disavow their acts of secession, abolish slavery, and repudiate their war debts.[10]

Johnson's second proclamation appointed a provisional governor for North Carolina and called for the state to create a constitution.[11] In the ensuing weeks, Johnson made similar offers to six additional southern states and recognized the Lincoln-sponsored governments of Louisiana, Arkansas, and Tennessee.[12] By the fall of 1865, "regular civil administrations" were thereby functioning in all of the former confederate states, except Texas.[13]

Notably, Johnson's proclamations did not directly address the issue of civil rights for freedmen—making most northerners (especially those in Congress) skeptical of his approach to

---

[6] *See* Catherine Locks et al., *History in the Making: A History of the People of the United States of American to 1877*, Section 17.2.5, pp. 791-792 (Ed. 1, Ver. 3, 2013); Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: Harper & Row, 1988), 60; James M. McPherson, *Ordeal by Fire: The Civil War and Reconstruction*, third edition (New York: Alfred A Knopf, 2002), 456-457.

[7] *See id.*

[8] *See* Locks, *History in the Making*, Section 17.3, p. 797.

[9] *See id.*

[10] *See id.*

[11] *See id.*

[12] *See id*.; McPherson, *Ordeal by Fire*, third edition, 499.

[13] *See id.*

reconstruction. On the other hand, the proclamations appear to have had a lulling effect on the former confederate states.

Indeed, some of the state legislatures ratified the Thirteenth Amendment; some did not. Some began to argue about war debts, and, while some declared secession null and void, others merely "repealed" their articles of secession. In addition, the ex-confederate states adopted "Black Codes," which essentially were legal codes that denied African Americans the right to purchase or rent land.[14] Despite this, Johnson announced that the Union was restored in early December of 1865.[15]

Nevertheless, Congress still refused to seat the former congressional representatives from the former confederate states. Basically, it was Congress's position that reconstruction of the former confederate states and those states' readmission to representation in Congress should be (and basically ended up being) in the exclusive domain of Congress.[16]

When Congress convened in December 1865, its members acted to remind southerners of the northern victory, and Congress created a Joint Committee on Reconstruction. The Committee had among its membership one of the most influential Radical Republicans in Congress: Thaddeus Stevens of Pennsylvania. Stevens and Charles Sumner, who was the Republican leader in the Senate, were the most outspoken proponents of radical reconstruction. For instance, Stevens made clear his position on Presidential Reconstruction when he remarked, "The punishment of traitors has been wholly ignored by a treacherous Executive and a sluggish Congress."[17]

---

[14] *See generally Pl. Compl.*

[15] *See* Locks, *History in the Making*, Section 17.3.1, p. 797.

[16] *See* Speech of Thaddeus Stevens on Dec. 18, 1865, http://www.let.rug.nl/usa/documents/1851-1875/thaddeus-stevens-speech-of-december-18-1865.php (last visited July 20, 2017): "[I]t is very plain that it requires the action of Congress to enable them to form a State government and send representatives to Congress…Whose especial duty is it to do it? In whom does the Constitution place the power?...Congress…is the only power that can act in the matter…Congress alone can do it…Congress must create States and declare when they are entitled to be represented. Then each House must judge whether the members presenting themselves from a recognized State possess the requisite qualifications of age, residence, and citizenship[.]"

[17] Samuel Eliot Morison, Henry Steele Commager and William E. Lauchenberg, *A Concise History of the American Republic*, vol. 1 to 1877 (New York: Oxford University Press,1977) at 334.

The Joint Committee eventually created the plan for reconstruction that Congress would ultimately adopt.[18] The Joint Committee drafted and sent the Fourteenth Amendment to the states for ratification. The southern refusal to ratify the Fourteenth Amendment at that time strengthened the Radical position in Congress, as northerners became more convinced than ever that the south was unreconstructed and that the plans of Johnson and Lincoln were failures.[19]

After the 1866 elections, the Radical Republicans had a firm base of support in both the House and Senate, and they moved to adopt the plans outlined by the Joint Committee, including the First Reconstruction Act of March 1867.[20] This is despite the fact that, in April of 1866, President Johnson had proclaimed that the "insurrection is at an end and that peace, order, tranquility, and civil authority now exist in and throughout the whole of the United States of America."[21]

Despite Johnson's proclamation, the Reconstruction Act passed. The basic premise of the Act was that "no legal state governments or adequate protection for life and property now exists in the southern states," with the exception of Tennessee, which had accepted the Fourteenth Amendment in July 1866.[22] The Act, which passed over Johnson's veto, divided the ten unreconstructed states into five military districts,[23] each under a federal commander "not below the rank of brigadier-general, and to detail a sufficient military force to enable such officer to perform his duties and enforce his authority[.]"[24]

---

[18] *See* Locks, *History in the Making*, Section 17.3.5, p. 799-800.

[19] *See id.*

[20] "An act to provide for the more efficient government of the Rebel States" 2 March 1867, The Reconstruction Acts: 1867, Texas State Archives and Library Commission, June 25, 2012, https://www.tsl.texas.gov/ref/abouttx/secession/reconstruction.html (last visited July 20, 2017).

[21] *See* The Papers of Andrew Johnson, Vol. II, Aug. 1866-Jan. 1867, (ed., Paul H. Bergerson) p. 103 (1994).

[22] *See* "An act to provide for the more efficient government of the Rebel States."

[23] Senator Doolittle of Wisconsin, in a statement before Congress, demonstrated quite clearly the new strategy Congress would pursue: "[T]he people of the South have rejected the constitutional amendment, and therefore we will march upon them and force them to adopt it at the point of bayonet, and establish military power over them[.]" CONG. GLOBE, 39th Cong., 2d Sess. 1644 (1867).

[24] *See* "An act to provide for the more efficient government of the Rebel States."

