**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**INDIGO WILLIAMS, *ET AL.***                                                     **PLAINTIFFS**

**V.**                                                              **CAUSE NO. 3:17-cv-404-WHB-LRA**

**PHIL BRYANT, *ET AL.***                                                       **DEFENDANTS**

---

**MEMORANDUM IN SUPPORT OF**
**RESPONSE TO MOTION TO DISMISS**

---

Despite its unusual context, this case presents a familiar claim: a request for declaratory relief to resolve a conflict between state law and federal law. When such a conflict exists, state law must yield.[1]

In the years following the Civil War, Congress sought to chart a new course for the South. Crucial to that new course, Congress recognized, was the right of Mississippi's new black citizens to a free and equal system of public education. That right would safeguard the war's hard-fought gains and ultimately be vital to securing a lasting peace. Congress understood that the key to establishing genuinely republican governments in the South was the political empowerment of the newly freed slaves. And the Freedmen's exercise of full citizenship (including the right to vote) depended on universal access to public education.

To further these goals, Congress placed conditions on Mississippi's readmission to full statehood after the Civil War. Pursuant to its authority under the Constitution's Guarantee Clause (among other provisions), Congress required "[t]hat the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the

---

[1] For the sake of simplicity, this Memorandum refers to the Defendants collectively as "the State." The State's repeated references to the Plaintiffs as "SPLC" are inaccurate and misleading. The Plaintiffs in this case are Indigo Williams, Dorothy Haymer, Precious Hughes, and Sarde Graham.

school rights and privileges secured" in Mississippi's 1868 Constitution.[2] Although nothing prevented Mississippi from *expanding* its citizens' rights, Congress plainly mandated that Mississippi "never" *weaken* its constitutionally provided education rights.

Yet Mississippi has done just that. The Mississippi Constitution's education clause now provides fewer rights than were provided in the Constitution of 1868. This retrogression has resulted in a woefully disuniform school system where a child's likelihood of receiving a quality education is determined by whether her school is mostly white or mostly black. Such retrogression blatantly violates the Readmission Act.

Rather than defend this system, the State conjures a variety of arguments for why this Court supposedly lacks the power to do anything about it. The State first argues that the political question doctrine bars judicial review of its compliance with the Readmission Act. But the political question doctrine categorically does not apply to statutory claims because the Constitution commits the construction of federal statutes to the judiciary – and the judiciary alone. In any event, the Plaintiffs' claims present the type of legal issue that courts address every day: the Plaintiffs allege that the current version of the Mississippi Constitution violates the Readmission Act because it secures fewer rights than the 1868 Mississippi Constitution. All the Court must do to decide the claim is to compare the current constitution to the 1868 version and determine whether Mississippi is now "depriv[ing]" its school children of what they previously had. Interpreting statutes and constitutions is a familiar judicial task.

The State's second argument, that the Readmission Act is not privately enforceable, is equally meritless. The test for whether a statute is privately enforceable requires a close examination of the statute's text. But the State does not address the Readmission Act's text at all.

---

[2] 16 Stat. 67 (1870).

That is likely because the statute speaks in quintessential rights-conferring language: the Act expressly protects the "school rights and privileges" of "any citizen or class of citizens," and is particularly intended to benefit African Americans like the Plaintiffs here.

The State's remaining arguments fare no better. The Plaintiffs have standing to assert that they are being harmed by the State's provision of a disuniform system of education. They attend inferior, mostly black schools that place them at a competitive disadvantage to similarly-situated students in mostly white schools. This injury would be remedied by a declaratory judgment affirming the State's obligation to comply with the Readmission Act and to provide a uniform system of public schools. The Eleventh Amendment does not require a different result, because the Plaintiffs are seeking only prospective relief from an ongoing violation of federal law. Lastly, the Plaintiffs' claims are timely, not least because they could not have brought suit until their children were eligible to attend school.

In addition to these legal flaws, each of the State's arguments stems from two mistaken premises: (1) that the Readmission Act essentially expired after Reconstruction, and (2) that the Plaintiffs are somehow seeking to unseat Mississippi's congressional representatives. The State apparently believes that Congress' purpose in passing the Readmission Act was simply to end the war and to restore Mississippi to representation, and that once those goals were accomplished, the Readmission Act lost all force and effect. The State is wrong. One of Congress' key purposes was to secure a *lasting* peace by ensuring that Mississippians – *all* Mississippians – could and would be educated. Education, Congress determined, would always be necessary to secure a republican form of government in Mississippi. That guarantee obviously did not expire with the Reconstruction era, but continues in full force today. The State's argument that the Plaintiffs' claims are not cognizable because they implicate Reconstruction-era

concerns is meritless – the Reconstruction Congress determined that Mississippi should "never" be allowed to retrogress. Never means never.

The State's repeated claim that the Plaintiffs seek to unseat Mississippi's congressional representatives is equally inaccurate. The Plaintiffs seek no such thing. That is not the relief requested in the Complaint, nor is it the relief contemplated by Congress. Indeed, the unseating of Mississippi's representatives would not remedy the injury caused by the State. The only appropriate remedy is to declare the State in violation of the Readmission Act's education guarantee, which is precisely what the Plaintiffs seek. The State's motion to dismiss should therefore be denied.

## BACKGROUND

### I.    THE ROLE OF EDUCATION IN THE RECONSTRUCTION-ERA SOUTH.

The Civil War's aftermath presented Congress with a dilemma unlike any seen before or since. Amid the echoes of a conflict that had cost some 750,000 lives[3] – the most of any war in American history – Congress sought a peace that could be reached only by returning all states fully to the brotherhood of the Union. But Congress knew well that, without meaningful change to Southern governance, America could repeat both the social unrest that preceded the war and the bloodshed of the war itself.

Congress determined that meaningful transformation in the South would be impossible unless states better educated their citizens, including the newly freed slaves. Senator Charles Sumner, for example, remarked in March 1867:

> In a republic Education is indispensable. A republic without education is like the creature of imagination, a human being without a soul, living and moving blindly,

---

[3] Guy Gugliotta, "New Estimate Raises Civil War Death Toll," *New York Times* (Apr. 2, 2012), available at http://www.nytimes.com/2012/04/03/science/civil-war-toll-up-by-20-percent-in-new-estimate.html. (last viewed Sept. 15, 2017).

with no just sense of the present or future. It is a monster. Such have been the rebel States. . . . .

It is not too much to say that had these States been more enlightened they would never have rebelled. The Barbarism of Slavery would have shrunk into insignificance, without sufficient force to break forth in blood.[4]

Senator Sumner recounted pre-war census figures showing dramatically higher illiteracy rates in slave states than in free states.[5] "In this prevailing ignorance we may trace the rebellion," Senator Sumner said.[6] Senator Oliver Morton concurred, explaining that until newly freed slaves "are educated the political power will remain almost entirely in the hands of the present rebel-educated classes."[7] In the years before the war, *90 percent* of southern African Americans were illiterate.[8]

Senator George Edmunds similarly remarked in 1870 that Southern aristocrats had preserved their pre-war caste system through a lack of the broad public education available in free states. "We are bound, therefore, as it seems to me," to ensure "that equality, that course of education, that course of social progress which shall gradually and slowly, but surely, wipe out and destroy all notions of aristocracy and of caste that have existed there hitherto."[9]

---

[4] Cong. Globe, 40th Cong., 1st Sess. 167 (Mar. 16, 1867), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=078/llcg078.db&recNum=302 (last viewed Sept. 15, 2017). *See* Exhibit A to Response to Motion to Dismiss (Declaration of Professor Vernon Burton) at 2 ("Public education was an indispensable part of Congress's plan to raise newly freed African Americans into full citizenship."). *See also* Exhibit B to Response to Motion to Dismiss (*Curriculum Vitae* of Professor Vernon Burton). In its brief, the State relies on a lengthy historical narrative replete with factual inaccuracies. The Plaintiffs submit Prof. Burton's Declaration to rebut the State's misstatements of fact.

[5] Cong. Globe, 40th Cong., 1st Sess. 167 (Mar. 16, 1867), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=078/llcg078.db&recNum=302 (last viewed Sept. 15, 2017).

[6] *Id. See also* Burton Declaration at 8 ("Suffrage became the topic of the time, but integral to suffrage was education.").

[7] Cong. Globe, 40th Cong., 1st Sess. 168 (Mar. 16, 1867), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=078/llcg078.db&recNum=303 (last viewed Sept. 15, 2017).

[8] Derek W. Black, *The Constitutional Compromise to Guarantee Education* at 22 n.141, publication forthcoming in Stanford Law Review, available at https://ssrn.com/abstract=2982509 (last viewed Sept. 15, 2017).

