**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**INDIGO WILLIAMS,** *on behalf of her minor child J.E.***,** et al.                                      **PLAINTIFFS**

**v.**                                                                                          **CIVIL ACTION NO: 3:17-cv-404**

**GOVERNOR PHIL BRYANT et al.**                                                           **DEFENDANTS**

**REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

**I.  INTRODUCTION**

In the last 150 years, no court has accepted the premise that the SPLC now urges. In fact, every court to address a litigant's attempt to repurpose a so-called Readmission Act has rejected the attempt outright. *E.g., Butler v. Thompson*, 97 F. Supp. 17 (E.D. Va.), *aff'd,* 341 U.S. 937 (1951); *Merritt v. Jones*, 259 Ark. 380, 389, 533 S.W.2d 497, 502 (1976). The SPLC has no good retort to these cases—instead just labeling them as "repugnant" and "shameful." *See* Pl. Br. at 16, 20.

Setting aside the hyperbolic language, these courts got the law exactly right on this point. This is so because the text of the congressional acts could not be clearer. Mississippi's Readmission Act, for instance, provides:

> *An Act to admit the State of Mississippi to Representation in the Congress of the United States.*
>
> WHEREAS the people of Mississippi have framed and adopted a constitution of State government which is republican; and whereas the legislature of Mississippi elected under staid constitution has ratified the fourteenth and fifteenth amendments to the Constitution of the United States; and whereas the performance of these several acts in good faith is a ***condition precedent to the representation of the State in Cong****ress . . . .*
>
> * * * the State of Mississippi is admitted ***to representation in Congress*** as one of the States of the Union upon the following ***fundamental conditions***:
>
> 'Third, That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States the school rights and privileges secured by the Constitution of said State.

*See* 16 Stat. 67 (1870) (emphasis supplied), Ex. "A" to Motion to Dismiss.

This Act, with its "conditions" governing Mississippi's readmission to representation in Congress, is a matter peculiarly within the domain of Congress. And, *a fortiori,* any purported enforcement of the enactment is committed to Congress alone. As a result, the SPLC's lawsuit is simply a non-starter.[1]

## II.  REBUTTAL ARGUMENT

### A.  This Matter Presents a Paradigmatic Example of a Nonjusticiable Political Question.

***The Doctrine's Applicability****.* The SPLC declares that the political question doctrine "categorically" cannot apply because they have branded their claims as "statutory." The SPLC is wrong.

For starters, "[t]he issue is not how [the SPLC] has styled [its] suit, but instead what the underlying controversy is." *In re Nazi Era Cases,* 129 F. Supp. 2d 370, 375 (D.N.J. 2001); *El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 842 (D.C. Cir. 2010) ("The political question doctrine bars our review of [the] claims…regardless of how they are styled[.]").[2] The critical question is which branch of government is the appropriate branch to determine the issue—in other words, is there a textually demonstrable commitment of ***the issue*** to a coordinate political department. Here, there is.

To be sure, the case cited for the SPLC's categorical proposition establishes no such thing. *See Zivotofsky v. Clinton*, 566 U.S. 189 (2012). Indeed, contrary to the SPLC's argument, *Zivotofsky* does not

---

[1] In the oppositional response, the SPLC submitted the declaration of a history professor as an exhibit. The purported "purpose of th[e] declaration is to explain that Reconstruction's overarching purpose was to establish republican forms of government in the South[.]" *See* Dkt. No. [27-1] at p.1. While detailing 19 pages of history, just like many treatises, the declaration does nothing to advance any of the *legal issues* in the dismissal motion, such as the private enforceability of the act. *See* also Compl. at ¶ 6.11 (issues in the case raise a "pure question of law"). The declaration also does nothing else to support the SPLC's position. Indeed, the fact that the Readmission Act, and the "conditions" to Mississippi's representation in Congress, was from the very beginning inextricably connected with the wartime and post-war efforts of the political branches to prosecute the military and political aspects of the Civil War, and to conclude a peace that would be lasting, only reinforces why the issue before this Court amounts to a political question. Further, the declaration is barely cited in the analysis section. *See* note 111. In one sentence, the declaration maintains that the "devolution of black education can be traced directly to the 1890 constitution." *Id.* While this is otherwise conclusory and unhelpful to the legal issues before the Court, it also directly contravenes the Supreme Court in *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 (1973) ("On even the most basic [education] questions…experts are divided[.]"); *id.* at 24 (noting the "infinite variables affecting the educational process").