The responsibilities of the commanders were to establish new requirements for voting, set up new state governments, and oversee the drafting of state constitutions by the states. When a convention was elected by the citizens of the state, a constitution created in keeping with the language and intent of the Constitution of the United States, and the Fourteenth Amendment ratified, then the states could apply for representation in Congress.[25]

During this time of congressional reconstruction, Ulysses S. Grant had continued in his wartime role as general-in-chief, while Johnson continued to serve as President. Grant oversaw the military commanders stationed in the southern states, and, as Republicans prepared for the presidential election of 1868, Grant emerged as the mostly likely candidate. When Grant ascended to the presidency in 1869, only three states, Virginia, Mississippi, and Texas, remained under military supervision.[26]

Virginia, Mississippi, and Texas had failed to ratify their state constitutions before 1869 because of so-called "proscriptive clauses," which were designed to prevent former confederates from participating in the government.[27] Eventually, though, the citizens of those three states voted on their respective constitutions with the proscriptive clauses omitted.[28] Voters in all three states then ratified their state constitutions, without the proscriptive clauses.[29]

Congress then seated representatives from Virginia, Mississippi, and Texas. As it specifically relates to Mississippi, on February 3, 1870, the House received a bill to admit Mississippi to representation in Congress. This bill contained a proviso identical to that contained in the earlier Virginia bill, conditioning the state's representation to Congress on the bases that the state would not

---

[25] *State of Texas v. White*, 7 Wall. 700, 74 U.S. 700, 19 L.Ed. 227; *Butler v. Thompson*, 97 F. Supp. 17, 20 (E.D. Va.), *aff'd*, 341 U.S. 937, 71 S. Ct. 1002, 95 L. Ed. 1365 (1951).

[26] *See* Locks, *History in the Making*, at 814.

[27] *See id.*

[28] J.G. Randall, *The Civil War and Reconstruction* 191 (1937).

[29] *See* MISS. CONST. of 1868.  In the election on November 30, 1869 in Mississippi, the constitution was ratified almost unanimously.

amend its constitution to deny equal suffrage, jury participation, and access to schools.[30] Eventually, the Mississippi bill passed.[31] Less than two months later, Texas was admitted to representation in Congress upon fulfillment of the same "conditions."[32]

Mississippi's Readmission Act provides, in pertinent part:

*An Act to admit the State of Mississippi to Representation in the Congress of the United States.*

WHEREAS the people of Mississippi have framed and adopted a constitution of State government which is republican; and whereas the legislature of Mississippi elected under staid constitution has ratified the fourteenth and fifteenth amendments to the Constitution of the United States; and whereas the performance of these several acts in good faith is a condition precedent to the representation of the State in Congress . . . .

* * * the State of Mississippi is admitted to representation in Congress as one of the States of the Union upon the following fundamental conditions:

'Third, That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States the school rights and privileges secured by the Constitution of said State.

*See* 16 Stat. 67 (1870), *attached hereto as Exhibit "A."*

### III.  LEGAL STANDARD

The SPLC's claim fails under Federal Rule of Civil Procedure 12(b)(1), for lack of jurisdiction, and/or Federal Rule 12(b)(6), for failure to state a claim. First, motions to dismiss based on the political question doctrine, standing, and the Eleventh Amendment raise issues of subject matter jurisdiction. *E.g.*, *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 948 (5th Cir. 2011) (political question); *Griffin v. HSBC Mortg. Servs., Inc.*, 2015 WL 4041657, at *3 n. 8 (N.D. Miss. July 1, 2015) (standing); *Warnock v. Pecos County, Tex.*, 88 F.3d 341, 343 (5th Cir. 1996)

---

[30] The purpose of the Virginia provision concerning access to schools was explained by Representative Paine. Although the Virginia constitution provided funding for a common-school system accessible to blacks as well as whites, it was widely believed that Governor Walker of Virginia would attempt to eliminate these provisions and not allow African Americans *access* to school *at all*. *See* H.R. 783, Cong. Globe, 41st Cong., 2d Sess. at 402-03.

[31] *See* Act of Feb. 23, 1870, c. 19, 16 Stat. 67, 68.

[32] *See supra* note 3.

(Eleventh Amendment). Second, the SPLC's claim otherwise fails to state a plausible claim for relief, and it additionally is due to be dismissed pursuant to Federal Rule 12(b)(6).

## IV.  ARGUMENT AND ANALYSIS

**A.     The Political Question Doctrine Necessitates Dismissal of the SPLC's Claim.**

The claim urged by the SPLC presents a classic nonjusticiable political question. Article III courts lack jurisdiction over political questions. *Flast v. Cohen,* 392 U.S. 83, 95 (1968); *see also Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 215 (1974). In the political question context, justiciability is a threshold determination that must be made at the outset of a case. *See id.*

The political question doctrine is "primarily a function of the separation of powers." *Baker v. Carr,* 369 U.S. 186, 210 (1962). At its core, the doctrine is "designed to restrain the Judiciary from inappropriate interference in the business of the other branches of government." *United States v. Munoz-Flores,* 495 U.S. 385, 394 (1990). It embraces the pragmatic, if unglamorous, reality that there are certain issues the judiciary is simply ill-suited to resolve—such as the reconstruction of the Union after the Civil War and the "condition precedent" purportedly placed on some southern states prior to those states being able to again seat representatives in Congress.

In *Baker v. Carr,* the Supreme Court laid out six "formulations" which "may describe a political question."[33] They are: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department," (2) "a lack of judicially discoverable or manageable standards for resolving" the issue, (3) "the impossibility of deciding [the issue] without an initial policy determination of a kind clearly for nonjudicial discretion," (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government," (5) "an unusual need for unquestioning adherence to a political decision already

---

[33] Quite obviously, *Baker* was decided long after the passage of the Readmission Act. As noted *infra*, even before *Baker v. Carr* was decided, and under any nonjusticiable political question formulation, there should be no doubt that the congressional reconstruction measures at issue here were considered political questions.

made," or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id.*

The Supreme Court later classified the *Baker* elements as "six independent tests" for determining the existence of a political question, and surmised that the tests are probably listed in "descending order of both importance and certainty." *Vieth v. Jubelirer,* 541 U.S. 267, 277–78 (2004); *Comer v. Murphy Oil USA, Inc*., 839 F. Supp. 2d 849, 862–63 (S.D. Miss. 2012), *aff'd*, 718 F.3d 460 (5th Cir. 2013). Thus, dismissal for lack of subject matter jurisdiction on political question grounds is warranted if *any one* of the six factors is present. Here, virtually all of the *Baker* factors are implicated.

> (i)      There is a textually demonstrable commitment to a coordinate political department.

The most obvious path to dismissal of the SPLC's claim is under the first *Baker* factor: "a textually demonstrable constitutional commitment of th[is] issue to a coordinate political department." *Baker,* 369 U.S. at 217. In general, there is a commitment to the political branches to make war and set the conditions of peace, to set the conditions placed on the confederate states in the wake of the Civil War, and, most notably, to set the conditions for readmission of the confederate states to representation in Congress.

To be sure, the conditions imposed on Mississippi (and other states) by the Readmission Act(s) only governed the seating of representatives from the former confederate states in Congress after the Civil War. As the Act itself states, it was an Act "to admit the State of Mississippi to Representation in the Congress of the United States," and the State of Mississippi was "admitted to representation in Congress" upon certain "fundamental conditions." The commitment of this issue is, and always has been, to a "coordinate political department."