[9] Cong. Globe, 41st Cong., 2nd Sess. 1333 (Feb. 16, 1870), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=090/llcg090.db&recNum=392 (last viewed Sept. 15, 2017).

Modern scholars also recognize that the Reconstruction-era Congress believed that a truly republican form of government could not exist unless all citizens had access to public education.[10] As one scholar put it: "[E]nsuring . . . that public education would be available to blacks[ ] can be seen as [an] effort[ ] to ensure that the political system was open to blacks, and that blacks would have sufficient education and understanding to effectively use their voting power."[11]

## II.     THE READMISSION ACT.

As a condition to being restored to their pre-war status, Congress required former Confederate states to adopt new constitutions providing republican forms of government.[12] After states met these and other requirements, Congress restored – through "readmission acts" – their congressional representation.

By January 1870, only three former Confederate states remained without congressional representation: Virginia, Mississippi, and Texas. Congress debated Virginia's readmission first, and it appeared poised to readmit Virginia with no fundamental conditions for reentry.[13] During the floor debate, however, the Senate received a report that Virginia's governor was urging his state's legislature to gut the new state constitution as soon as Congress readmitted her.[14] In response, the Senate amended the Virginia readmission bill to incorporate three fundamental conditions, including "that the Constitution of Virginia shall never be so amended or changed as

---

[10] *See, e.g.*, William E. Forbath, *Caste, Class, and Equal Citizenship*, 98 Mich. L. Rev. 1, 26 (Oct. 1999) ("Citizenship demanded suffrage, and the independence of the freedman's ballots required material foundations. That entailed not only equal rights to contract and own property, but also to public education and training."). *See also* Burton Declaration at 5-6 ("Following the Civil War, Congress intended education during Reconstruction to prepare African Americans to use all the tools of American citizenship and to guarantee republican forms of government.").

[11] Eric Biber, *The Price of Admission: Causes, Effects, and Patterns of Conditions Imposed on States Entering the Union*, 46 Am. J. Legal Hist. 119, 147 (April 2004).

[12] John Harrison, *The Lawfulness of the Reconstruction Amendments*, 68 U. Chi. L. Rev. 375, 406 (Spring 2001).

[13] Cong. Globe, 41st Cong., 2nd Sess. 512 (Jan. 17, 1870), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=089/llcg089.db&recNum=883 (last viewed Sept. 15, 2017).

[14] *Id.* at 518.

to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said state."[15] With these conditions, the Virginia Readmission Act passed both chambers of Congress, and Virginia was readmitted to full statehood.[16]

Mississippi was next. The House bill to readmit Mississippi followed the Senate's lead from the Virginia debate and included the same requirements.[17] Mississippi was readmitted to representation in Congress under the following conditions:

> First, That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the constitution herein recognized, except as a punishment for such crimes as are now felonies at common law, whereof they shall have been duly convicted under laws equally applicable to all the inhabitants of said State: Provided, That any alteration of said constitution, prospective in its effects may be made in regard to the time and place of residence of voters. Second, That it shall never be lawful for the said State to deprive any citizen of the United States, on account of his race, color, or previous condition of servitude, of the right to hold office under the constitution and laws of said State, or upon any such ground to require of him any other qualifications for office than such as are required of all other citizens. Third, *That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State.*[18]

These conditions were designed to guarantee Mississippi citizens a republican form of government and to transform the South fundamentally. Senator Oliver Morton summarized the views of the Readmission Act's supporters:

> [I]n securing a republican government in the State of Mississippi, what better means can we employ than the universal education of that people? In a State like Mississippi, just emerged from slavery, where nearly one half of the people cannot read or write, . . . what better guarantee, to use the language of the

---

[15] *Id.* at 643.

[16] 16 Stat. 62 (1870).

[17] Cong. Globe, 41st Cong., 2nd Sess. 1173 (Feb. 10, 1870), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=090/llcg090.db&recNum=232 (last viewed Sept. 15, 2017).

[18] 16 Stat. 67 (1870) (emphasis added).

Constitution, can be created for a republican form of government in that State than to secure the general education of the people?[19]

Congress reasoned that this goal could only be achieved if Mississippi was prohibited from ever retrogressing.[20] That much is explicit in the statute itself: it required that Mississippi "shall never . . . deprive any citizen or class of citizens" of their education rights. That understanding is also explicit in the historical record. Senator George F. Edmunds of Vermont, for instance, understood Virginia's identical clause as ensuring "that she shall not turn her back upon us this year or next year or fifty years hence, and undertake to make progress in a *retrogressive* direction."[21] Indeed, some Senators who opposed the Readmission Act did so precisely because it prevented Mississippi from ever retrogressing beneath the 1868 Constitution's guarantees. As Senator Thomas Bayard of Delaware colorfully described it, the Act "fasten[ed] forever upon the people of this so-called State" the 1868 Constitution's education clause.[22]

## III.    MISSISSIPPI'S CURRENT VIOLATION.

---

[19] Cong. Globe, 41st Cong., 2nd Sess. 1254 (Feb. 14, 1870), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=090/llcg090.db&recNum=313 (last viewed Sept. 15, 2017).

[20] Congress was not alone in its belief that the Readmission Act forbade Mississippi from retrogressing on certain constitutional rights. At the Mississippi Constitutional Convention of 1890, the delegates' foremost goal was to strip African Americans of their voting rights. *See* Complaint [Docket No. 1] at ¶¶5.1-5.26. But before they could begin that business, they sought a special report "upon the effect of the act of Congress re-admitting Mississippi into the Union, limiting the right of the State of Mississippi to impose certain restrictions upon the right of franchise and otherwise prohibiting the State from changing the Constitution of the State of Mississippi, adopted in 1869, so far as the said act shall affect the work of this Convention[.]" *Journal of the Constitutional Convention of the State of Mississippi* (1890) at 83-84, available at https://archive.org/stream/journalproceedi01convgoog#page/n85/mode/2up (last viewed Sept. 15, 2017). As future Secretary of State Eric Clark observed in his master's thesis on the Convention, this episode demonstrated the delegates' understanding that the Readmission Act "declared that the state could not put stronger restrictions on the franchise than those adopted in the 1868 constitutional convention." Eric C. Clark, The Mississippi Constitutional Convention of 1890: A Political Analysis at 10-11 (May 1975) (on file with Mississippi Department of Archives and History).

[21] Cong. Globe, 41st Cong., 2nd Sess. 1174 (Feb. 10, 1870), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=090/llcg090.db&recNum=233 (emphasis added) (last viewed Sept. 15, 2017). *See also* Cong. Globe, 41st Cong., 2nd Sess. 1254 (Feb. 14, 1870), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=090/llcg090.db&recNum=313 ("You shall not impair the general system of education that has been declared in your constitution.") (last viewed Sept. 15, 2017).

[22] Cong. Globe, 41st Cong., 2nd Sess. 1282 (Feb. 15, 1870), available at https://memory.loc.gov/cgi-bin/ampage?collId=llcg&fileName=090/llcg090.db&recNum=341 (last viewed Sept. 15, 2017).

When Congress passed the Readmission Act in 1870, Mississippi's constitution contained a robust education clause. If that clause remained in effect today, it would stand as one of the strongest guarantees of public education in America. But beginning in 1890, and continuing today, Mississippi eroded its constitution's education clause until it was nothing more than a shell of its former self.

**Mississippi Constitution's Education Clause, 1868 and Present**

| | |
|---|---|
| As the stability of a republican form of government depends mainly upon the intelligence and virtue of the people, it shall be the duty of the Legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvements, by establishing a uniform system of free public schools, by taxation, or otherwise, for all children between the ages of five and twenty-one years, and shall, as soon as practicable, establish schools of higher grade. | The Legislature shall, by general law, provide for the establishment, maintenance and support of free public schools upon such conditions and limitations as the Legislature may prescribe. |
| **1868** | **Present** |

The Reconstruction-era education clause contained a number of rights absent from the modern-day version, and chief among them was the right to a "uniform" system of free public schools.[23] The 1868 Constitution's education clause also began with a preamble explaining its important purpose, emphasized the Legislature's mandatory "duty" to establish a system of uniform schools, and required that the uniform system be "encourage[d], by all suitable means."