[2] The SPLC cites to *El-Shifa* on page 11, but the citation is to the *concurring* opinion that did not apply the political question doctrine. The majority opinion does not support the SPLC's absolutist approach to political question. *See El-Shifa*, 607 F.3d at 844 (political question barred Federal Tort Claims Act suit: even "a statute providing for judicial review does not override…that federal courts refrain from deciding political questions").

suggest that the existence of a statute prevents a claim from presenting a political question.[3] Rather, *Zivotofsky* held only that, in light of the statute and the nature of the parties' dispute, adjudicating the claim did not require the Court to intrude on any decisions committed to another branch. *Id.* at 1427.

In *Zivotofsky,* the plaintiff sought to enforce a statute purporting to require the Secretary of State, on request, to list "Israel" as the place of birth on the passport of an American citizen born in Jerusalem. In rejecting the government's argument on political question, the Court stated that the "existence of a statutory right *** is certainly relevant to the Judiciary's power to decide Zivotofsky's claim." *Id.* at 1427.

Notably, though, "the parties [did] not dispute the interpretation" of the statute, and the question concerned *only* whether the statute was constitutional. *Id.* Thus, *Zivotofsky* simply reaffirmed that, with political question, a court must consider the question and issue it is being asked to decide.[4] *See id.*

***The Baker Factors***. The SPLC next argues that this case amounts to nothing more than a "federal court's power to review the political choices of state officials." *See* Pl. Br. at 14, n.44. Not so. The political question doctrine applies here because there is a conflict between the federal judiciary and Congress.

Indeed, virtually all—if not all—of *Baker*'s political question factors are satisfied here. First, the text of Readmission Act commits "the issue" and the enforcement to Congress. The Act purported to set up a "condition precedent" to "representation of the State in Congress," stating that "Mississippi is admitted to representation in Congress…upon" certain "fundamental conditions." *See* 16 Stat. 67 (1870).

---

[3] *E.g., bin Ali Jaber v. U.S.*, 861 F.3d 241, 246 (D.C. Cir. 2017) ("*Zivotofsky* confirms no *per se* rule"); *see also Smith v. Obama*, 217 F. Supp. 3d 283, 298-300 (D.D.C. 2016) (in a case where "statutes [we]re involved[,]" the court noted that the "reality" was "more nuanced" and that the characterization of *Zivotofsky* was "strained"); *Aktepe v. U.S.,* 105 F.3d 1400, 1402 (11th Cir. 1997); *Spectrum Stores v. CITGO Petroleum, Inc.,* 632 F.3d 938, 954 (5th Cir. 2011). The SPLC cites to *Spectrum* in note 35, but they use the case incorrectly. In *Spectrum*, the political question doctrine applied. The SPLC cites to the portion of the case where the court discussed "statutory scheme[s] [that] exist[ ] to guide the court's determination of an issue." *Id.* at 952. That quote was in the discussion of judicially manageable standards—it was *not* a comment on any bar to political question.

[4] It is most certainly inapt to attribute to *Zivotofsky* a categorical rule that the decision itself disavowed. For instance, the Court recognized that if the issue were to be framed as the lower court framed it, it would "certainly raise [political question] concerns." *Zivotofsky,* 566 U.S. at 197 ("Our precedents have also found the political question doctrine implicated when there is 'a lack of judicially discoverable and manageable standards for resolving' the question before the court…"); *see also Zivotofsky*, 566 U.S. at 208-09 (Sotomayor, J., concurring) (That is not to say, however, that no statute could give rise to a political question. It is not impossible to imagine a case involving the application or even the constitutionality of an enactment that would present a nonjusticiable issue"); *Zivotofsky*, 566 U.S. at 210 (Alito, J., concurring) ("This case presents a narrow question[.]").

3

The SPLC's only retort to this is to proclaim that "Congress…determined that [the southern] states should be proscribed *forever* from depriving their citizens of certain rights[.]" *See* Pl. Br. at 16. But that assertion, even if true, does nothing to change the obvious. The issue—conditions to a state's representation in Congress after the Civil War, "perpetual" or not—remains committed to Congress.[5] *See id*. That the enactment so clearly commits the issue to Congress unravels each and every argument urged.