Indeed, this is precisely what every court to address the issue has stated. That is, the claim asserted by the SPLC—as puzzling as it may be—has been made before and has been quickly rejected

by every court to address the issue. For example, a three judge panel from the Eastern District of Virginia held that claims brought pursuant to a state's Readmission Act raise matters that are "within the domain of Congress itself, since it only purports to set up a condition governing [a State's] right to admission to representation in Congress." *See Butler*, 97 F. Supp. at 20; *see also, e.g.,* U.S. CONST. art. V; CONST. art. I, § 2; CONST. art. I, § 3; CONST. art. I, § 4; CONST. art. I, § 5; CONST. art. I, § 6.

In *Butler*, the plaintiff maintained that the requirements for voting in Virginia should be invalid because Virginia is prohibited by Virginia's 1870 Readmission Act from imposing such requirements. In rejecting the claim, the three judge panel aptly reasoned:

> Such a matter ***is one peculiarly within the domain of Congress itself, since it only purports to set up a condition governing Virginia's right to admission to representation in Congress***. If the establishment of the requirement of the payment of a poll tax…were to be considered as a violation of the condition prescribed in the Act of 1870, ***it would be a matter peculiarly within the domain of the Congress alone***. Such condition, if it be such, might well be considered as waived by Congress in view of the fact that Virginia has continued to be admitted to representation in Congress for a period of nearly half a century after the adoption of the poll tax requirement, and with this increasing representation in accordance with the increase in population. The Act of 1870, too, must be studied against the background of the Tragic Era of which it was a part.

*Id.* (emphasis supplied).

The Supreme Court of Arkansas followed suit and also adopted this reasoning:

> First, we must consider that this Act was in 1868, soon after the Civil War, . . . [and that] the Supreme Court has ruled that the Confederate states were never out of the Union and, hence, there was no necessity for readmission. State of Texas v. White, 7 Wall. 700, 74 U.S. 700, 19 L.Ed. 227. ***Even if we assume that the Act has some force and effect, its enforcement is in the exclusive domain of Congress***.

*Merritt v. Jones*, 259 Ark. 380, 389, 533 S.W.2d 497, 502 (1976) (emphasis supplied). It is thus clear that the SPLC's Readmission Act claim is not novel. The lawsuit is dated, the claim has been rejected, and it requires dismissal because it raises a matter that falls within the exclusive domain of Congress.

Likewise, the historical record shows that this and other congressional policies to secure the reintegration of the rebellious states into Congress specifically, and into the political life of the Union, generally were matters of ending war and securing long-term preservation of the Union—requiring

delicate policy judgments made and enforced directly by the political branches of government. As the Supreme Court noted in *Baker*: "Our cases in this field seem invariably to show a discriminating analysis of the particular question posed, in terms of the history of its management by the political branches[.]" *Baker*, 369 U.S. at 211-12; *see Made in the USA Found. v. U.S.,* 242 F.3d 1300, 1311 n.27 (1lth Cir. 2001) ("history may inform the inquiry inasmuch as it fleshes out the manner in which the [political] branches have sought to exercise and accommodate their…powers over time").

During and after the Civil War, the political branches considered and weighed important national goals, including, but not limited to: the need to end the war with a consensus that could preserve the Union; the need to abolish slavery throughout the Union, including in the politically important border states; the need to provide some form of an amnesty program to induce confederate citizens to "return" to the Union; the need for the passage of the congressional Reconstruction Acts, including the First Reconstruction Act in 1867; the eventual need to have a plan to end reconstruction and military supervision of the former confederate states; and the need to again seat representatives in Congress from the former confederate states.[34]  These resulting political choices eventually led voters in Texas, Virginia, and Mississippi to ratify their state constitutions, for the Readmission Acts to be passed, and for Congress to again seat representatives from those three states in 1870.[35]  Now, approximately 150 years later, the SPLC seeks to summons the Act that seated those representatives in Congress.

---

[34] *See, e.g.,* Eric Foner, *Politics and Ideology in the Age of the Civil War* 131-44 (1980).

[35] The SPLC "seeks a declaration that Mississippi has failed to live up to obligations it incurred in 1870 upon its readmission to the United States." *See Compl. at ¶ 1.1.* As already noted, such an underlying theory—that the Readmission Act placed conditions upon the State's so-called re-entry to the United States—is incorrect as a matter of law. *See State of Texas v. White*, 7 Wall. 700, 74 U.S. 700; *Butler v. Thompson*, 97 F. Supp. 17, 20 (E.D. Va.), *aff'd*, 341 U.S. 937 (1951). Yet even if *Texas v. White* had not been decided, and even if there was a necessity for readmission into the United States, that issue, too, of course would present a classic political question. Similarly, the most that could be said about the Readmission Act is that it attempted to place a condition on Mississippi's re-entry to representation in Congress. *See* 16 Stat. 67 (1870). As discussed, that matter is in the domain of Congress alone.

But the Reconstruction Act, and the "condition" to Mississippi's representation in Congress, was from the very beginning inextricably connected with the wartime and post-war efforts of the political branches to prosecute the military and political aspects of the Civil War and to conclude a peace that would be lasting.[36] The commitment of such issues to the political branches is clear, as is the record of those branches managing such issues.

In fact, even historical challenges to the political arrangements that ended the Civil War chapter of American history were considered to be political questions. That is, the Supreme Court long ago held that courts should not interject themselves into the Civil War-era efforts of the political branches to bring the war to an end and preserve the Union. *See Georgia v. Stanton,* 73 U.S. (6 Wall.) 50, 54-55, 61-62 (1867) (refusing to consider challenge to the Reconstruction Acts of 1867 because it involved a non-justiciable political question); *Mississippi v. Johnson,* 71 U.S. (4 Wall.) 475, 499-501 (1866) (refusing to enjoin the President from enforcing Reconstruction Acts); *Mississippi v. Stanton*, 154 U.S. 554, 554 (1868). In short, even if the Readmission Act continues to have some force and effect, the enforcement resides in the domain of Congress.