When comparing the 1868 education clause and its modern-day counterpart, it is helpful to understand how legal scholars analyze education clauses. Modern education-law scholars classify states' education clauses into four broad categories, with "Category I" clauses being the

---

[23] *See, e.g.*, *Leandro v. State*, 346 N.C. 336, 348 (1997) (state constitution's guarantee of "uniform" schools requires "that every child have a fundamental right to a sound basic education which would prepare the child to participate fully in society as it existed in his or her lifetime"). *See also* 67B Am. Jur. 2d Schools § 10 (Provisions Requiring Uniform School System) ("State constitutions and statutes usually provide for a general and uniform system of common schools. 'Uniform,' under such a provision, means that every child shall have the same advantages and be subject to the same discipline as every other child."); Burton Declaration at 15 (1868 Constitution's uniformity requirement "demonstrated that broader education rights were an important effort in securing republicanism").

weakest and "Category IV" clauses being the strongest. Today, Section 201 of the Mississippi Constitution is universally viewed as a Category I clause[24] – that is, it "merely mandate[s] a system of free public schools."[25] In contrast, clauses requiring "uniform" systems of public schools are generally viewed as Category II education clauses,[26] and clauses with both an "all means" component and a "purposive preamble" are generally viewed as Category III clauses.[27] The education clause in Mississippi's 1868 Constitution was a Category III clause because it included a purposive preamble – "as the stability of a republican form of government depends mainly on the intelligence and virtue of the people" – and required that the Legislature's "duty" to establish a uniform system of schools be accomplished "by all suitable means."

Mississippi's retrogression from a Category III clause to a Category I clause is no mere academic triviality. It has resulted in a disuniform system of schools that is far more likely to injure African-American students (like the Plaintiffs' children) than white students: predominantly white school districts are substantially more likely to offer a high-quality education than predominantly black school districts.[28] The Mississippi Department of Education currently gives 14 school districts "A" ratings. All but one of those districts is majority white, and nine of them have enrollments of at least 66 percent white students. Predominantly black districts tell the opposite story: of the 19 districts currently rated "F," all have more than 80 percent black students.[29]

---

[24] *See, e.g.*, Sparkman, Dayton & Hartmeister, *Financing Wyoming's Public Schools: The Wyoming Legislature Gets to Try Again*, 31 Land & Water L. Rev. 469, 499 n.198 (1996).
[25] William E. Thro, *The Role of Language of the State Education Clauses in School Finance Litigation*, 79 Ed. Law Rep. 19, 23 (Feb. 1993).
[26] *Id.* at nn.24, 31.
[27] *Id.* at 24 ("Category III education clauses go beyond simply mandating the establishment of a school system. However, these clauses are distinguished from the Category I and Category II by both a stronger and more specific educational mandate, such as 'all means,' and a 'purposive preamble.'") (quotation omitted).
[28] *See* Complaint at ¶5.75 (table).
[29] *See generally* Enrollment Data for 2016-2017 School Year, Mississippi Department of Education, available at http://mdereports.mdek12.org/data/ (last viewed Sept. 17, 2017).

A system of schools that provides opportunity so blatantly based on whether the student body is mostly white or mostly black falls far short of the "uniform system" that Congress required Mississippi to preserve.

## ARGUMENT

## I.     THE POLITICAL QUESTION DOCTRINE DOES NOT BAR THIS COURT'S REVIEW.

### A.     The Political Question Doctrine is Categorically Inapplicable to Statutory Claims.

The State's principal argument is that the political question doctrine applies in this case. It does not. The doctrine has no application to statutory claims, which by definition must be resolved by the judiciary.

The political question doctrine traces its origin to Chief Justice Marshall's opinion in *Marbury v. Madison*.[30] It stands, at its core, for the proposition that *the Constitution* commits certain questions to the coordinate branches of the federal government, and not to the judiciary.[31] This case, however, "is a statutory case. The Supreme Court has never applied the political question doctrine in a case involving alleged *statutory* violations. Never."[32]

A review of the Supreme Court's decision in *Baker v. Carr* – where the Court identified six possible characteristics of a nonjusticiable political question – shows why.[33] The two most important *Baker* factors – the factors on which virtually every political question doctrine case

---

[30] *Marbury v. Madison*, 5 U.S. 137, 166 (1803) ("[I]n cases in which the executive possesses a constitutional or legal discretion, nothing can be more perfectly clear than that their acts are only politically examinable.").

[31] *See, e.g.*, *Baker v. Carr*, 369 U.S. 186, 217 (1962).

[32] *El Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring); *see also* Chris Michel, *There's No Such Thing as a Political Question of Statutory Interpretation: The Implications of Zivotofsky v. Clinton*, 123 Yale L.J. 253, 256 (Oct. 2013) ("[I]n no case has the Supreme Court ever found a political question arising from a statutory claim.").

[33] *Baker v. Carr*, 369 U.S. 186 (1962). The six *Baker* factors are: a textually demonstrable commitment of the issue to a coordinate branch; lack of  judicially discoverable or manageable standards; it is impossible to decide the issue without making a political judgment; it is impossible to review without expressing a lack of respect or a coordinate branch; there is an unusual need for unquestioning adherence to a political decision already made; or there is the potential for embarrassment from multiple pronouncements on an issue by different departments. *Id.* at 217.

turns – will *never* be satisfied in a case involving a statutory claim. The first factor looks for a textually demonstrable *constitutional* commitment of the issue to a coordinate political branch. Congress, in passing a statute, makes a political choice (as it did in passing the Readmission Act), but once that choice is made, the Constitution commits the construction and interpretation of the statute *solely* to the judiciary. "[I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts."[34] The second *Baker* factor asks whether there are judicially discoverable and manageable standards for resolving the question. Legislation, by definition, provides discoverable and manageable standards for courts to apply.[35]

The other *Baker* factors confirm this point. The political question doctrine concerns itself with "the respect due coordinate branches of government,"[36] and declining to enforce a congressional enactment – especially one that, as shown *infra,* creates privately enforceable rights – would show a decided lack of respect for a coordinate branch.[37] The political question doctrine likewise focuses on "adherence to a political decision already made,"[38] which is all a plaintiff in a statutory case is asking for. When Congress enacts a statute, it makes a policy judgment embodied in the law. Adherence to that policy judgment *requires* judicial enforcement. Refusing to enforce (or even hear) a case asserting a congressionally created right, by contrast,

---

[34] *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986).

[35] *Zivotofsky v. Clinton*, 566 U.S. 189,196 (2012) ("To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. That is a familiar judicial exercise."). *See also Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 952 (5th Cir. 2011) (political question doctrine inapplicable "where a statutory scheme exists to guide the court's determination of an issue").

[36] *Baker*, 369 U.S. at 217.

[37] *See* Chris Michel, *There's No Such Thing as a Political Question of Statutory Interpretation: The Implications of Zivotofsky v. Clinton*, 123 Yale L.J. 253, 263 (Oct. 2013) ("Consider the practical consequences of dismissing a statutory claim like Zivotofsky's. On the one hand, if the statutory constraint is constitutional but the claim is dismissed, the court has sanctioned executive defiance of a valid statute, thus contradicting the foundational principles that no President stands above the law.").

[38] *Baker*, 369 U.S. at 217.

would lead to "multifarious pronouncements by various departments on one question,"[39] and embarrassment to the political branches that enacted it.

The Supreme Court's decision in *Zivotofsky v. Clinton* makes clear that the political question doctrine does not apply to statutory claims. *Zivotofsky* involved a claim of executive non-compliance with a politically-tinged statute: a statute providing citizens born in Jerusalem a right to list Israel as their country of birth. Zivotofsky's parents sued to enforce that right when the State Department refused to comply with the statute. The State Department argued that the plaintiffs' claim raised a nonjusticiable political question. Hearing the claim, the State Department asserted, would require the judiciary to weigh in on the political status of Jerusalem.

The Supreme Court rejected that contention. The statute's political wisdom and its enforceability were two very different questions.[40] The Court clarified that only the former, which was implicated when Congress *passed* the statute, was a political matter. The latter – the construction, application, and determination of the validity of *any* congressional enactment – was committed squarely to the judiciary. The Court explained:

> The federal courts are not being asked to supplant a foreign policy decision of the political branches with the courts' own unmoored determination of what United States policy toward Jerusalem should be. Instead, Zivotofsky requests that the courts enforce a specific statutory right. To resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise.[41]

Resolution of any statutory claim will demand "careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute"

---

[39] *Id.*

[40] *Zivotofsky*, 566 U.S. at 195 ("The District Court understood Zivotofsky to ask the courts to decide the political status of Jerusalem. This misunderstands the issue presented. Zivotofsky does not ask the courts to determine whether Jerusalem is the capital of Israel. He instead seeks to determine whether he may vindicate his statutory right . . . to choose to have Israel recorded on his passport as his place of birth.") (citation and quotation marks omitted).