The arguments made as to the additional *Baker* factors are equally unavailing. The SPLC maintains that "all" it wants is a "declaration" that the current state constitution violates the state constitution of 1868, and that courts "routinely" undertake such an analysis. These allegations, though, are astonishingly disingenuous. In fact, *no* court has done what the SPLC asks here.

"When a court is given no standard by which to adjudicate a dispute…resolution of the suit is beyond the judicial role envisioned by Article III." *Zivotofsky*, 566 U.S. at 203-04 (Sotomayor, J., concurring) (citing *Vieth*, 541 U.S. at 278 ("One of the most obvious limitations imposed by [Article III] is that judicial action must be governed by *standard*...").[6]

In 1868, a "uniform system" was guaranteed for only "four months in each year." *See* 1868 MISS. CONST. art. 8 § 5. There are no judicially discoverable or manageable standards for comparing the "rights and privileges" provided under that constitution for four months, on the heels of the Civil War, with the rights

---

[5] The SPLC maintains that the "conditions" imposed on some southern states, pursuant to purported authority under the Guarantee Clause, "were designed to guarantee Mississippi citizens a republican form of government." *See* Pl. Br. at 1, 7-8 (claiming that if Mississippi were to "retrogress[ ]," it would not be providing the "goal" of a republican form of government). Despite the suggestion to the contrary, the fact that the SPLC is claiming that the state has "retrogressed" and thus allegedly is not providing a republican form of government adds further context to the political question presented. Indeed, dating back to its *locus classicus* of *Luther v. Borden*, 48 U.S. (7 How.) 1, 42 (1849), the political question doctrine has assumed that it is Congress that is in the sole position to judge whether a state has a "republican form of government," and the consequences if it does not. *See Baker,* 369 U.S. 186; *Pac. States Tel. & Tel. Co. v. Oregon*, 223 U.S. 118 (1912).

[6] Further, the relevant events took place at least as far back as 1868 and 1870. The point here is not just that the law has "roots stretching hundreds of years into the past." *See* Pl. Br. at 19. Instead, it is that in the last 147 years, "no judicially discernible and manageable standards for adjudicating" the instant (and otherwise inapt) claim "have emerged." *Vieth v. Jubelirer*, 541 U.S. 267, 281, (2004); *Spectrum Stores*, 632 F.3d at 952. While the SPLC brands the additional cases cited on this same point as setting forth a "hodgepodge" of precedent, that is just a less artful way of saying there are no standards under any case—or any other law.

and privileges provided today—with nine months of free public education.[7] While the SPLC conveniently casts this argument as "irrelevant," it highlights why their claim fails on multiple fronts. *See* Pl. Br. at 19.

For example, the brief contends, "[t]he Readmission Act did not preclude Mississippi from expanding the 1868 Constitution's education rights; it only prohibited *retrogression*." Thus, even under the SPLC's theory, to prohibit so-called "retrogression," the State would need to enact a version of § 201 that provides *only* for as "uniform" of a "system" as was provided in 1868—for *four* out of twelve months. In short, nothing about such a claim allows for judicially discoverable or manageable standards, and virtually all of the prudential *Baker* factors are triggered.[8]

**B.    The Readmission Act Does Not Provide for an Individual Enforceable Right Under § 1983.**

To state a § 1983 claim, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal law. *Gonzaga v. Doe,* 536 U.S. 273, 283 (2002) ("reject[ing] the notion that [ ] anything short of an unambiguously conferred right [can] support a [§ 1983]…action.").[9] "Accordingly, it is rights, not the broader or vaguer benefits or interests, that may be enforced under…[§ 1983]." *Equal Access*, 509 F.3d at 702-04; *see id.* ("statute [must] create [ ] rights…in the particular plaintiff.").

---

[7] The SPLC misapprehends the value of *Rodriguez*, 411 U.S. 1. The SPLC is attempting to re-cast an equal protection claim that they do not have in light of *Rodriguez* as a so-called Readmission Act claim—but that is a claim they also do not have. In addition, as to the analysis of whether there are judicially discoverable or manageable standards—and for purposes of whether the right is so vague and amorphous that it would not be judicially administrable (*see* note 19)—*Rodriguez*'s rationale is instructive. *Id.* ("On even the most basic questions…scholars and educational experts are divided[.]"); *see infra* note 17.