    *(ii)*    *The lack of judicially discoverable or manageable standards for resolving this issue.*

*Baker* also requires dismissal for the independent reason that there are no judicially discoverable and/or manageable standards for resolution of the SPLC's claim. Among other reasons, the historical issues raised here involve too broad a span of conduct over too broad an expanse of time to be susceptible to any manageable judicial standards for resolution. Indeed, the claim is rife with uncertainties that preclude adjudication on a blank slate without any framework.[37]

---

[36] *E.g., Texas v. White*, 74 U.S. 700, 727, 19 L. Ed. 227 (1868) ("These new relations imposed new duties upon the United States. The first was that of suppressing the rebellion. The next was that of re-establishing the broken relations of the State with the Union …The authority for the performance of the first had been found in the power to suppress insurrection and carry on war; for the performance of the second, authority was derived from the obligation of the United States to guarantee to every State in the Union a republican form of government.").

[37] *E.g., Spectrum Stores, Inc. v. Citgo Petroleum Corp.,* 632 F.3d 938, 952 (5th Cir. 2011) ("[W]here there is an 'utter absence of statutory, administrative or case law' available to guide our decision, we disfavor resolution on the merits."); *Lane v. Halliburton*, 529 F.3d 548, 562 (5th Cir. 2008).

First, and as discussed, the Act relied upon by the SPLC set forth a condition to Mississippi's readmission to representation in Congress after the Civil War. Even if the Act could be said to have some force and effect, and even if Mississippi is somehow violating it, there are certainly no standards for resolving the violation alleged or the relief for the supposed violation. In other words, there are no judicially discoverable or manageable standards for determining whether Mississippi should no longer have representatives seated in Congress, or whether Mississippi should have some form of decreased representation.[38] And, of course, Mississippi has continued to be admitted to representation in Congress for nearly 150 years after the Readmission Act, 127 years after the 1890 amendments to the State Constitution, 83 years after the 1934 amendments, and 57 years after the 1960 amendments.[39]

Second, there is an additional layer that precludes the obtainability of judicially discoverable or manageable standards for resolving this issue. For Mississippi to purportedly have violated the Readmission Act, under the SPLC's theory, it would have to be determined that the amendments to the State Constitution have deprived citizens or a class of citizens the educational "rights and privileges" that were provided for by the Constitution of 1868.

The pertinent language of the 1868 Constitution read as follows: "it shall be the duty of the Legislature *to encourage*, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural *improvement*, by establishing a *uniform system* of free public schools, by taxation *or otherwise*[.]" *See* 1868 MISS. CONST. art. 8 § 1 (emphasis supplied). The 1868 Constitution did not

---

[38] *See Butler*, 97. F. Supp. at 20 ("Such condition, if it be such, might well be considered as waived by Congress in view of the fact that Virginia has continued to be admitted to representation in Congress for a period of nearly half a century after the adoption of the poll tax requirement, and with this increasing representation in accordance with the increase in population.").

[39] *See Compl. at ¶ 5.26* ("The 1890 Constitution was the first time the State violated the Readmission Act."); *¶ 5.28* (the amendments to the constitution in 1934 "was the second time Mississippi violated the Readmission Act"); *¶ 5.37* ("The 1960 amendment to Section 201 was the third time the State violated the Readmission Act.").

mandate "uniform schools"—instead, it imposed a duty on the Legislature to "encourage" and "promot[e]" "improvement" and establish a "uniform *system*" by "taxation or otherwise." *Id.*

Notably, the 1868 Constitution also did not mandate any particular level of funding for schools—nor did it micromanage the Legislature, or the individual schools. The standards in the Constitution were quite vague and amorphous and, more importantly, the Constitution did not command any specific educational outcomes or results (nor could it). Still more, the 1868 Constitution did not even direct integration of the new public school system. *E.g.*, Edward Mays, *History of Education in Mississippi* 289 (1899) (noting that, even under the provisions of the 1868 Constitution, "nearly all of the schools . . . ha[d] branches for colored children, always in separate buildings[.]"). And the establishment of a "uniform system" was only guaranteed for "***four months*** in each year." *See* 1868 MISS. CONST. art. 8 § 5 (emphasis supplied).

With this, there are no judicially discoverable or manageable standards for comparing the "rights and privileges" provided under the 1868 Constitution for four months, on the heels of the Civil War, with the rights and privileges provided today, 150 years removed from the War, that include roughly nine months of free public education to all school-aged children in the State.[40]

Third, there are other reasons why there is a lack of judicially discoverable or manageable standards for resolving this issue. To point out just a few examples: the relevant events took place at least as far back as 1868 and 1870; the Act relied upon only set forth a "condition" to Mississippi's readmission to representation in Congress—underscoring that the purported available relief is political, not judicial; the relief actually requested, for the federal judiciary to freeze the State's constitutional provision as it was written 150 years ago, is constitutionally unthinkable and not contemplated by the Readmission Act or any court in the last 150 years;[41] even after the Constitution

---

[40] This issue is also discussed *infra* in Section F, and those arguments are incorporated herein.

[41] *E.g., Sproule v. Fredericks*, 69 Miss. 898, 11 So. 472, 474-75 (1892) (addressing an allegation that the changes to the Mississippi Constitution violated the Readmission Act, and concluding that "when the state was

was amended, the Supreme Court decided cases such as *Plessy v. Ferguson*, 163 U.S. 537 (1896) on the federal level; Mississippi's Constitution has evolved numerous times since 1868, and its 1890 provisions were upheld in *Williams v. Mississippi*, 170 U.S. 213 (1898).

As the Supreme Court highlighted in *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973), after determining that education "is not among the rights" afforded protection under the federal constitution: "On even the most basic questions in this area the scholars and educational experts are divided . . .[and that] the judiciary is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions[.]" *See id.*

Plainly put, there are no judicially discoverable or manageable standards for resolving the issues raised by the SPLC. Moreover, the invitation for this Court to wade into the political, military, economic, moral, and social considerations grappled with by the political branches approximately 150 years ago is patently unworkable and, in the end, confirms the wisdom of the well-settled "political question."[42]

---

readmitted to her place in the federal Union, she was restored to all her rights, dignities, and powers. She was admitted as the equal of any other state[.]"); *Butler,* 97 F. Supp. at 20–21 ("All states, after their admission into the Federal Union, stand upon equal footing and the constitutional duty of guaranteeing each state a republican form of government gives Congress no power in admitting a state to impose restriction which would operate to deprive that state of equality with other states."); *Coyle v. Smith*, 221 U.S. 559 (1911); *Permoli v. Municipality of New Orleans*, 44 U.S. 589 (1845); *Coyle v. Smith*, 28 Okla. 121, 113 P. 944, 951, *aff'd,* 221 U.S. 559 (1911) (discussing *Permoli* and noting that "the court held that the Ordinance ceased to be in force when Louisiana became a state"); James Garner, *Reconstruction in Mississippi* 273 (1902) ("Congress, in assuming the power to deprive the state of the right to change its constitution [ ] in certain particulars, arrogated to itself sovereign powers, and had it been able to enforce its commands, the principle of the Federal system would have been destroyed[.]); James Q. Dealey, *Growth of American State Constitutions* 70 (photo. reprint 1972) (1915) (discussing the acts for readmission to representation in Congress, and reasoning that "once the state becomes a full fledged member of the Union, such conditions and compacts may remain as moral obligations but would hardly be enforcible [sic] at law.").