[41] *Id.* at 196.

and the rights created under it.[42] That, *Zivotofsky* holds, "is what courts do."[43] The political question doctrine is thus categorically inapplicable to the Plaintiffs' claims.[44]

### B.    None of the *Baker* Factors Supports the Application of the Political Question Doctrine.

Even if the political question doctrine could ever apply to statutory claims, it still would not bar this suit. *Baker* set forth six tests for determining whether a claim implicates a nonjusticiable political question. A claim presents a political question if: (i) there is a textually demonstrable commitment of the issue to a coordinate branch; (ii) it lacks judicially discoverable or manageable standards; (iii) it is impossible to decide the issue without making a political judgment; (iv) it is impossible to review without expressing a lack of respect for a coordinate branch; (v) there is an unusual need for unquestioning adherence to a political decision already made; or (vi) there is the potential for embarrassment from multiple pronouncements on an issue by different departments. None of those factors supports the doctrine's application here.

1.    <u>*The Constitution Commits the Question of the Readmission Act's Meaning Squarely to the Judiciary.*</u>

Not every case with "significant political overtones" presents a nonjusticiable political question.[45] Rather, the first and surest sign of a political question is "a textually demonstrable

---

[42] *Id.* at 201.

[43] *Id.*

[44] Even if statutory claims could raise nonjusticiable political questions, to the extent the State suggests that its conduct is unreviewable because education in Mississippi is solely the prerogative of the State's political branches, the State is incorrect. The political question doctrine only affects the federal judiciary's relationship with the other branches of the *federal* government. *See Baker*, 369 U.S. at 201. The political question doctrine does not limit a federal court's power to review the political choices of *state* officials, especially when those choices implicate (and violate) federal rights.

[45] *INS v. Chadha*, 462 U.S. 919, 942-43 (1983).

*constitutional* commitment of the issue to a coordinate political department."[46] The State

identifies no constitutional text committing the question in this case – whether Mississippi is

violating the Readmission Act – to a coordinate political branch. That is because no such text

exists. Rather, this case calls only for an interpretation of a federal statute, a review of state law,

and a determination as to whether the former conflicts with the latter. Resolution of such

questions of law is for the judiciary, and the judiciary alone: "the proper construction of a

congressional statute [is] a question eminently suitable to resolution in federal court."[47]

The State's contrary argument rests on two fundamental mischaracterizations. The State

first observes that the Constitution "[i]n general" entrusts "the political branches to make war

and set the conditions of peace."[48] No one disagrees, but the Plaintiffs are not asking this Court

to make war or set the conditions of peace. Here, Congress made many relevant political

judgments in *passing* the Readmission Act, and it determined, among other things, that

Mississippi should "never" be permitted to deprive its children of their "school rights." It is the

constitutional province and duty of the courts to *enforce* that guarantee.

The State also contends that the case is nonjusticiable because the Readmission Act

governed "only" the seating of Mississippi's representatives and that its education guarantee is

"inextricably connected" with Reconstruction-era policy judgments.[49] The State is incorrect.

Although the Act did seat Mississippi's representatives, it *also* endeavored to secure forever a

republican form of government by requiring that Mississippi "*never*" deprive its schoolchildren

of their constitutionally guaranteed school rights. This case does not require the Court to wade

into questions concerning Mississippi's representation; Congress made that determination 150

---

[46] *Baker*, 369 U.S. at 217 (emphasis added).
[47] *Massachusetts v. EPA*, 549 U.S. 497, 516 (2007).
[48] Memorandum in Support of Motion to Dismiss [Docket No. 24] (hereinafter "State's Brief") at 10.
[49] State's Brief at 10.

years ago and there is nothing on that score for this Court to review. The only question here is whether the State should be brought into compliance with the Readmission Act's retrogression ban, and that question is uniquely suited for judicial review and enforcement.

The State's primary support is *dicta* from a single, shameful case. *Butler v. Thompson*[50] is a Jim Crow-era district court decision from another district, in another state, in another circuit, that upheld the constitutionality of Virginia's poll tax.[51] Not only is that decision non-binding, but history also has shown that its holding is wrong: poll taxes are unconstitutional.[52] And the *Butler* court's specific treatment of Virginia's Readmission Act in *dicta* is unpersuasive. Although the court "doubt[ed]" that the Virginia Readmission Act's prohibition on voting restrictions was judicially enforceable, it labored under the same false premises as the State does here: the Act's condition was part and parcel of the seating of the State's representatives and thus could be enforced only by Congress. But that is simply not true. Congress seated the southern states' representatives *and* determined that those states should be proscribed forever from depriving their citizens of certain rights necessary to maintain functional, republican governments. The protection of those rights is perpetual – hence, the Readmission Act's use of the phrase "shall never" – and has nothing to do with the seating of congressional representatives.

---

[50] *Butler v. Thompson*, 97 F. Supp. 17 (E.D. Va. 1951).

[51] Eleven years later, in 1962, the decision was cited by a Mississippi district court in support of the shameful notion that "the Constitution of the United States . . . does not prohibit a municipality from permitting, authorizing or encouraging voluntary segregation." *Clark v. Thompson*, 206 F. Supp. 539, 542 (S.D. Miss. 1962) (Mize, C.J.).

[52] *See Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966) (holding that poll taxes violate the Equal Protection Clause).

The State's reliance on the Arkansas Supreme Court's decision in *Merritt v. Jones*[53] is likewise misplaced. That court, again in *dicta*, hypothesized that the Arkansas Readmission Act might be unreviewable. But its only support was the *dicta* in *Butler v. Thompson*.

*Georgia v. Stanton*,[54] *Mississippi v. Johnson*,[55] and *Mississippi v. Stanton*[56] are even farther afield. Those Reconstruction-era cases involved efforts by Southern states to *restrain* the federal political branches from engaging in Reconstruction. This case, by contrast, involves no such political second-guessing. It seeks only a declaration enforcing a federal statute that Congress enacted. Congress determined that Mississippi's school-age children should "never" be deprived of their school rights. This suit merely asks the Court to enforce that guarantee.

2. *The Readmission Act Provides Discoverable and Manageable Standards.*

The State is also wrong in asserting that there are no judicially manageable standards for determining whether Mississippi is currently in violation of the Readmission Act.[57] The State argues that there is no way for a court to "determin[e] whether Mississippi should no longer have representatives seated in Congress, or whether Mississippi should have some form of decreased representation."[58] But Plaintiffs have not requested such relief, nor is that the relief Congress intended, *see supra* at 15-16, *infra* at 24-25. All the Plaintiffs seek is a declaration that Section 201 of the current Mississippi Constitution violates the Readmission Act and is therefore void.[59]

That issue is self-evidently subject to judicially discoverable and manageable standards. It only requires a court to determine whether Section 201 of the Mississippi Constitution currently "deprive[s]" school children of rights guaranteed at the time of the Readmission Act's

---

[53] *Merritt v. Jones*, 259 Ark. 380 (1976).
[54] 73 U.S. (6 Wall.) 50 (1867).
[55] 71 U.S. (4 Wall.) 475 (1866).
[56] 154 U.S. 554 (1868).
[57] *See* State's Brief at 13-16.
[58] State's Brief at 14.
[59] *See* Complaint ¶ 7.1(a).

passage.[60] In other words, the Court must review the education clause in the 1868 Constitution,

review the education clause in the current Constitution, and determine if the current Constitution

provides weaker school rights than were provided in 1870. That sort of "careful examination of

the textual, structural, and historical evidence put forward by the parties regarding the nature of a

statute" and constitutional provision "is what courts do."[61]

  The State's related argument that the 1868 Constitution did not impose any meaningful

educational obligations is simply not accurate. It was "the duty of the Legislature," the 1868

Constitution made clear, to "establish[] a uniform system of free public schools."[62] The purpose

of that mandate was to promote "intellectual, scientific, moral and agricultural improvement,"[63]

and the core obligation was unquestionably to establish (and maintain) a uniform school system.

The text allows no other construction.[64] The State's ad hoc emphasis of other words in the

provision does not demonstrate otherwise.[65]

  The State is also mistaken to suggest that there is no way to compare the "rights and

privileges" under the 1868 Constitution to the "rights and privileges provided today."[66] This

Court is capable of analyzing constitutional text to determine whether the 1868 Constitution and

the current Constitution provide the same right to a uniform system of free public schools.

Indeed, courts across the country routinely analyze and apply similar constitutional provisions

---

[60] 16 Stat. 67.