[8] As noted in the opening memorandum, the remaining *Baker v. Carr*, 369 U.S. 186, 210 (1962) factors are implicated here as well. *See* Dkt. No. [24] at pp. 9-10. At its core, the political question doctrine is "designed to restrain the Judiciary from inappropriate interference in the business of the other branches of Government." *United States v. Munoz-Flores*, 495 U.S. 385, 394 (1990). It embraces the pragmatic, if unglamorous, reality that there are certain issues the judiciary is simply ill-suited to resolve—such as the reconstruction of the Union after the Civil War and the "conditions" purportedly placed on some southern states prior to those states being able to again seat representatives in Congress. Further, Mississippi has continued to be admitted to representation in Congress for nearly 150 years after the Readmission Act, 127 years after the 1890 amendments to the Constitution, 83 years after the 1934 amendments, and 57 years after the 1960 amendments. *Cf. Butler*, 97 F. Supp. at 20.

[9] The pre-*Gonzaga* cases relied on by the SPLC, such as *Reese* in note 87, must be viewed in light of *Gonzaga* and the Fifth Circuit's case law since that decision. *E.g., Equal Access for El Paso, Inc. v. Hawkins,* 509 F.3d 697, 704 (5th Cir. 2007) (recognizing that *Gonzaga* abrogated the court's previous decision in *Evergreen v. Hood*, 235 F. 3d 908 (5th Cir. 2000), and noting that "[w]e are forced by *Gonzaga* to abjure the notion that anything short of an unambiguously conferred private individual 'right'…may be enforced"); *Williams v. U.S.*, 2006 WL 2546536, at *8 (E.D.N.Y. Sept. 1, 2006).

Here, the act does not unambiguously confer any rights. The only way the SPLC can contend otherwise is by sidestepping this point and pretending the act is something it is not. For instance, the SPLC *repositions* the words of the enactment—phrasing it this way: "no 'citizen or class of citizens' 'shall' ever be 'deprived' of their 'school rights' by an amendment to the State Constitution." See Pl. Br. at n.85. Presumably, the words are rearranged like this to try and satisfy *Gonzaga*, which the SPLC contends is met when a statute is "phrased no person…shall." *Id.*; *Gonzaga,* 536 U.S. at 284 (citing Title VI and Title IX).

But the SPLC's representation is *not* consistent with the actual wording of the Readmission Act. Per that act, the State was admitted to representation in Congress upon certain "fundamental conditions." See 16 Stat. 67 (1870). One of those conditions was: "the constitution of *Mississippi shall* never be so amended or changed as to deprive any citizen or class of citizens of the United States the school rights and privileges secured by the Constitution of said State." *See id.*[10] When quoted correctly, it is manifest that the act does not focus on rights granted to any person, but instead focuses and places conditions *on the State*—and commits enforcement of those conditions *to Congress*.[11] Accordingly, the unambiguous "rights-creating" language so critical to *Gonzaga* is completely absent here.[12]

## C. Plaintiffs Have Not Satisfied the Requirements for Article III Standing.

*Injury*. The claimed injury is that "predominantly white school districts are substantially more likely to offer a high-quality education than predominantly black school districts." See Pl. Br. at 10. Although

---

[10] *Compare Delancey v. City of Austin*, 570 F.3d 594, n.6 (5th Cir. 2009) (noting that Title IX provides: "*No person* in the United States shall, on the basis of sex,... be subjected to discrimination….," which places the persons benefitted as the subject not object); *with id.* at 594 (finding that the URA did not focus on the persons benefitted but the entity regulated because the regulated entity was the subject not the object, "The head of any displacing agency shall....").
  The citation to *Planned Parenthood v. Gee*, 862 F.3d 445, 459 (5th Cir. 2017) also does not help the SPLC's position. As the Fifth Circuit noted, the statute there evidenced an unambiguously conferred right by being phrased in terms of "*any individual* eligible for medical assistance...may obtain such assistance.") *Id.* (emphasis in original).

[11] *See, e.g., Equal Access*, 509 F.3d at 703 (noting that the statute "speaks only to the state"); *Johnson v. City of Detroit*, 446 F.3d 614, 627 (6th Cir. 2006) ("Although residents of public housing undoubtedly 'benefit' from the statutory provisions at issue, the language of § 1437f has an aggregate focus on the entity being regulated….").