[42] There are many avenues for early dismissal of the claim asserted by the SPLC. In addition to the avenues discussed herein, there also are concerns related to the constitutionality of the Acts.  The Supreme Court considered these issues to be political questions when they were raised in the 1800s. *E.g., Georgia v. Stanton,* 73 U.S. (6 Wall.) 50, 54-55, 61-62 (1867); *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499-501 (1866); *Mississippi v. Stanton*, 154 U.S. 554 (1868).  On another occasion, the Court did not reach the issue because Congress suspended the writ of habeas corpus. *See Ex Parte McCardle*, 74 U.S. 506 (1869). This Court need not delve into the additional questions

(iii)     *The adjudication of the claim would also implicate the remaining Baker factors.*

The last four *Baker* factors also provide independent bases to dismiss the SPLC's dated claim. To allow the SPLC's claim would be to ignore 150 years' worth of developments and require wading into political decisions that ended the Civil War, as well as wading into a myriad of other political decisions that galvanized congressional reconstruction of the former confederate states. These policy determinations are, and always have been, for the political branches.

What is more is that congressional reconstruction and the "authority to provide for the restoration of State governments" has been said to be an exercise made under the authority of the Guarantee Clause. *E.g., Texas v. White*, 74 U.S. 700, 701 (1868); *see also id.* at 701 ("But, the power to carry into effect the clause of guaranty is primarily a legislative power, and resides in Congress[.]"). Yet "the guarantee clause [also] present[s] [a] nonjusticiable political question[.]" *Flores v. Bedard*, 4 F.3d 990 (5th Cir. 1993); *Luther v. Borden,* 48 U.S. (7 How.) 1 (1849). The fact that the Guarantee Clause additionally presents a political question solidifies the political nature of the Readmission Act.

Moreover, the resolution of the SPLC's claim would necessarily tread on the political branches of government. During and after the bloodiest war in this Country's history, these branches grappled with ending the war successfully and reconstructing the Union. The congressional reconstruction efforts included placing an identical condition to representation in Congress on three

---

concerning whether the Acts were/are unconstitutional. Indeed, delving into such questions would require Federal Rule 5.1 notice based on the presence of a constitutional question/challenge. Because there so many other paths to dismissal, grappling with the additional aspects of the (un)constitutionality of the Acts is not necessary.

However, should the Court decline to dismiss the case under one or more of the six avenues presented in the instant motion to dismiss, multiple constitutional questions, at that point, could and would be raised. These constitutional questions include (i) the principle of equal sovereignty, including as applied recently in *Shelby Cty. v. Holder*, 133 S. Ct. 2612 (2013), and (ii) the Tenth Amendment and the anti-commandeering doctrine. In addition, there are other questions related to aspects of the constitutionality of the Acts. For example, commentators have noted: "Article V does not give Congress the power to deny a state representation in Congress *without its consent*. In fact, it prohibits such conduct. Nor does Article V give Congress the power to abolish a state government when it refuses to ratify a proposed amendment. And certainly, Article V does not allow Congress to deny a state its representation until it ratifies a desired amendment." *See* Douglas Bryant, *Unorthodox and Paradox: Revisiting the Ratification of the Fourteenth Amendment*, 53 Ala. L. Rev. 555, 578 (2002); *see also, e.g.,* Forrest McDonald, *Was the Fourteenth Amendment Constitutionally Adopted*? 1 Ga. J.S. Legal History 1, 1 (1991) (the Reconstruction/Readmission Acts "flew in the face of the Constitution in a large variety of ways.").

states, Mississippi, Texas, and Virginia. As it always has been, that issue presents simply a nonjusticiable political question.

**B.     Mississippi's Readmission Act is Not Privately Enforceable.**

Additionally, and alternatively, the Readmission Act does not provide for a privately enforceable federal right. While Plaintiffs assert their claim under 42 U.S.C. § 1983, Section 1983 "provides redress only for a plaintiff who asserts a 'violation of a federal *right*, not merely a violation of federal *law*.'" *E.g., Boyd v. Town of Ransom Canyon, Tex.*, 547 F. Supp. 2d 618, 625 (N.D. Tex. 2008) (quoting *Blessing v. Freestone,* 520 U.S. 329, 340 (1997)) (emphasis in original).

In other words, because federal rights enforceable under § 1983 are creatures of federal substantive law, Congress must create them. *Johnson v. City of Detroit*, 319 F. Supp. 2d 756, 774 (E.D. Mich. 2004), *aff'd*, 446 F.3d 614 (6th Cir. 2006); *Gonzaga v. Doe*, 536 U.S. 273, 283 (2002) (Section 1983 provides a means of enforcing federal *rights*, not vague or diffuse interests); *Planned Parenthood v. Gee*, 837 F.3d 477, 491–92 (5th Cir. 2016) (considering "(1) whether Congress intended for the provision to benefit the plaintiff; (2) whether the plaintiff can show that the right in question is not so 'vague and amorphous' that its enforcement would 'strain judicial competence'; and (3) whether the statute unambiguously imposes a binding obligation on the states."").

In *Gonzaga,* a decision that held that the Family Educational Rights and Privacy Act was not privately enforceable through § 1983, the Court noted that the initial inquiry is "whether Congress *intended to create a federal right."* 536 U.S. at 283 (emphasis supplied); *see also Blessing,* 520 U.S. at 341. As the Third Circuit observed, "the Supreme Court [has] refined its analysis to focus directly on Congress' intent to create enforceable rights and to confine its holdings to the limits of that intent." *S. Camden Citizens in Action v. New Jersey Dep't of Envtl. Prot.*, 274 F.3d 771, 784 (3d Cir. 2001); *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001).

The statute must contain unambiguous "rights-creating language." *E.g., Nursing v. Norwood*, No. 1:16-CV-10255, 2017 WL 2461544, at *6 (N.D. Ill. June 7, 2017). "[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit[.]" *Gonzaga*, 536 U.S. at 286; *Sharber v. City of Louisville*, 2017 WL 2221711, at *5 (W.D. Ky. May 19, 2017).