[61] *Zivotofsky*, 566 U.S. at 201; *see Japan Whaling*, 478 U.S. at 230 (determining "the nature and scope of the duty imposed" on the defendant, "which calls for applying no more than the traditional rules of . . . construction, and then applying this analysis to the particular set of facts," "is a recurring and accepted task for the federal courts"); *Spectrum Stores*, 632 F.3d at 952 (political question doctrine inapposite "where a statutory scheme exists to guide the court's determination of an issue").

[62] Miss. Const. art. VIII § 1 (1868).

[63] *Id.*

[64] *See, e.g.*, *Campbell Cty. Sch. Dist. v. Wyoming*, 907 P.2d 1238, 1264 (Wyo. 1995) (holding that materially identical state constitutional provision "impose[d] an affirmative mandatory duty upon the legislature" that was "judicially enforceable").

[65] *See* State's Brief at 14-15.

[66] State's Brief at 15.

establishing uniform systems of public education, further belying the State's contention that the 1868 Constitution imposed no judicially cognizable standards.[67]

It is irrelevant that the 1868 Constitution did not integrate Mississippi's schools or guaranteed only four months of schooling. The Readmission Act did not preclude Mississippi from expanding the 1868 Constitution's education rights; it only prohibited retrogression. Whether the Mississippi Constitution *today* provides fewer education rights than it did in 1868 is undoubtedly a question fit for judicial review.

The State's remaining miscellaneous arguments are even less persuasive. The general thrust of their assertions appears to be that because Mississippi first violated the Readmission Act 127 years ago, the political question doctrine prevents the Plaintiffs from challenging it today. But courts routinely review questions of law with roots stretching hundreds of years into the past.[68] The mere vintage of a question does not shield an otherwise cognizable question from review,[69] and there is ample authority (discussed above) to determine what the 1868 education clause means.[70]

---

[67] *See, e.g.*, *Campbell Cty. Sch. Dist.*, 907 P.2d at 1259 ("We can ascertain the further intent of these words by considering the purpose which the framers believed education served. . . . [I]n 1889, similar education provisions were found in every state constitution, reflecting the contemporary sentiment that education was a vital and legitimate state concern, not as an end in itself, but because an educated populace was viewed as a means of survival for the democratic principles of the state."); *id.* (state constitution's education article was "a mandate to the state legislature to provide an education system of a character which provides Wyoming students with a uniform opportunity to become equipped for their future roles as citizens, participants in the political system, and competitors both economically and intellectually"); s*ee also Lobato v. Colorado*, 304 P.3d 1132 (Colo. 2013) (construing and applying similar education clause); *Fed. Way Sch. Dist. No. 210 v. Washington*, 219 P.3d 941 (Wash. 2009) (same); *Roosevelt Elementary Sch. Dist. No. 66 v. Bishop*, 877 P.2d 806 (Ariz. 1994) (same); *Idaho Sch. for Equal Educ. Opportunity v. Evans*, 850 P.2d 724 (Idaho 1993) (same); *Rose v. Council for Better Educ. Inc.*, 790 S.W. 2d 186 (Ky. 1989) (same).

[68] *See, e.g., Kerry v. Din*, 135 S.Ct. 2128, 2132 (2015) (tracking Due Process Clause's origins to Magna Carta).

[69] *See, e.g., Noel Canning v. NLRB*, 705 F.3d 490, 499 (D.C. Cir. 2013) (hearing and resolving question of first impression under the Constitution's Appointments Clause).

[70] The State's reliance on *San Antonio Independent School District. v. Rodriguez*, 411 U.S. 1 (1973), is misguided and confusing. First, *Rodriguez* was a Fourteenth Amendment Equal Protection Clause challenge, not a challenge under the Readmission Act. Second, the State cites language from *Rodriguez* warning courts against imposing "inflexible constitutional restraints that could circumscribe or handicap the continued research and experimentation so vital to finding even partial solutions to educational problems and to keeping abreast of ever-changing

Finally, the State rests on a disgraceful hodgepodge of cases with no relevance to the Readmission Act. The State remarkably relies on *Plessy v. Ferguson*, about which little need be said;[71] on an equally distasteful 1898 case, *Williams v. Mississippi*,[72] upholding a provision in the State's 1890 constitution excluding African American jurors for failure to pay poll taxes; and on *Butler*, the Jim Crow-era case discussed above. Those cases, apart from having been rejected long ago, are repugnant and have no bearing on whether the Readmission Act and 1868 Constitution are subject to judicially management standards.[73]

### 3. None of the Remaining Baker Factors is Implicated

The State's catchall argument under the last four *Baker* factors largely rehashes the misplaced themes discussed above: the seating of Mississippi's representatives was a political decision; the Act was passed 150 years ago; and it was designed only to end the Civil War. Those arguments are wrong and irrelevant. And the last four *Baker* factors favor a finding that this case *is* justiciable: the Plaintiffs seek a declaration based on a statute, not a policy judgment; declining to enforce this law would show a lack of respect for Congress; granting relief to the Plaintiffs would adhere to a political decision that Congress already made; and refusing to protect the Plaintiffs' rights under the Readmission Act would be inconsistent with Congress' judgment on this issue.

Finally, the State's reference to the nonjusticiability of questions under the Guarantee Clause *undermines* its suggestion that the Readmission Act is unconstitutional. The Supreme

---

conditions." State's Brief at 22 n.50 (quoting *Rodriguez*, 411 U.S. at 42-43). But this is simply not what the Complaint requests. The Plaintiffs seek only a declaration that the Mississippi Constitution violates the Readmission Act.

[71] 163 U.S. 537 (1896). The 1890 constitution was specifically designed to disenfranchise African Americans and was not put to a popular vote because it would have been rejected by the very African-American voters the constitution was meant to disenfranchise. *See* Complaint at ¶¶ 5.10-5.26.

[72] 170 U.S. 213 (1898).

[73] The Plaintiffs do not address any of the State's cases cited in footnote 42 because the State is not challenging the constitutionality of the Readmission Act. *See* State's Brief at 16-17 n.42 ("Because there are so many other paths to dismissal, grappling with the additional aspects of the (un)constitutionality of the Acts is not necessary.").

Court has held that when Congress passes laws under the Guarantee Clause, those decisions cannot be challenged in court.[74] That holding applies to the Readmission Act, whose validity the State cannot challenge in court. In contrast, the Plaintiffs seek not to overturn the Act, but to enforce it.

## II.   THE READMISSION ACT IS PRIVATELY ENFORCEABLE.

The State's argument that the Readmission Act does not provide a private right of action is also unpersuasive. One of the "principal purpose[s]" of allowing enforcement of federal statutes through Section 1983 "was to ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of the civil action authorized by that statute."[75]

When determining whether Section 1983 allows private enforcement of a federal statute, courts ask whether the statute in question (in this case, the Readmission Act) is "phrased in terms of the persons benefitted."[76] This review requires "looking to the language of the statute itself."[77] A statute "which expressly identifies the class Congress intended to benefit"[78] creates a privately enforceable federal right. The Readmission Act satisfies that standard.

While the State agrees that the analysis of whether there is a private right of action must focus on the Readmission Act's text, it does not analyze the statute's text in its brief *at all*. It simply states that the private right does not exist. The problem for the State is that the

---

[74] *Baker*, 369 U.S. at 224 ("Just as the Court has consistently held that a challenge to state action based on the Guaranty Clause presents no justiciable question so has it held, and for the same reasons, that challenges to congressional action on the ground of inconsistency with that clause present no justiciable question.")

[75] *Maine v. Thiboutot*, 448 U.S. 1, 7 (1980) (quotation omitted). While the State contends that Plaintiffs only claim a right of action under Section 1983, State's Brief at 8, that is incorrect. Plaintiffs also have an implied right of action under the Readmission Act itself. Complaint at ¶4.1. The tests for determining whether a statute itself creates a private right of action and whether Section 1983 supplies the cause of action are, for these purposes, similar.

[76] *Gonzaga Univ. v. Doe*, 536 U.S. 273, 274 (2002). Under Section 1983, courts also ask whether the right is sufficiently definite and whether the statute imposes binding obligations on the state. *See Blessing v. Freestone*, 520 U.S. 329, 340-41 (1997).

[77] *Cannon v. Univ. of Chicago*, 441 U.S. 677, 689 (1979).