[12] Notably, the presumptive availability of § 1983 relief can be rebutted through a showing of "[c]ongressional intent to 'shut the door to private enforcement.'" *Gonzaga*, 536 U.S. at 284 n.4. Here, the congressional enactment commits the enforcement *to Congress*. *Butler*, 97 F. Supp. at 20; *Merrit*, 259 Ark. at 389 ("enforcement in the exclusive domain of Congress"). Similarly, and as discussed, the supposed right asserted is so vague and amorphous that it would not be judicially administrable. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378 (2015).

standing is not to be denied simply because many people suffer the same injury, the Supreme Court has made clear that a plaintiff may not base a claim on an abstract grievance "shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin,* 422 U.S. 490, 499 (1975).[13]

Plaintiffs' alleged injury here flows from their geographical location, as they claim their particular local school district is worse than others.[14] Additionally, the harm claimed is even more generalized because Plaintiffs recognize that the schools attended by their minor children contain students from a variety of racial/ethnic backgrounds. Thus, the chief grievance is against the delivery of education in Mississippi, which is an insufficient generalized grievance.

*Traceability*. The purported "inferior" education claimed by Plaintiffs is not "fairly traceable" to changes made to the Constitution as far back as 1890. *Lujan*, 504 U.S. at 560-61. In contending otherwise, the SPLC distorts the arguments concerning the "infinite variables" and socioeconomic factors contributing to literacy and education. But this is exactly what the Court recognized in *Rodriguez*, 411 U.S. at 24 ("Nor [ ] in view of the *infinite variables* affecting the educational process, can any system assure equal quality of education…."); *Moore v. Bryant*, 205 F. Supp. 3d 834 (S.D. Miss. 2016).

*Redressability*. An injury is only redressable if a court can provide "substantial and meaningful relief." *E.g., Moore,* 205 F. Supp. 3d at 856. Here, the Readmission Act set up a condition to the seating of representatives in Congress.[15] The purported relief available, then, is within the domain of Congress alone.

Likewise, the complaint requests relief in the form of asking the judiciary to turn back the clock on the State's Constitution by 150 years. Yet the complaint offers only speculation that this proposed (and, again, improper) remedy would/could redress the alleged injury of "inferior" education. Further, because the 1868 Constitution guaranteed the right to public education for only "four months in each year," the most a

---

[13] As noted, there also are prudential limitations on standing. Federal courts are not "publicly funded forums for the ventilation of public grievances." *Valley Forge v. Americans United*, 454 U.S. 464, 473-75 (1982).

[14] The general rule is that a child attends a school "in the school district of his residence[.]" MISS. CODE § 37-15-29.

[15] The contention that "unseating [ ] congressional representatives is not the appropriate remedy for a violation of the Act[ ]" is telling. *See* Pl. Br. at 24. The remedy the SPLC wants is found nowhere in the Readmission Act.

court could order to prohibit so-called "retrogression" is for the State enact a version of § 201 that provides for as "uniform" of a "system" as was provided in 1868—for "four months." Not only does this highlight the underlying inaptness of the claim, but it also negates a finding of redressability.[16]

**D.    The Claim Runs Afoul of the Eleventh Amendment and Principles of Federalism.**

The SPLC mischaracterizes their complaint as seeking prospective, equitable relief under *Ex Parte Young*. However, contrary to the suggestion otherwise, this Court already addressed and rejected that argument in *A-1 By D-2 v. Molpus*, 906 F. Supp. 375 (S.D. Miss. 1995).[17] In *A-1*, the plaintiffs argued that Mississippi's current Constitution deviates from the Constitution of 1868 in violation of the Readmission Act. In holding the *A-1* plaintiffs' claim barred by the Eleventh Amendment, this Court expressly acknowledged *Ex Parte Young* and rightly found that the narrow exception did not apply.[18]  *Id*. at 378 n.9.

### III.  CONCLUSION

For these reasons, the State Defendants reiterate their request that the SPLC's claim be dismissed.