Here, the Readmission Act is void of any rights creating language, and there is otherwise no indication of any intent that Congress was creating new "individual rights." As the Court explained in *Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1387–88 (2015), "[o]ur precedents establish that a private right of action under federal law is not created by mere implication, but must be 'unambiguously conferred,' *Gonzaga,* 536 U.S., at 283, 122 S.Ct. 2268."

As discussed, the Readmission Act purported to place a condition on the seating of representatives in Congress after the Civil War. Accordingly, and even assuming *arguendo* such a condition is valid and somehow still binding, to purportedly "violate" the condition would result in Mississippi no longer having a representative in Congress—or somehow being forced to have decreased representation in Congress. That is not a right to be enforced by any individual plaintiff— it is committed to a coordinate political branch. It is a matter "peculiarly within the domain of the Congress alone." *Butler*, 97 F. Supp. at 20; *Merrit*, 259 Ark. at 389 ("enforcement in the exclusive domain of Congress").

In addition, and as it relates to the supposed right asserted by the SPLC—that is, the supposed right to have a federal court force a sovereign state to revert back to its constitution as written in 1868—is so vague and amorphous (and, of course, improper) that it would be judicially administrable.[43] *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015) (discussing

---

[43] The claim additionally is so vague and amorphous so as to be judicially administrable for all of the reasons discussed in context of the political question and the discussion of the merits in Section F of this brief.

the "complexity associated with enforcing § 30(A)").[44]   Accordingly, there is simply no privately enforceable right.

**C.   Plaintiffs Do Not Have Standing.**

Standing is a threshold requirement for invoking federal court jurisdiction. *Binno v. American Bar Assoc.*, 826 F.3d 338, 344 (6th Cir. 2016). For standing to exist, a plaintiff must show: (1) a "concrete, particularized, and actual or imminent" injury; (2) that is "fairly traceable" to the defendant's alleged conduct; and (3) that the court could redress by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561 (1992). The SPLC's complaint fails all three.

**Injury.** The injury necessary to invoke constitutional standing must be concrete/particularized and palpable, not merely abstract. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). Generalized grievances "against allegedly illegal governmental conduct" are insufficient. *U.S. v. Hayes*, 515 U.S. 737, 743 (1995).  The Plaintiffs' complaint here fails that test.

The gravamen of the complaint is that some local school districts are rated by the Mississippi Department of Education as lower than others; that "Mississippi has one of the most inequitable and poorly resourced, poorly performing school systems in the nation"; and that these grievances "affect[ ] children statewide."[45]   The complaint recognizes that the schools attended by the Plaintiffs' minor children contain students from a variety of racial and ethnic backgrounds.[46] The chief grievance of the Plaintiffs is that they do not like the delivery of education in Mississippi in general. This, however, amounts only to a grievance against the State of Mississippi's education system in general and in its entirety, which is insufficient. *See Hayes*, 515 U.S. at 743.

---

[44] For the reasons discussed, the Act also does not unambiguously impose a binding obligation on states.

[45] *See* Pl. Compl. at ¶¶ *2.13-3.4*, 5.75.

[46] The complaint does not contend that the State is treating minority children differently in terms of the access to public schools in the State in general. Of course, in Mississippi, the general rule is that a minor child attends a school "in the school district of his residence[.]" Miss. Code Ann. § 37-15-29.

In the same vein, this generalized grievance is alleged to have stemmed from generalized changes to the State's Constitution over approximately the last 150 years. While Plaintiffs seek to return to the Constitution of 1868, that Constitution provided only for a "uniform system" of schools for "four months" out of the entire year. *See* 1868 MISS. CONST. art. 8. The 1868 Constitution did not mandate uniform schools; it did not mandate any particular level of funding;[47] and it did not command particularized educational outcomes or results. In sum, then, Plaintiffs assert a generalized grievance tied to generalized changes to what was a generalized requirement from 150 years ago.

**Traceability**. Regarding traceability, standing is more difficult to establish when the injury is indirect. *Parsons v DOJ*, 801 F.3d 701, 713 (6th Cir. 2015). Courts cannot confer standing where the causal link is tenuous, and where speculative inferences are necessary to "connect the[ ] injury to the challenged action[.]" *Simon v. E. Ky. Welfare Rights,* 426 U.S. 26, 45 (1976); *Linda R.S. v. Richard D.,* 410 U.S. 614, 618 (1973); *Shakman v. Dunne,* 829 F.2d 1387, 1396-97 (7th Cir. 1987).

Here, Plaintiffs cannot show that the purported "inferior" education they receive is "fairly traceable" to changes made to the State Constitution from 1868, or otherwise to the State Defendants' conduct. *Lujan*, 504 U.S. at 560-61. The complaint also ignores the many other factors that contribute to literacy and education—such as resources, parental involvement, medical problems, intellectual limitations, domestic violence, trauma, and other numerous influences.[48] *Cf. San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 24, 93 S. Ct. 1278, 1291–92, 36 L. Ed. 2d 16 (1973) ("Nor indeed, in view of ***the infinite variables affecting the educational process***, can any system assure equal quality

---

[47] Indeed, the education in 1868 was funded, in part, by a poll tax. *See* MISS. CONST. of 1868 art. 8, § 7.

[48] What is more, the State of Mississippi provides funding and sets broad guidelines within which local school districts operate. But local districts—administrators, parents, and educators—have some level of discretion to manage funds, hire and allocate teachers, choose textbooks, assign students to buildings, select and deliver curriculum, and achieve Mississippi's broad guidelines. *See Ariz. Christian Sch. Tuition Org. v. Winn*, 562 U.S. 125, 143 (2011); *Rodriguez*, 411 U.S. at 42-43; *see, e.g.,* MISS. CODE ANN. §§ 37-57-1, 37-151-7.

of education except in the most relative sense.") (emphasis supplied). In the face of these many forces,[49] Plaintiffs have not alleged facts that would support a causal link.

**Redressability**. Regarding redressability, an injury is only redressable if a court order can provide "substantial and meaningful relief" to the plaintiff. *E.g., Parsons*, 801 F.3d at 715. There are a host of redressability concerns with the generalized injury claimed in the complaint.

First, the purported "relief" contemplated by Mississippi's Readmission Act relates to Mississippi's representation in Congress. As discussed, the Readmission Act set up a condition governing the seating of representatives in Congress after the Civil War. The only purported relief (if any at all) available, then, is one peculiarly within the domain of Congress.