[78] *Id.*

Readmission Act *does* use precisely the type of rights-creating language that courts have found to be judicially enforceable. It speaks in distinctly "individually focused terminology."[79] The Act, in unmistakable terms, protects the "school rights and privileges" of "any citizen or class of citizens,"[80] and those school rights, in turn, were meant to benefit Mississippi's school-age "children."[81]

Courts routinely find similar language meant to benefit individuals – here, those eligible to attend school in Mississippi – to be privately enforceable. The cases are legion.[82] For example, in *Cannon v. University of Chicago*, the Court held that Title IX of the Education Amendments of 1972 – which provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in . . . any education program or activity receiving Federal financial assistance" – was privately enforceable, because it "expressly identifies the class Congress intended to benefit."[83] Likewise, in *S.D. ex rel. Dickson v. Hood*, the Fifth Circuit held that a provision in the Medicaid Act requiring states to "provide for making medical assistance

---

[79] *Gonzaga*, 536 U.S. at 287.

[80] 16 Stat. 67, 68.

[81] Miss. Const. art. VIII § 1 (1868).

[82] *See, e.g.*, *Planned Parenthood of Gulf Coast, Inc. v. Gee*, 862 F.3d 445, 459-60 (5th Cir. 2017) (statute "unambiguously confers" an enforceable right upon Medicaid-eligible patients by requiring state Medicaid plans to provide assistance to "any individual eligible") (quotations omitted); *Day v. Apoliona*, 496 F.3d 1027 (9th Cir. 2007) (Hawaii's Admission Act privately enforceable); *see also Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 510 (1990) (allowing private suit for health care providers as the intended beneficiaries of the statute governing Medicaid reimbursements because the provision was "phrased in terms benefiting health care providers"); *Wright v. City of Roanoke Redevelopment & Hous. Auth.*, 479 U.S. 418, 430 (1987) (allowing private suit by tenants because Housing Act provision and implementing regulations "focus[] on the individual family and its income"); *Cannon*, 441 U.S. at 690 n.13 (collecting pre-*Gonzaga* cases in which the Court found a private right of action because "the statute explicitly conferred a right directly on a class of persons," including one case, *Sullivan v. Little Hunting Park*, 396 U.S. 229, 238 (1969), where the statute provided for uniform treatment for "[a]ll citizens") (cited approvingly in *Gonzaga*, 536 U.S. at 285).

The statutory language here is even more "rights-conferring" than that in *Wright* or *Wilder*. *Wright* found privately enforceable a statute provision that said only that "[a] family shall pay as rent . . . 30 per centum of the family's adjusted monthly income." 42 U.S.C. § 1437a(a) (1982). *See Johnson v. Housing Auth. of Jeff. Parish*, 442 F.3d 356, 361 (5th Cir. 2006). And *Wilder* found privately enforceable a statutory provision that required Medicaid reimbursement according to rates that a "State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C. § 1396a(a)(13)(A) (1982); *Wilder*, 496 U.S. at 501-02.

[83] *Cannon*, 441 U.S. at 690.

available . . . *to all individuals*" who meet certain eligibility criteria, is privately enforceable because the statute's text focused on the class of individuals benefitted.[84] Indeed, the Readmission Act includes precisely the same language that the Supreme Court has found creates individual rights,[85] leaving no room for doubt about the statute's enforceability.

The Readmission Act's history bolsters this conclusion.[86] The purpose of the Readmission Act's education guarantee was to ensure that Mississippi's population – specifically, its African-American population – would be sufficiently educated to exercise their right to vote meaningfully and to ensure an enduring republican form of government. *See supra* at 4-6. The education guarantee was thus aimed at protecting the individual rights of an identified class of beneficiaries.[87]

The Readmission Act's text is therefore unlike statutory text that courts have held is not privately enforceable. "Statutes that focus on the person regulated rather than the individuals protected create no implication of an intent to confer rights on a particular class of persons."[88] The Readmission Act features no such framing. "It does not speak only in terms of institutional policy and practice, nor does it have an aggregate focus."[89] That is, the statute is not directed at Executive Branch administration;[90] rather, it creates rights "personal to the beneficiaries . . .

---

[84] *S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 602-03 (5th Cir. 2004).

[85] *Compare* 18 Stat. 67, 68 (no "citizen or class of citizens" "shall" ever be "deprived" of their "school rights" by an amendment to the State constitution), *with Gonzaga*, 536 U.S. at 284 n.3 (statutes are privately enforceable when phrased "no person . . . shall" be deprived of the right the statute protects).

[86] *See, e.g., Poole v. Hous. Auth. for the Town of Vinton*, 202 F. Supp. 3d 617, 624 (W.D. La. 2016) (statute's legislative history relevant in determining whether it is privately enforceable).

[87] *See, e.g., Reese v. Miami-Dade Cty.*, 210 F. Supp. 2d 1324 (S.D. Cal. 2002) (finding the Quality Housing and Work Responsibility Act, 42 U.S.C. § 1437, to be privately enforceable because it was designed to "benefit, among others, individuals such as the [African American] plaintiffs" in the case).

[88] *Alexander v. Sandoval*, 532 U.S. 275, 289 (2001). *See also Cannon*, 441 U.S. at 690 (no federal right created by "statutory language customarily found in criminal statutes . . . enacted for the protection of the general public").

[89] *Romano v. Greenstein*, 721 F.3d 373, 379 (5th Cir. 2013) (quotation and alteration omitted).

[90] *Gonzaga*, 536 U.S. at 287-88; *Blessing*, 520 U.S. at 343 (statute not privately enforceable where it was "simply a yardstick for the Secretary to measure systemwide performance") (emphasis omitted); *Alexander*, 532 U.S. at 289

which, by design, are intended to promote the equal treatment of and equal opportunity for the beneficiaries"[91] In fact, the only Fifth Circuit case the State cites on this point found that a provision requiring state assistance to "any individual eligible" *did* create a privately enforceable right.[92] This holding confirms that the Readmission Act's protection of education rights of those eligible to attend school in Mississippi is privately enforceable.

The State nevertheless contends that the Act is not privately enforceable because Congress could not have intended the remedy in an individual action to be the unseating of Mississippi's representatives.[93] But the State again misses the point. "[T]he question whether a litigant has a 'cause of action' is analytically distinct and prior to the question of what relief, if any, a litigant may be entitled to receive."[94] And for all the reasons described above, the text of the Readmission Act creates privately enforceable rights.

In any event, unseating Mississippi's congressional representatives is not the appropriate remedy for a violation of the Act's education provision.[95] First, stripping Mississippi of its representatives *would not* do anything to remedy the State's deprivation of school rights guaranteed to its citizens under the Readmission Act and 1868 Constitution. Second, the relief contemplated by the State is inconsistent with the Readmission Act's purpose. Congress included the education provision in the Readmission Act to ensure that the country would never again be confronted with a situation in which Mississippi's populace was insufficiently educated to

---

(statute not privately enforceable when "[i]t focuses neither on the individuals protected nor even on the funding recipients being regulated, but on the agencies that will do the regulating").
[91] *Medley v. Ginsberg*, 492 F. Supp. 1294, 1304 (S.D. W. Va. 1980).
[92] *See Gee*, 862 F.3d at 458-59 (cited by State's Brief at 18).
[93] State's Brief at 19.
[94] *Davis v. Passman*, 442 U.S. 228, 239 (1979); *see also Franklin v. Gwinnett Cty. Pub. Schs.*, 503 U.S. 60, 69 (1992) (noting the "misunderstanding over the difference between a cause of action and the relief afforded under it").
[95] *Franklin* affirmed "the long line of cases in which the Court has held that if a right of action exists to enforce a federal right and Congress is silent on the question of remedies, a federal court may order any appropriate relief." *Id.* at 69.

meaningfully exercise its right to vote and ensure a republican form of government. *See supra* at 6-9. Stripping Mississippi of its representatives for non-compliance with the Act's education provision would do nothing to further that purpose. A judicial declaration requiring Mississippi to comply with that federal mandate, by contrast, unquestionably would.[96]

Congress often imposes conditions on state participation, and the remedy for non-compliance is never ejectment from the program or Union – it is enforcement. The Medicaid Act, for example, provides federal funding to states on the condition that states offer Medicaid services. When a state violates the Medicaid Act, the remedy is not expulsion from either the Medicaid program or from the Union. The solution is simply to order compliance with the law.[97] The State offers no reason why Congress would have intended to remedy a Readmission Act violation differently.

## III.    THE PLAINTIFFS HAVE STANDING.

Surviving a standing challenge at the motion to dismiss stage requires no proof. A plaintiff need only plead allegations that satisfy three familiar elements of Article III standing: an injury in fact; traceable to the defendant's conduct; redressable by a favorable decision.[98] The Plaintiffs have done so. Their children are African Americans attending some of Mississippi's

---

[96] *See Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 284-85 (1998) (the Court will not fashion an implied remedy "in a manner at odds with the statutory structure or purpose"); *Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 457-58 (1974) (enforcement of a statute must be consistent "with the effectuation of the purposes intended to be served by the Act").