---

[16] As noted, there is no suitable barometer for measuring the "school rights and privileges" received then and received now. What's more, even just comparing what educational "rights" are more superior than others is itself unclear per the Supreme Court. *See Rodriguez* 411 U.S. at 42-43. This is why some states have "uniformity" clauses, and many other states ***do not***. For instance, many state constitutions, like Mississippi, refer generally to the state's obligation to provide "free common schools" or "free public schools." *See* CONN. CONST. art. VIII, § 1; IDAHO CONST. art. IX, § 1; MICH. CONST. art. VIII, § 2; MISS. CONST. art. 8, § 201; MO. CONST. art. IX, § 1(a); N.Y. CONST. art. XI, § 1; OKLA. CONST. art. I, § 5; *id*. art. XIII, § 1; TENN. CONST. art. XI, § 12. Other constitutions refer to "uniform" schools or a "uniform system" of schools. *See* FLA. CONST. art. IX, § 1; COLO. CONST. art. IX, § 2; IND. CONST. art. 8, § 1; MINN. CONST. art. XIII, § 1; NEV. CONST. art. XI, § 2; N.M. CONST. art. XII, § 1; N.C. CONST. art. IX, § 2; N.D. CONST. art. VIII, § 2; S.D. CONST. art. VIII, § 1; WASH. CONST. art. IX, § 2; WIS. CONST. art. X, § 3; WYO. CONST. art. 7, § 1.  Still others discuss an "efficient system" of schools. DEL. CONST. art. X, § 1; MD. CONST. art. VIII, § 1; MINN. CONST. art. XIII, § 1; N.J. CONST. art. VIII, § IV; OHIO CONST. art. VI, § 2; PA. CONST. art. III, § 14; W. VA. CONST. art. XII, § 1. Worse still, states that do have "uniformity" clauses interpret them differently. *E.g., Meredith v. Pence*, 984 N.E.2d 1213 (Ind. 2013); *Davis v. Grover*, 480 N.W.2d 460 (1992); *Bush v. Holmes*, 919 So.2d 392 (Fla.2006).

[17] The *Ex Parte Young* exception does not apply to claims for retroactive declaratory relief, *Green v. Mansour*, 474 U.S. 64, 73 (1985), and any violation of the Readmission Act occurred when Mississippi amended its Constitution in 1890. Similarly, the SPLC seeks a declaration that the State Defendants are in violation of the State Constitution as it existed in 1868. However, as discussed originally, this would run afoul of *Pennhurst v. Halderman*, 465 U.S. 89, 105-06 (1984).

[18] Any violation of the Act occurred, and any claim accrued, when Mississippi "amended or changed" its Constitution. *See A-1*, 906 F. Supp. at 379 (There is "nothing to support a contention that any claims…have survived to the present day."). While the SPLC argues that the "minor tolling statute" serves as a perpetual tolling device, this Court in *A-1* addressed the limitations issue. There, the minor children were older than the ones here, but both are/were minors. Further, the "minor savings statute" only operates to toll a statute of limitations for "any person entitled to bring" the action. MISS. CODE ANN. § 15-1-57. Because the Readmission Act is not privately enforceable, the minors are not "entitled to bring" this action.

THIS, the 10th day of October, 2017.

Respectfully submitted,

By: **JIM HOOD, ATTORNEY GENERAL OF THE STATE OF MISSISSIPPI**

By: */s/ Krissy C. Nobile*
Krissy Casey Nobile, MB #103577
STATE OF MISSISSIPPI
OFFICE OF THE ATTORNEY GENERAL
Post Office Box 220
Jackson, MS 39205
Phone: 601-359-3680
Email: knobi@ago.state.ms.us

*Counsel for State Defendants Gov. Phil Bryant, Speaker of the Mississippi House of Representatives Phillip Gunn, Lieutenant Gov. Tate Reeves, Secretary of State Delbert Hosemann, State Superintendent of Education Carey Wright, Chair of the Mississippi State Board of Education Rosemary Aultman, Mississippi State Board of Education Member Jason Dean, Mississippi State Board of Education Member Buddy Bailey, Mississippi State Board of Education Member Kami Bumgarner, Mississippi State Board of Education Member Karen Elam, Mississippi State Board of Education Member Johnny Franklin, Mississippi State Board of Education Member Williams Harold Jones, Mississippi State Board of Education Member John Kelly, and Mississippi State Board of Education Member Charles McClelland.*

## **CERTIFICATE OF SERVICE**

I, KRISSY C. NOBILE, hereby certify that I electronically filed the above and foregoing with the Clerk of the Court using the ECF system which sent notification of such filing to the all counsel of record.

This the 10th day of October, 2017.

*/s/ Krissy C. Nobile*
KRISSY C. NOBILE