Second, to demonstrate redressability, a plaintiff must show that "a favorable decision will relieve a discrete injury[.]" *Id.* Here, the complaint requests relief in the form of asking the federal judiciary to turn back the clock on the State's Constitution by 150 years. Yet the complaint offers (and only could offer) speculation that this proposed (and, again, improper) remedy would/could redress the alleged injury of "inferior" education. *See Lujan*, 504 U.S. 560–61.

Indeed, the proposed relief will not provide substantial and meaningful relief because it does not take into account the other socioeconomic, intellectual, and personal factors affecting literacy, education, and educational outcomes.[50] *See Parsons*, 801 F.3d at 715. In other words, even if Plaintiffs

---

[49] The instant federal complaint recognizes this point. Plaintiffs complain about how many of the teachers that teach their minor children are "in their first year of teaching," that some of the "teaching staff is inexperienced," and/or that there is a high rate of "teacher absenteeism" in their respective schools. *See Compl. at ¶¶ 5.52-5.54.* Plaintiffs also allege that they would like to place their children in after school "literacy program[s]" but those programs are "prohibitively expensive." *See Compl. at ¶ 5.55.*

[50] As the Supreme Court noted in *Rodriguez*, 411 U.S. at 42-43, 58-59:

On even the most basic questions in this area the scholars and educational experts are divided. Indeed, one of the major sources of controversy concerns the extent to which there is a demonstrable correlation between educational expenditures and the quality of education—an assumed correlation underlying virtually every legal conclusion drawn by the District Court in this case. Related to the questioned relationship between cost and quality is the equally unsettled controversy as to the proper goals of a system of public education. And the question regarding the most effective relationship between state boards of education and local school boards, in terms of their respective responsibilities and degrees of control, is now undergoing searching re-examination. The ultimate wisdom as to these and related problems of education is not likely to be divined for all time even by the scholars who now so earnestly debate the issues. In such circumstances, the judiciary

receive a favorable decision, it would be pure guesswork as to whether any purported injuries would be relieved by reverting back to the State's Constitution as written 150 years ago—a constitution that provided for a limited education for four months that was funded, in part, by a poll tax, did not direct integration of the public schools, and came on the heels of the Civil War.

**Prudential limitations and generalized grievances**. The federal courts are not "publicly funded forums for the ventilation of public grievances." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982). Indeed, federal courts refrain from "adjudicating abstract questions of wide public significance which amount to 'generalized grievances,' pervasively shared and most appropriately addressed in the representative branches." *Id.* at 475. But, here, Plaintiffs are trying to use the federal courts for precisely that purpose: to "ventilate" a "generalized grievance" over an entire chapter in our Nation's history as it relates to Mississippi's system of education. This is improper, and triggers the prudential limitations on standing.

**D.      The Claim Runs Afoul of the Eleventh Amendment and Principles of Federalism.**

The Eleventh Amendment, and ingrained principles of federalism, provides the next avenue for dismissal of the SPLC's claim. The Eleventh Amendment incorporates common law principles of sovereign immunity and confirms that the judicial power established by Article III does not confer

---

is well advised to refrain from imposing on the States inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing conditions.
…
The complexity of these problems is demonstrated by the lack of consensus with respect to whether it may be said with any assurance that the poor, the racial minorities, or the children in over-burdened core-city school districts would be benefited by abrogation of traditional modes of financing education . . . Additionally, several research projects have concluded that any financing alternative designed to achieve a greater equality of expenditures is likely to lead to higher taxation and lower educational expenditures in the major urban centers, a result that would exacerbate rather than ameliorate existing conditions in those areas.
…
And certainly innovative thinking as to public education, its methods, and its funding is necessary to assure both a higher level of quality and greater uniformity of opportunity. These matters merit the continued attention of the scholars who already have contributed much by their challenges. But the ultimate solutions must come from the lawmakers and from the democratic pressures of those who elect them.

jurisdiction over suits against non-consenting states. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996). In addition, suits against state officials which ultimately operate against the State are barred by the Eleventh Amendment. *Pennhurst v. Halderman*, 465 U.S. 89, 101 (1984).

Along the same lines, state official Eleventh Amendment immunity is subject only to the *Ex Parte Young* exception for suits against state officials for prospective relief from alleged federal law violations. *See McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407, 412 (5th Cir. 2004) (citing *Ex parte Young*, 209 U.S. 123 (1908)). The *Ex Parte Young* exception does not apply to claims for retroactive declaratory relief, which are barred by the Eleventh Amendment since they would resolve disputes over the past conduct or past acts as opposed to ongoing federal law violations. *E.g.*, *Green v. Mansour*, 474 U.S. 64, 73 (1985).[51] Moreover, *Ex Parte Young* does not extend to state law claims against state officials. *Pennhurst*, 465 U.S. at 106.

Here, the SPLC's request for declaratory relief runs afoul of these basic federalism principles by seeking relief directed at the State's past conduct in adopting a new constitution, as far back as 1890. The SPLC also asks this Court to make a determination that the current Constitution is in conflict with the "school rights and privileges" secured by the 1868 Constitution which, in turn, the SPLC argues violates the Readmission Act. This is contrary to the prohibitions of *Pennhurst*.[52]

Similar reasoning, in fact, previously led this Court to determine that an attempt to bring a claim under the Readmission Act was barred by the Eleventh Amendment. *See A-1 By D-2 v. Molpus*, 906 F. Supp. 375 (S.D. Miss. 1995). In that case, the plaintiffs contended that the State violated the

---

[51] *See also Papasan v. Allain*, 478 U.S. 265, 277-78, 282 (1986); *Black Farmers & Agriculturists Ass'n, Inc. v. Hood*, 2014 WL 935147, at *5 (S.D. Miss. Mar. 10, 2014).

[52] Section 1983 does not abrogate Eleventh Amendment immunity, and the State of Mississippi has not waived it. *See Hines v. Miss. Dep't of Corr.*, 239 F.3d 366 (5th Cir. 2000); MISS. CODE ANN. § 11-46-5.

same provision of the Act at issue here, and unlawfully abrogated the State's obligations under the 1868 Constitution to provide a uniform system of free public education.[53]

In short shrift, this Court dismissed the plaintiffs' claims, in part because they were barred by the Eleventh Amendment. *Id.* at 378.  In so holding, the court noted that *Ex Parte Young* "constitutes a significant exception to the restrictions of the Eleventh Amendment, but the rule rather than the exception applies in the instant case." *Id.* n.9. This Court should similarly hold that the relief sought by the SPLC in this case is barred by the Eleventh Amendment.