[97] *See, e.g., Dickson*, 391 F.3d at 584-85, 607 (requiring Louisiana to provide medical supplies to eligible children under Medicaid Act's EPSDT provision).

[98] *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *see also id.* at 561 ("Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation. At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.") (citations, quotations, and alterations omitted).

lowest-performing elementary schools.[99] These children are *exactly* whom Congress intended to protect with the Readmission Act.

### A.      The Plaintiffs Have Suffered an Injury in Fact.

First, the Plaintiffs have alleged an injury in fact. The Complaint alleges that the Plaintiffs in this case are currently receiving an inferior education that is not uniform with that provided to other students in Mississippi, particularly those who attend predominantly white schools.[100] Providing a disuniform and inferior education is a "concrete and particularized" injury unto itself,[101] and "has caused, is causing, and will cause" myriad other concrete injuries, including: a diminished ability to exercise the right to vote meaningfully; illiteracy; economic injuries, such as diminished lifetime earnings potential and increased likelihood of poverty; and non-economic injuries, such as diminished likelihood of attending and/or graduating college.[102]

The State contends that the Plaintiffs are alleging only a generalized grievance because they are injured alongside others who attend Mississippi's woefully disuniform schools.[103] This argument is meritless. Mississippi's provision of a disuniform system of education is concretely and directly harming the *Plaintiffs*. That it may also harm others – in particular, other students in failing school districts – does not convert an individualized injury into a non-cognizable generalized grievance.[104] As the Supreme Court explained in *FEC v. Akins*: "where a harm is concrete, though widely shared, the Court has found 'injury in fact.'"[105] Or, as the Fifth Circuit *en banc* stated: "the fact that many persons suffer an injury does not mean that no person has

---

[99] Complaint at ¶¶3.1-3.4.
[100] Complaint at ¶¶ 5.48-5.76.
[101] *See, e.g.*, *C.M. ex rel. Marshall v. Bentley*, 13 F. Supp. 3d 1188, 1201 (M.D. Ala. 2014); *Leslie v. Bd. of Educ. for Ill. Sch. Dist. U-46*, 379 F. Supp. 2d 952, 958-59 (N.D. Ill. 2005).
[102] *See* Complaint at ¶ 6.9.
[103] State's Brief at 20.
[104] Taken to its logical conclusion, the State suggests that it can avoid consequences for violating federal law so long as it injures enough people in the process.
[105] 524 U.S. 11, 24 (1998).

suffered the requisite injury."[106] "Such a claim of standing is even stronger," in fact, "when the plaintiffs are students and parents of students attending public schools. Students and their parents enjoy a cluster of rights vis-a-vis their schools – a relationship which removes them from the sphere of 'concerned bystanders.'"[107] Thus, plaintiffs like those in this case "have often been found to have suffered an injury, albeit along with many other students and parents."[108]

### B.      The Plaintiffs' Injuries are Traceable to the State's Conduct.

The Complaint alleges that the Plaintiffs' injuries are traceable to the State's failure to provide a uniform system of public schools.[109] The State's sole contention to the contrary is that the Plaintiffs injuries *might* have multiple causes.[110] But that presents a question of fact.[111]

Remarkably, the State suggests – without presenting any evidence – that these children's parents are not involved, or that these children have intellectual limitations, or that they experience domestic violence. Even if any of those things were true, the Constitution does not require the challenged conduct to be the sole, or even dominant, cause of an injury.[112] The traceability requirement is satisfied if the defendant's conduct merely contributes to the injury[113] – even "an indirect causal relationship will suffice."[114] The injury here, however, is direct: if

---

[106] *Doe by Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 466 (5th Cir. 2001).

[107] *Id.* at 466-67 (quoting *Bell v. Little Axe Indep. Sch. Dist. No. 70*, 766 F.2d 1391, 1398 (10th Cir. 1985)).

[108] *Id.*

[109] *See* Compl. ¶ 6.8.

[110] *See* State's Brief at 21.

[111] *James v. Texas Collin Cnty.*, 535 F.3d 365, 377 n.10 (5th Cir. 2008) ("causation is generally a question of fact to be left for the jury"). *See also* Burton Declaration at 17 ("The post-1890 devolution of black education can be traced directly to the 1890 constitution.").

[112] *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010) ("Tracing an injury is not the same as seeking its proximate cause.").

[113] *Id.* ("Because the Defendants significantly contributed to the Plaintiffs' alleged injuries, Plaintiffs have satisfied the requirement of traceability."); *Sierra Club, Lone Star Chapter v. Cedar Point Oil Co. Inc.*, 73 F.3d 546, 558 (5th Cir. 1996) (in traceability requirement, "it is sufficient for Sierra Club to show that Cedar Point's discharge of produced water *contributes* to the pollution that impairs Douglas's use of the bay") (emphasis in original).

[114] *Campaign for Southern Equality v. Miss. Dep't of Human Servs.*, 175 F. Supp. 3d 691, 707 (S.D. Miss. 2016) (Jordan, J.) (quoting *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 142 (3rd Cir. 2009)).

Mississippi provided a uniform system of public schools, the Plaintiffs would not be set at a lifelong competitive disadvantage relative to students in predominantly white schools.

### C.      The Plaintiffs' Injuries Will Be Redressed by a Favorable Ruling.

As with the issue of traceability, a motion to dismiss challenging redressability presents a plaintiff with a "relatively modest" hurdle.[115] Here, a judicial declaration that Mississippi is required to provide a uniform system of public schools will unquestionably remedy the Plaintiffs' injuries, at least in part. If a declaration issues, the Plaintiffs presume that the State will begin upgrading Mississippi's public school system to a uniform system, as required by the Readmission Act.[116] Compliance with the declaration will require the State to provide better and badly-needed services in the Plaintiffs' schools. At a minimum, this will even the playing field between the Plaintiffs' schools and higher-rated white schools across the state.

The State does not argue otherwise. Instead, it incorrectly repeats that the relief contemplated by the Readmission Act would be the unseating of Mississippi's congressional representatives. But for all the reasons described above, that argument is simply incorrect. The State also repeats its claim that this Court cannot provide the Plaintiffs "meaningful" relief because their injuries *might* be caused in part by "socioeconomic, intellectual, and personal factors."[117] Even if that were proven as a *factual* matter after discovery, a plaintiff "need not show that a favorable decision will relieve his *every* injury," much less at the pleading stage.[118] Partial redress also supports standing.[119] Here, the Plaintiffs' requested relief would even the

---

[115] *Campaign for Southern Equality*, 175 F. Supp. 3d at 701 (quoting *Bennett v. Spear*, 520 U.S. 154, 170-71 (1997)).

[116] *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001).

[117] State's Brief at 22.

[118] *K.P.*, 627 F.3d at 123 (emphasis in original) (quoting *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982)).

[119] *Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 716 (6th Cir. 2015) ("It need not be likely that the harm will be *entirely* redressed, as partial redress can also satisfy the standing requirement.") (citing *Meese v. Keene*, 481 U.S.

playing field for the Plaintiffs compared to similarly situated students at predominantly white

schools. The State's suggestions to the contrary must be rejected.

## IV.   NEITHER THE ELEVENTH AMENDMENT NOR "PRINCIPLES OF FEDERALISM" BAR A SUIT SEEKING PROSPECTIVE RELIEF FOR AN ONGOING VIOLATION OF FEDERAL LAW.

*Ex parte Young* provides, as the State concedes, a crucial avenue for the vindication of

federal rights like those asserted by the Plaintiffs.[120] Under *Ex parte Young*, neither the Eleventh

Amendment nor amorphous "principles of federalism" bar claims for *prospective* equitable relief

against state officers in their official capacities.[121] To determine whether relief meets this

exception, "a court need only conduct a straightforward inquiry into whether the complaint

alleges an ongoing violation of federal law and seeks relief properly characterized as

prospective."[122] If a legal violation has ended, then any relief granted against the violation is

inherently retrospective. On the other hand, if the violation is continuing, then relief is

prospective, and *Ex parte Young* allows the claim.[123]

The Plaintiffs clearly seek prospective, declaratory relief against a continuing violation of

federal law.[124] The Plaintiffs do not seek to remedy past harm; they do not seek damages; and

they do not seek to hold the State liable in federal court for violating state law. The Readmission

Act forever prohibited Mississippi from depriving its school children of their education rights,

---

[120] *Green v. Mansour*, 474 U.S. 65, 68 (1985) (Rehnquist, J.) ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.").