**E.      The SPLC's Claim is Barred by the Applicable Statute of Limitations.**

The SPLC's complaint alleges violations to the Readmission Act that date back to 1890.[54] In Mississippi, § 1983 suits are governed by the general statute of limitations, which requires the commencement of an action within three years of the action's accrual. *See James v. Sadler,* 909 F.2d 834, 836 (5th Cir. 1990). In *Molpus*, 906 F. Supp. at 378-79, the Court also dismissed the plaintiffs' Readmission Act claim because it was barred by the statute of limitations.

The Court found that, while the "plaintiffs claim that the State of Mississippi violated federal law when the Mississippi Constitution of 1890 was adopted[,]…The actions of the defendants…occurred over one hundred years prior to the filing of this lawsuit. This court can find nothing to support a contention that any claims based upon the State of Mississippi's adoption of the Constitution of 1890 have survived to the present day." *Id.* Dismissal of the SPLC's claim also is required on this ground.

---

[53] In the *Molpus* case, two minor children brought an action against the Secretary of State, Superintendent of Education, and Attorney General, in their official capacities.

[54] *See Compl. at ¶ 5.26* ("The 1890 Constitution was the first time the State violated the Readmission Act."); *¶ 5.28* (amendments to the constitution in 1934 "was the second time Mississippi violated the Readmission Act"); *¶ 5.37* ("The 1960 amendment to Section 201 was the third time the State violated the Readmission Act.").

**F.     The SPLC's Allegations Otherwise Fail on the Merits.**

The SPLC contends that the substantive issue before the Court is a "pure question of law." *See Compl. at ¶ 6.11.* While this Court need not (and should not) reach the underlying merits of the claim, the allegations are meritless in any event. There are a host of reasons why this is so. For instance, the purported educational "rights" provided for by the Constitution of 1868 only guaranteed a right to public education for *four months* out of the year. In addition, the Constitution of 1868 did not direct integration of the public school system,[55] and education was funded, in part, by a poll tax.[56]

In addition, while the Plaintiffs levy a generalized grievance about the overall experience level of the teachers that teach their minor children,[57] under the 1868 Constitution:

> Examinations for teachers' licenses were not such as to ascertain the real fitness of applicants or conduct to a high standard of scholarship. They were asked a few oral questions by the superintendent in his private office, and the certificate was granted as a matter of course.

*See* Garner, *Reconstruction in Mississippi* 358-59. Plaintiffs also advance grievances related to "playgrounds," the lack of "iPads," and "expensive" "afterschool literacy program[s]."[58] Yet none of this was contemplated by—let alone guaranteed by—a provision in the Constitution of 1868.[59]

Bearing these points in mind, at least two things are clear. First, and at a minimum, the relief the SPLC seeks—turning back the clock by 150 years on the State's Constitution—does not provide a suitable (or otherwise) barometer for measuring the educational benefits, or the "school rights and privileges," received then and received now. That is, even aside from the host of other legal issues, there is no way to measure, nor a suitable comparison between, the educational rights provided for

---

[55] *E.g.*, Mays, *History of Education in Mississippi* 289 (1899) (noting that "nearly all of the schools . . . ha[d] branches for colored children, always in separate buildings[.]").

[56] *See* MISS. CONST. of 1868 art. 8, § 7.

[57] S*ee* Compl. at ¶¶ 5.52-5.54 (complaining that many teachers are "in their first year of teaching").

[58] *See* Compl. at ¶ 5.53-5.55.

[59] For example, "[a]ll schools were divided into two grades. In those of the first, orthography, reading, penmanship, arthimetic, grammar, geography, history of the United States, and composition were the prescribed studies…In those of the second were prescribed orthography, reading, penmanship, and the rudiments of arithmetic, grammar, and geography[.]" *See* Mays, *History of Education in Mississippi* 284 (1899).

four months in 1868 after this Country's bloodiest war and under a constitutional provision that did not direct integration of the school system, with the educational benefits provided today, 150 years removed from the War, that include approximately nine months of public education for all school-aged children, with vast advances in technology, opportunities, and learning.

Second, even if there could be a comparison, it is beyond cavil that the "school rights and privileges" as they are today have not fallen beneath any purported and indeterminate floor that was set in 1868 on the heels of the utter devastation caused by the Civil War.  That is, even if the Readmission Act was valid, and is enforceable as construed by the SPLC (which it is not), the Mississippi Constitution has not been so amended to deprive any citizen or class of citizens the educational "rights and privileges" as they existed in 1868—especially as amorphous and limited as those purported rights were at that time. The SPLC's complaint thus also fails on this additional front.

## V.  CONCLUSION

While there is no dispute that all Mississippi schools can improve—and that educational concerns and improving student learning is of unmeasurable significance to the State—the SPLC's lawsuit does nothing to advance the ball in this regard, and the requested relief falls out of step with core principles of federalism, presents a nonjusticiable question, and is simply improper. The complaint must be dismissed under Federal Rules 12(b)(1) and/or 12(b)(6).

THIS, the 24th day of July, 2017.

Respectfully submitted,

By:  **JIM HOOD, ATTORNEY GENERAL OF THE
      STATE OF MISSISSIPPI**

By:  */s/Krissy C. Nobile*
     Krissy Casey Nobile, MB #103577
     STATE OF MISSISSIPPI
     OFFICE OF THE ATTORNEY GENERAL
     Post Office Box 220
     Jackson, MS 39205
     Phone: 601-359-3680
     Email: knobi@ago.state.ms.us

     *Counsel for State Defendants Gov. Phil Bryant, Speaker of
     the Mississippi House of Representatives Phillip Gunn,
     Lieutenant Gov. Tate Reeves, Secretary of State Delbert
     Hosemann, State Superintendent of Education Carey
     Wright, Chair of the Mississippi State Board of Education
     Rosemary Aultman, Mississippi State Board of Education
     Member Jason Dean, Mississippi State Board of Education
     Member Buddy Bailey, Mississippi State Board of
     Education Member Kami Bumgarner, Mississippi State
     Board of Education Member Karen Elam, Mississippi State
     Board of Education Member Johnny Franklin, Mississippi
     State Board of Education Member Williams Harold Jones,
     Mississippi State Board of Education Member John Kelly,
     and Mississippi State Board of Education Member Charles
     McClelland.*

## **CERTIFICATE OF SERVICE**

I, KRISSY C. NOBILE, hereby certify that I electronically filed the above and foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the all counsel of record.

This the 24th day of July, 2017.

/s/ Krissy C. Nobile
KRISSY C. NOBILE