465, 476 (1987)); *Humane Society of the U.S. v. Vilsack*, 797 F.3d 4, 8 (D.C. Cir. 2015) (finding standing where the "alleged harm would be at least partially redressed").

[121] *Aguilar v. Tex. Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998) (citing *Ex Parte Young*, 209 U.S. 123 (1908)).

[122] *Virginia Office for Protection & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011) (quotation and extraneous punctuation omitted).

[123] Rochelle Bobroff, *Ex Parte Young as a Tool to Enforce Safety-net and Civil Rights Statutes*, 40 U. Tol. L. Rev 819, 828 (Summer 2009) ("Ex parte Young does not authorize a declaratory judgment for violations occurring wholly in the past . . . .").

[124] Compare *NiGen Biotech, LLC v. Paxton*, 804 F.3d 389, 395 (5th Cir. 2015) (*Ex parte Young* applies to "continu[ing]" violations that "still inflict[ ]" injury), to *Cantu Servs., Inc. v. Roberie*, 534 Fed. Appx. 342, 345 (5th Cir. 2013) (*Ex parte Young* does not apply to a "one-time, past event").

and the current Mississippi constitution deprives schoolchildren of those rights, because it does not provide the right to a uniform system of public schools. This is allowable under *Ex parte Young*.

The claim held barred by the Eleventh Amendment in *A-1 v. Molpus*, the principal case cited by the State, is inapposite because the plaintiff was seeking *retrospective* relief – not the prospective relief that the Plaintiffs seek.[125] *A-1* was a *pro se* suit, in which the plaintiffs "claim[ed] that the State of Mississippi violated federal law when the Mississippi Constitution of *1890* was adopted."[126] The court understood the plaintiffs to be seeking retrospective relief to remedy a course of conduct already completed and superseded by later constitutional amendments (and the claim was also likely moot). For that reason, the *A-1* court never addressed *Ex parte Young*.

To the extent *A-1* is read to include a claim for prospective relief (as the Plaintiffs here are seeking), the decision is wrong: *Ex parte Young* unequivocally allows suits for prospective, equitable relief against a state for violations of federal law. That is precisely what the Plaintiffs here are seeking. The State's suggestions to the contrary are incorrect.

## V.   THE PLAINTIFFS' CLAIMS ARE TIMELY.

Section 1983 claims in Mississippi are subject to a three-year statute of limitations.[127] The State argues that the Plaintiffs' claims arose in 1890 and, therefore, are time-barred.[128] The State is incorrect.

First, a statute of limitations cannot begin to run against a plaintiff until the time of her

---

[125] *A-1 By D-2 v. Molpus*, 906 F. Supp. 375, 378 (S.D. Miss. 1995) (emphasis added).
[126] *Id.* at 379 (emphasis added).
[127] *Walker v. Epps*, 550 F.3d 407, 415 (5th Cir. 2008).
[128] State's Brief at 25.

injury.[129] In this case, the Plaintiffs' children were injured no earlier than their fifth birthdays, when their children became eligible to attend public school.[130] At the time the Complaint was filed, three of the Plaintiffs' children were six years old, and the fourth was seven years old.[131] Therefore, the Plaintiffs filed this lawsuit less than three years after their rights accrued, and their claims are not time-barred.

Second, Mississippi law tolls a statute of limitations against minors until the age of majority. Federal courts borrow state-law tolling principles in Section 1983 cases,[132] and Mississippi's "minor savings statute" provides, in relevant part:

> If any person entitled to bring any of the personal actions mentioned shall, at the time at which the cause of action accrued, be under the disability of infancy or unsoundness of mind, he may bring the actions within the times in this chapter respectively limited, after his disability shall be removed as provided by law.[133]

Therefore, "the statute of limitations . . . does not begin to run until [a minor] attains his twenty first birthday."[134] None of the Plaintiffs' children has reached his or her twenty-first birthday. Under the minor savings statute, their claims are not time-barred.[135]

## VI.    THE STATE IS VIOLATING THE READMISSION ACT.

The State's final argument is that the current version of Section 201 does not violate the Readmission Act. First, the State contends that "there is no way to measure, nor a suitable

---

[129] *Longoria v. City of Bay City, Tex.*, 779 F.2d 1136, 1138 (5th Cir. 1986).

[130] Miss. Const. of 1868, art. VIII § 1 (guaranteeing education rights to children "between the ages of five and twenty-one years").

[131] Complaint at ¶¶3.1-3.4.

[132] *Walker*, 550 F.3d at 415 ("Just as we borrow the forum state's statute of limitations for § 1983 purposes, we borrow also the state's tolling principles.").

[133] Miss. Code Ann. § 15-1-59.

[134] *Taylor v. Gen. Motors Corp.*, 717 So. 2d 747, 750 (Miss. 1998).

[135] *A-1* is not to the contrary. Unlike the Plaintiffs here, the minor in that case was 14 years old, and his school rights accrued "approximately eight years" before filing. *A-1*, 906 F. Supp. at 379. The *A-1* court also never considered the minor savings statute because the *pro se* plaintiff never raised those issues. Therefore, *A-1* is not even persuasive authority on these issues. *See, e.g.*, *Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.").

comparison between" the education rights provided by Article VIII, Section 1 of the 1868 Constitution and those provided today by Section 201.[136] This is merely a restatement of the argument that the case lacks manageable standards and, therefore, presents a nonjusticiable political question.[137] For all the reasons discussed above, *see supra* at 17-20, the State is incorrect.

Second, the State argues that amendments to the State constitution have not violated the Readmission Act. But the State is again incorrect. When Congress passed the Readmission Act in 1870, the Mississippi Constitution's education clause required, among other things, a "uniform" system of public schools to be "encourage[d], by all suitable means."[138] It also included a preamble explaining its purpose and framed Mississippi's obligations as a mandatory "duty."[139] Today's education clause includes none of these requirements. This is precisely what the Readmission Act forbade.

## CONCLUSION

The Readmission Act explicitly required that Mississippi "never" weaken its children's constitutionally guaranteed school rights. Mississippi did exactly what the Act forbade. Because of this violation of federal law, schools across the state have been witnesses to generations of legally sanctioned disuniformity, where race determines a child's chance at a meaningful education. No lawsuit can undo that injustice. This one does not try.

This lawsuit does not seek an injunction instructing the State how to ameliorate those injustices, and it seeks no damages to compensate for those injuries. It seeks only a declaration reaffirming that the State is obligated to do what the Readmission Act commands it to do:

---

[136] State's Brief at 26-27.
[137] *But see Zivotofsky*, 566 U.S. at 201 (statutory interpretation "is what courts do").
[138] Complaint at ¶1.6 (quoting Miss. Const. of 1868, art. VIII § 1) ("As the stability of a republican form of government depends mainly upon the intelligence and virtue of the people . . .").
[139] *Id.*

continue providing Mississippi's children the education rights provided in 1870. The State's

motion to dismiss should be denied.

RESPECTFULLY SUBMITTED this Fifteenth day of September 2017.


 /s/ *Will Bardwell*
Will Bardwell
Counsel for the Plaintiffs

**OF COUNSEL:**
William B. Bardwell (Miss. Bar No. 102910)
Jody E. Owens, II (Miss. Bar No. 102333)
Southern Poverty Law Center
111 E. Capitol Street, Suite 280
Jackson, Mississippi  39201
Phone:          (601) 948-8882
Facsimile:      (601) 948-8885
E-mail: will.bardwell@splcenter.org
E-mail: jody.owens@splcenter.org

Rita L. Bender (*pro hac vice*)
William J. Bender (*pro hac vice*)
Skellenger Bender, P.S.
Rainier Tower
1301 Fifth Avenue, Suite 3401
Seattle, Washington  98101
Telephone:      (206) 623-6501
Facsimile:      (206) 447-1973
E-mail: wbender@skellengerbender.com
E-mail: rbender@skellengerbender.com

Anton Metlitsky (*pro hac vice*)
Brad Elias (*pro hac vice*)
O'Melveny & Myers LLP
Times Square Tower, 33rd Floor
7 Times Square
New York, New York  10036
Telephone:      (212) 326-2000
Facsimile:      (212) 326-2061
E-mail: ametlitsky@omm.com
E-mail: belias@omm.com

. . .

## CERTIFICATE OF SERVICE

I, Will Bardwell, hereby certify that, simultaneous with this Memorandum's filing, I have served true and correct copies of the same on all counsel of record via the Court's electronic filing system.

SO CERTIFIED this Fifteenth day of September 2017.

 /s/ *Will Bardwell*
Will Bardwell
Counsel for the Plaintiffs