# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

April 2, 2020

Lyle W. Cayce
Clerk

No. 19-60069

———————

INDIGO WILLIAMS, on behalf of her minor child J.E.; DOROTHY
HAYMER, on behalf of her minor child, D.S.; PRECIOUS HUGHES, on
behalf of her minor child, A.H.; SARDE GRAHAM, on behalf of her minor
child, S.T.,

        Plaintiffs - Appellants

v.

TATE REEVES, in his official capacity as Governor of Mississippi; PHILIP
GUNN, in his official capacity as Speaker of the Mississippi House of
Representatives; TATE REEVES, in his official capacity as Lieutenant
Governor of Mississippi; DELBERT HOSEMANN, in his official capacity as
Secretary of State of Mississippi; CAREY M. WRIGHT, in her official capacity
as State Superintendent of Education and Executive Secretary of MS State
Board of Education; ROSEMARY AULTMAN, in her official capacity as
Chair of the Mississippi State Board of Education; JASON DEAN, in his
official capacity as Member of the Mississippi State Board of Education;
BUDDY BAILEY, in his official capacity as Member of the Mississippi State
Board of Education; KAMI BUMGARNER, in her official capacity as Member
of the Mississippi State Board of Education; KAREN ELAM, in her official
capacity as Member of the Mississippi State Board of Education; JOHNNY
FRANKLIN, in his official capacity as Member of the Mississippi State Board
of Education; WILLIAM HAROLD JONES, in his official capacity as Member
of the Mississippi State Board of Education; JOHN KELLY, in his official
capacity as Member of the Mississippi State Board of Education; CHARLES
MCCLELLAND, in his official capacity as Member of the Mississippi State
Board of Education,

        Defendants - Appellees



EXHIBIT
A

No. 19-60069

———————————

Appeal from the United States District Court
for the Southern District of Mississippi

———————————

Before JOLLY, GRAVES, and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

Five years after the end of the Civil War, the Mississippi Readmission Act of 1870 reseated Mississippi's representatives in Congress, formally restoring Mississippi's rights as a member of the Union. By the plain terms of the Act, the State's readmission to Congress was subject to several "fundamental conditions," including a restriction prohibiting the State from "amend[ing] or chang[ing]" its Constitution in such a way that it "deprive[s] any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State." 16 Stat. 67 (1870).

The plaintiffs in this lawsuit are low-income African-American women whose children attend public schools in Mississippi. They filed suit against multiple state officials in 2017, alleging that the current version of the Mississippi Constitution violates the "school rights and privileges" condition of the Mississippi Readmission Act. The district court held that plaintiffs' suit was barred by the Eleventh Amendment and dismissed the case. Though we agree that a portion of the relief plaintiffs seek is prohibited by the Eleventh Amendment, we hold that the lawsuit also partially seeks relief that satisfies the *Ex parte Young* exception to sovereign immunity. Accordingly, we AFFIRM in part and VACATE and REMAND in part.

I.

When the Confederate states seceded from the Union, their congressional seats became vacant, leaving them without representation in the Senate and the House of Representatives. *See* Joint Committee on

2

No. 19-60069

Reconstruction, 39th Cong., 1st Sess., 1866 S. Rept. 112, x–xxi. In order to regain representation in Congress at the end of the war, the former Confederate states were required to adopt a Constitution that guaranteed a republican form of government to all state residents. 14 Stat. 429 (1867). Mississippi adopted a new Constitution on May 15, 1868, which was subsequently ratified on December 1, 1869 (the "1868 Constitution"). *See* Miss. Const. of 1868. Article Eight of the 1868 Constitution contained a series of provisions related to education and the establishment and maintenance of schools in the State. Section 1 provided as follows:

> As the stability of a republican form of government depends mainly upon the intelligence and virtue of the people, it shall be the duty of the Legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and shall, as soon as practicable, establish schools of higher grade.

*Id.*, art. VIII § 1.

Shortly after the 1868 Constitution was ratified, Congress enacted the Mississippi Readmission Act, which declared that the State was now "entitled to representation in the Congress of the United States." 16 Stat. 67, 68 (1870). Despite this broad proclamation, Congress conditioned Mississippi's newly-restored rights on three "fundamental" restrictions:

> First, That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote . . . .

> Second, That it shall never be lawful for the said State to deprive any citizen of the United States, on account of his race, color, or previous condition of servitude, of the right to hold office . . . .

> Third, That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of

3

No. 19-60069

the United States of the school rights and privileges secured by the
constitution of said State.

*Id.* Since 1868, the Mississippi Constitution's education clause has been
amended four times: in 1890, 1934, 1960, and, most recently, in 1987. The
current version of the Constitution contains the following education clause,
codified in Section 201 of Article 8:

> The Legislature shall, by general law, provide for the
> establishment, maintenance and support of free public schools
> upon such conditions and limitations as the Legislature may
> prescribe.

Miss. Const., art. VIII § 201.

Plaintiffs argue that Section 201, as most recently amended in 1987,
violates the "school rights and privileges" condition of the Mississippi
Readmission Act. They highlight one specific difference between the 1868 and
1987 education clauses: While the 1868 version of the education clause
required the Legislature to establish "a *uniform* system of free public schools,"
the 1987 version has no reference to "uniform[ity]," mandating only that the
Legislature provide for the establishment of a system of "free public schools."[1]
Plaintiffs allege that the removal of the uniformity clause has caused
significant disparities in the educational resources, opportunities, and
outcomes afforded to children in Mississippi based on their race and the race
of their classmates. They assert that the schools attended by plaintiffs'
children—Raines Elementary and Webster Street Elementary—"are
emblematic" of the problems caused by the lack of a uniformity guarantee. The
student body at both schools is over 95% African American, and over 95% of all

---

[1] Plaintiffs identify other differences between the two education clauses as well,
including the elimination of "an obligation for the Legislature to 'encourage' the promotion of
public education 'by all suitable means'" and the elimination of the duty "to establish a core
curriculum of 'intellectual, scientific, moral, and agricultural improvement.'" Throughout
their briefing, however, they focus primarily on the absence of the uniformity guarantee.

4

No. 19-60069

students are eligible to receive free-or-reduced-price lunch, an indicator of poverty. Fewer than 11% of the students at these schools are proficient in reading and math, and the schools are currently rated "D" by the Mississippi Department of Education. In contrast, plaintiffs point to three "A"-rated schools—in Madison County, DeSoto County, and Gulfport—where the student populations are predominantly white and higher-income and over 65% of students are proficient in reading and math.

These disparities extend well beyond academic performance. Plaintiffs allege that their children attend schools where "[t]he ceilings are covered in wet spots, . . . the paint is chipping off the walls," students are taught by inexperienced teachers, and extracurricular activities are limited or non-existent. At schools that are predominantly white, children benefit from experienced teachers, low student-teacher ratios, and extensive resources, including "an iPad e-Reader library," musical programming, and robust physical education.

According to plaintiffs, Mississippi's removal of the word "uniform" from its Constitution resulted in a violation of the Readmission Act that has caused them to suffer a number of injuries, including illiteracy, a diminished likelihood of high school graduation, low rates of college attendance and college completion, and an increased likelihood of future poverty. In their first complaint, filed in May 2017, they sought a three-part declaratory judgment against fourteen state officials—all of whom play a role in managing and overseeing educational services in Mississippi. Defendants moved to dismiss under Federal Rule of Civil Procedure 12(b)(1) and (b)(6). The district court granted defendants' motion for dismissal under 12(b)(1), holding that plaintiffs' complaint was barred by sovereign immunity. Although plaintiffs sued state officials rather than Mississippi itself, the court concluded that the relief plaintiffs seek would impermissibly "result in the issuing of an order that

5

No. 19-60069

would, and could, operate only against the State." The district court also held that plaintiffs' claim for declaratory relief was not covered by the *Ex parte Young* exception to the Eleventh Amendment because it sought to "rectify prior violations of the Mississippi Readmission Act" rather than prospectively dictate future conduct.

Plaintiffs timely moved for reconsideration of the district court's order. The district court denied the motion on the merits, but amended the judgment to reflect the fact that the dismissal was without prejudice—a mandatory condition for a dismissal under Federal Rule of Civil Procedure 12(b)(1). *See Warnock v. Pecos County*, 88 F.3d 341, 343 (5th Cir. 1996) ("Because sovereign immunity deprives the court of jurisdiction, . . . claims barred by sovereign immunity can be dismissed only under Rule 12(b)(1) and not with prejudice."). On appeal, plaintiffs largely abandon the relief requested in their original complaint, relying instead on the proposed amended complaint attached to their motion for reconsideration. In that complaint, plaintiffs request a "prospective declaratory judgment" that makes two distinct findings: first, "that Section 201 of the Mississippi Constitution is violating the Readmission Act," and second, "that the requirements of Article VIII, Section 1 of the Constitution of 1868 remain legally binding on the Defendants, their employees, their agents, and their successors."[2]

This appeal requires us to consider the "substance rather than . . . the form of the relief" plaintiffs seek, identifying the often "indistinct" line between permissible and prohibited claims under the Eleventh Amendment. *See Papasan v. Allain*, 478 U.S. 265, 278–79 (1986). As we explain below, this

---

[2] Plaintiffs initially sought a third declaration that the "1987, 1960, 1934, and 1890 versions of Section 201 were void *ab initio*." They removed this request from their amended complaint and acknowledge on appeal that the remaining two parts of their requested declaration "would suffice for present purposes."

No. 19-60069

careful analysis leads us to a split conclusion on plaintiffs' request for a two-part declaratory judgment: while the first part of their requested declaration seeks prospective relief that is permissible under *Ex parte Young*, the second part seeks a declaration of *state* law and is therefore barred by the Supreme Court's decision in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89 (1984).

## II.

We review a district court's dismissal under Federal Rule of Civil Procedure 12(b)(1) de novo. *AT&T Commc'ns v. BellSouth Telecomms. Inc.*, 238 F.3d 636, 643 (5th Cir. 2001) (citations omitted). In conducting this analysis, we "take the well-pled factual allegations of the complaint as true and view them in the light most favorable to the plaintiff." *Lane v. Halliburton*, 529 F.3d 548, 557 (5th Cir. 2008). A dismissal for lack of jurisdiction will not be affirmed unless "it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief." *Gilbert v. Donahoe*, 751 F.3d 303, 307 (5th Cir. 2014).

## III.

The district court dismissed the complaint because it concluded that plaintiffs' claims were barred by the Eleventh Amendment. On appeal, the state officials defend the district court's judgment while also making several alternative arguments in support of affirmance, contending that plaintiffs lack standing, the suit is barred by the political question doctrine, and there is no private right of action under the Mississippi Readmission Act. These arguments were raised in defendants' briefing before the district court, but they were not addressed in the district court's order. Though "[a] successful party in the District Court may sustain its judgment on any ground that finds support in the record," *Jaffke v. Dunham*, 352 U.S. 280, 281 (1957), the decision whether to consider an argument for the first time on appeal is "one left

7

No. 19-60069

primarily to the discretion of the courts of appeals," *Singleton v. Wulff*, 428 U.S. 106, 121 (1976).

We conclude that there are no "special circumstances" that would justify review of these issues at this stage of the litigation, *Man Roland, Inc. v. Kreitz Motor Express*, 438 F.3d 476, 483 (5th Cir. 2006), and we therefore remand so that the district court may reach them in the first instance. We thus confine the remainder of our analysis to the Eleventh Amendment question. We express no opinion on the merits of this lawsuit or defendants' alternative jurisdictional arguments. *See PDK Labs. Inc. v. U.S. D.E.A.*, 362 F.3d 786, 799 (D.C. Cir. 2004) ("[T]he cardinal principle of judicial restraint [is] if it is not necessary to decide more, it is necessary not to decide more." (Roberts, J., concurring)).

## A.

As a sovereign entity, a state may not be sued without its consent. The Eleventh Amendment, which protects the states' sovereign immunity, "deprives a federal court of jurisdiction to hear a suit against a state." *Warnock*, 88 F.3d at 343 (citing *Pennhurst*, 465 U.S. at 100). Read literally, the text of the Eleventh Amendment prevents only *non-citizens* of a state from suing that state. U.S. Const. amend. XI. Since *Hans v. Louisiana*, 134 U.S. 1, 10–11 (1890), however, courts have understood that the Amendment provides protections beyond its text, shielding states from suits brought by their own citizens as well as citizens of other states.[3] *See Va. Office for Prot. & Advocacy*

---

[3] Because this broad reading of the Eleventh Amendment is not supported by its text, we have dubbed "Eleventh Amendment immunity" a "misnomer . . . [since] that immunity is really an aspect of the Supreme Court's concept of state sovereign immunity and is neither derived from nor limited by the Eleventh Amendment." *Meyers ex. rel. Benzing v. Texas*, 410 F.3d 236, 240–41 (5th Cir. 2005) (citing *Alden v. Maine*, 527 U.S. 706, 712–13 (1999)). "Nevertheless, the term 'Eleventh Amendment immunity' has been used loosely and interchangeably with 'state sovereign immunity' to refer to a state's immunity from suit without its consent in federal courts." *Id.* (citing cases).

No. 19-60069

*v. Stewart*, 563 U.S. 247, 253 (2011) (*VOPA*). The doctrine of sovereign immunity is derived from the fundamental principle that "it is inherent in the nature of sovereignty not to be amenable to the suit of an individual without [the sovereign's] consent." *Fla. Prepaid Postsecondary Educ. Expense Bd. v. College Sav. Bank*, 527 U.S. 627, 634 (1999) (quoting *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54 (1996)).

Sovereign immunity is not limitless, and this case involves an important caveat—the *Ex parte Young* exception. Under *Ex parte Young*, 209 U.S. 123, 167–68 (1908), a litigant may sue a state official in his official capacity if the suit seeks prospective relief to redress an ongoing violation of federal law. *Id.* at 167–68; *Air Evac EMS v. Tex., Dep't of Ins., Div. of Workers' Comp.*, 851 F.3d 507, 519 (5th Cir. 2017). The exception rests on a legal fiction, the premise that a state official is "not the State for sovereign-immunity purposes" when "a federal court commands [him or her] to do nothing more than refrain from violating federal law." *VOPA*, 563 U.S. at 255. Though an *Ex parte Young* suit has an "obvious impact on the State itself," it is an essential mechanism for affirming the supremacy of federal law.[4] *Pennhurst*, 465 U.S. at 104–05; *see also VOPA*, 563 U.S. at 254–55 (observing that the *Ex parte Young* exception "has existed alongside our sovereign-immunity jurisprudence for more than a century, accepted as necessary to permit the federal courts to vindicate federal rights." (internal quotation marks omitted)).

---

[4] As a general rule, "a suit against state officials that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." *Pennhurst*, 465 U.S. at 102. But *Ex parte Young* is "an important exception to th[at] general rule." *Id.* Thus, if a case meets the requirements of *Ex parte Young*, it is permissible—despite the fact that, in reality, a judgment in the case would ultimately operate against the state. *Id.*; *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993) ("*Young* and its progeny render the [Eleventh] Amendment wholly inapplicable to a certain class of suits.").

No. 19-60069

There are three basic elements of an *Ex parte Young* lawsuit. The suit must: (1) be brought against state officers who are acting in their official capacities; (2) seek prospective relief to redress ongoing conduct; and (3) allege a violation of federal, not state, law. *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015). An *Ex parte Young* suit must also seek equitable relief—relief that is "declaratory or injunctive in nature and prospective in effect." *Aguilar v. Tex. Dep't of Criminal Justice*, 160 F.3d 1052, 1054 (5th Cir. 1998); *see also Lipscomb v. Columbus Mun. Separate Sch. Dist.*, 269 F.3d 494, 500–01 (5th Cir. 2001) (holding that *Ex parte Young* applied to a suit for declaratory relief because the "requested relief is indistinguishable from a suit to enjoin the [state official] from declining to [enforce the law]"). "[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002).[5] Therefore, in order to determine whether a suit complies with the requirements of *Ex parte Young*, the "court need only conduct a 'straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective.'" *Id.* (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in judgment)).

Plaintiffs clearly comply with the first requirement for an *Ex parte Young* suit: the named defendants are state officers, and they are sued in their official capacities. Plaintiffs' two-part request for a declaratory judgment requires a more nuanced analysis of the "prospective" and "federal law" prongs

---

[5] Defendants argue that the availability of a private right of action to enforce the Mississippi Readmission Act is a question that goes "hand in hand" with the sovereign immunity question. In *McCarthy ex rel. Travis v. Hawkins*, 381 F.3d 407 (5th Cir. 2004), however, we held that there is "no support" for the notion that "a court must determine the validity of a plaintiff's cause of action in the course of deciding whether an *Ex parte Young* suit can proceed in the face of a state's Eleventh Amendment defense." *Id.* at 415.

10

No. 19-60069

of an *Ex parte Young* lawsuit. Two Supreme Court cases primarily guide our inquiry: *Papasan v. Allain* and *Pennhurst State School & Hospital v. Halderman*.

i.

Defendants argue that plaintiffs' lawsuit seeks retroactive relief that cannot be pursued under *Ex parte Young*. The *Ex parte Young* exception is "focused on cases in which a violation of federal law by a state official is ongoing as opposed to cases in which federal law has been violated at one time or over a period of time in the past." *Papasan*, 478 U.S. at 277–78. This limitation is consistent with the purpose of the *Ex parte Young* exception: While "'[r]emedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law," *id.* at 278 (quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985)), the same rationale does not apply to remediation of a *prior* violation of federal law. Thus, to comply with the dictates of *Ex parte Young*, plaintiffs' lawsuit must allege that the defendants' actions are *currently* violating federal law. *See NiGen Biotech*, 804 F.3d at 394 (citing *Green*, 474 U.S. at 71–73).

According to defendants, the first part of plaintiffs' two-part requested declaration—a finding "that Section 201 of the Mississippi Constitution is violating the Readmission Act"—fails this test. Defendants characterize this portion of plaintiffs' requested relief as a challenge to the Mississippi legislature's actions to *amend* the Constitution's education clause—an act that occurred thirty-two years ago, and which is not expected to occur again in the imminent future. Defendants also note that the Mississippi Readmission Act itself places limitations on the *amendment* of the Constitution, not on the text of the laws that result from that amendment process. *See* 16 Stat. 68 (prohibiting the State from "amend[ing] or chang[ing]" its Constitution if the amendment has the particular effect of "depriv[ing] any citizen or class of

11

No. 19-60069

citizens of the United States of the school rights and privileges secured by the constitution of said State"). They therefore argue that plaintiffs unlawfully seek retroactive relief—a declaration that the constitutional amendment violated federal law at the time that it occurred.

We disagree with this characterization of plaintiffs' requested relief. The Supreme Court's decision in *Papasan* is particularly instructive, compelling the conclusion that this portion of plaintiffs' requested relief is permissible under *Ex parte Young*. In *Papasan*, a group of Mississippi public-school children alleged that the State *had* breached its obligation to hold federally-granted land in a perpetual trust for the benefit of schoolchildren in the State's northern twenty-three counties—an area previously held by the Chickasaw Indian Nation. 478 U.S. at 272–73. Mississippi sold the land in 1856, investing the proceeds in railroads that were later destroyed. *Id.* at 272. The *Papasan* plaintiffs alleged that those decisions amounted to a breach of trust and an equal protection violation. *Id.* at 274.

The Court allowed plaintiffs to pursue their equal-protection claim but rejected the second claim for a breach of trust. *Id.* at 280–82. Though phrased as a claim for equitable relief, the breach-of-trust claim asked the State to provide monetary relief for the State's imprudent investment activities, a harm that occurred when the State sold the land over 100 years before the plaintiffs brought their claims. *Id.* at 280–81. Because the plaintiffs sought to remedy the breach itself, any relief linked to the past breach would have been retrospective, not prospective. *Id.* In contrast, the Court held that the equal-protection claim was prospective and thus permitted that claim to go forward. *Id.* at 281–82. Plaintiffs alleged that the State's past actions had present and persistent consequences, denying them "their rights to an interest in a minimally adequate level of education, or reasonable opportunity therefor." *Id.* at 282. The Court held that "[t]his alleged ongoing constitutional violation—

12

No. 19-60069

the unequal distribution by the State of the benefits of the State's school lands—is precisely the type of continuing violation for which a remedy may permissibly be fashioned under *Young*." *Id*. Though "the current disparity result[ed] directly from . . . actions in the past," the "essence" of the claim alleged a current and persisting disparity in the State's distribution of funds. *Id*.

Like the equal-protection claim in *Papasan*, plaintiffs' claim that Section 201 currently violates the Mississippi Readmission Act seeks relief for an ongoing violation. Plaintiffs argue that Mississippi schoolchildren *today* are deprived of their school rights, and they allege that the current version of Section 201—presently enforced and maintained by the defendants—is the cause of that harm. *Papasan* instructs that the historical origins of the continuing violation are not determinative of the viability of an *Ex parte Young* suit. As long as the claim seeks prospective relief for ongoing harm, the fact that a current violation can be traced to a past action does not bar relief under *Ex parte Young. Id*. at 282. Plaintiffs must allege that "the defendant *is violating* federal law, not simply that the defendant has done so" at some point in the past, *NiGen Biotech*, 804 F.3d at 394. Once they meet that requirement, however, the complaint's straightforward, present-tense allegations "are sufficient to demonstrate the ongoing nature of the alleged un[lawful] conduct." *Id*. at 395.

Plaintiffs' allegations are sufficiently forward-looking, and thus permissible under *Papasan*. They seek relief for what they allege to be defendants' ongoing violation of federal law—the enforcement of a state constitutional provision that conflicts with the federal Readmission Act. This is the type of relief permitted under *Ex parte Young*, which "rests on the need to promote the vindication of federal rights." *Cox v. City of Dallas*, 256 F.3d 281, 307 (5th Cir. 2001); *Verizon*, 535 U.S. at 645. Contrary to defendants'

13

No. 19-60069

characterization, plaintiffs do not challenge the act of amending the Mississippi Constitution; instead, they challenge the ongoing harm they allegedly suffer as a result of its current text. An invalid law produces consequences long after the date of its enactment—that is the very essence of a legal dictate. "In discerning on which side of the line a particular case falls, we look to the substance rather than to the form of the relief sought, and will be guided by the policies underlying the decision in *Ex parte Young*." *In re Tejas Testing Tech. One*, 149 F.3d 1177, at *4 (5th Cir. 1998) (unpublished) (quoting *Papasan*, 478 U.S. at 279) (holding that several of plaintiffs' causes of action sought, "at least on their face, prospective declaratory or injunctive relief for a continuing violation of federal law," and were therefore permissible under *Ex parte Young*). Thus, because plaintiffs claim to be presently harmed by these consequences, they may pursue prospective relief under *Ex parte Young*.

Defendants also argue that plaintiffs' request for a declaration that Section 201 conflicts with the Readmission Act impermissibly interferes with "special sovereignty interests." We do not find this argument persuasive. Though the Supreme Court held in *Coeur d'Alene* that "special sovereignty interests" may invalidate an otherwise appropriate *Ex parte Young* suit, that case involved a lawsuit that was the "functional equivalent of a quiet title action"—a specific infringement on state land rights. 521 U.S. at 281. We have never before applied the holding of *Coueur d'Alene* in a context outside of the unique land rights challenge in that case. *See, e.g., Severance v. Patterson*, 566 F.3d 490, 495 (5th Cir. 2009) (declining to extend the *Coeur d'Alene* limitation to a case that did not involve a quiet title action and would thus not impede on the state's right to its own lands); *Lipscomb*, 269 F.3d at 502 (holding that a lawsuit that did not seek to quiet title was not barred by *Coeur d'Alene* since it would not result in relief that "strip[ped] the State of any of its jurisdiction or authority to regulate the land"). To the contrary, "this circuit has rejected the

14

No. 19-60069

idea that *Coeur d'Alene* affects the traditional application of *Ex parte Young*." *AT&T Comm'ns*, 238 F.3d at 648; *Air Evac EMS*, 851 F.3d at 517; *see also* 17 Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 4232 (3d ed. 2019) ("Lower courts have been reluctant to use the special state sovereignty interest rationale to limit Ex Parte Young relief."). Moreover, plaintiffs' requested relief would not interfere with the State's general ability to manage and operate its own schools. It would simply lead to a declaration that one constitutional provision defining the terms of that management structure violates federal law.

For these reasons, we conclude that the first part of plaintiffs' two-part requested relief—a declaration that Section 201 of the Mississippi Constitution conflicts with the Readmission Act—may be pursued under *Ex parte Young*, and we reverse the district court's Eleventh Amendment-only dismissal as to this part.

ii.

We reach the opposite conclusion with respect to the second part of plaintiffs' requested declaratory judgment: a finding that "the requirements of Article VIII, Section 1 of the Constitution of 1868 remain legally binding on the Defendants, their employees, their agents, and their successors." Because this request impermissibly asks a federal court to "instruct[] state officials on how to conform their conduct to state law," it is barred by the Supreme Court's decision in *Pennhurst*, 465 U.S. at 106.

In *Pennhurst*, the Court explained that the rule announced in *Ex parte Young* cannot be used to redress a state official's violation of state law. *Id.* The plaintiffs in *Pennhurst* sought to invoke the federal court's supplemental jurisdiction to bring a claim under a Pennsylvania state law. *Id.* at 92. The Court found that this practice did not comply with the purpose or requirements of an *Ex parte Young* suit. "A federal court's grant of relief against state officials

15

No. 19-60069

on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law." *Id.* at 106. "Such a result [would] conflict[] directly with the principles of federalism that underlie the Eleventh Amendment." *Id.*

Plaintiffs' first requested declaration—a judicial finding that Section 201 violates the Mississippi Readmission Act—will necessarily require the court to determine the meaning of "school rights and privileges," a term that will require analysis of the 1868 Constitution. This judicial exercise, however, does not run afoul of *Pennhurst* because it does not ask the court to compel compliance with "state law *qua* state law." *Ibarra v. Tex. Emp't Comm'n*, 823 F.2d 873, 877 (5th Cir. 1987). Instead, it asks the court to interpret the meaning of a *federal* law—the Mississippi Readmission Act—by reference to a related state law. *See World of Faith World Outreach Ctr. Church, Inc. v. Morales*, 986 F.2d 962, 965 (5th Cir. 1993) ("Under existing law, federal courts must necessarily construe local law and administrative regulations to ascertain if there is a[n] interest protected by [a federal statute]." (quoting *Patchette v. Nix*, 952 F.2d 158, 162 (8th Cir. 1991))); *Everett v. Schramm*, 772 F.2d 1114, 1119 (3d Cir. 1985) ("[A]scertaining state law is a far cry from compelling state officials to comply with it.").

In contrast, the second part of plaintiffs' claim asks the court to do something more than merely "determine . . . what the [state] statute means." *World of Faith*, 986 F.2d at 966. It asks the court to identify *which* state law is binding upon state officials, making a judicial declaration that a state law enacted over 150 years ago remains valid and enforceable, despite many years of amendments and alterations. Because the *Ex parte Young* exception "is not a way to enforce state law through the back door," *Wozniak v. Adesida*, 932 F.3d 1008, 1011 (7th Cir. 2019), *Pennhurst* requires us to hold that this is an invalid basis for an *Ex parte Young* suit.

16

No. 19-60069

Plaintiffs argue that the second part of their requested declaration is permissible under *Pennhurst* because it merely asks the court to enforce a state law that is incorporated within the federal Readmission Act. They cite cases in which a federal law *explicitly* incorporated a particular provision of a state law or otherwise transformed an individual state requirement into a binding federal mandate. *See Kapps v. Wing*, 404 F.3d 105, 120 n.21 (2d Cir. 2005) (compelling defendants to comply with state law because "compliance with state law [was] required as a matter of *federal* law"); *Ibarra*, 823 F.2d at 877 (finding no *Pennhurst* violation where a Texas statute "expressly incorporates" certain standards from a federal statute, "and indeed, provides that any change in the [federal] standard is automatically incorporated into Texas law"); *Everett*, 772 F.2d at 1119 (allowing a federal claim to proceed under *Pennhurst* where the federal law required states to abide by standards of need provided in state law). Likewise, plaintiffs cite cases where state laws required compliance with a federal rule, transforming the state laws into federal mandates that could be enforced without "run[ning] afoul of *Pennhurst*'s admonition regarding state law claims." *Cox*, 256 F.3d at 308.

Plaintiffs' claim does not fit either of these situations. Plaintiffs sue defendants under the Mississippi Readmission Act, which does not explicitly incorporate any of the language, requirements, or provisions of the 1868 Constitution. Nor does the Readmission Act require Mississippi to abide indefinitely by the 1868 Constitution's education clause. Indeed, it explicitly permits the State to amend its Constitution, placing only a general limitation upon the State to retain the "school rights and privileges" that were protected under the 1868 Constitution. The Readmission Act does not use the phrase "uniformity" or any of the specific language contained in the 1868 education clause. By asking a federal court to declare that *all* of these state requirements remain binding and valid upon state officials, plaintiffs seek to import a

No. 19-60069

specific "uniformity" requirement into the more general federal act. Yet while the Readmission Act imposes an obligation for the State to continue to provide the same educational rights that were protected in 1868, it does not demonstrate that Congress intended to force Mississippi to retain fixed, 200-year-old language in its education clause.

Other circuits have similarly held that the federal government's approval of a state law does not automatically transform that law into a federal mandate. In *Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess*, 297 F.3d 310 (3d Cir. 2002), and *Bragg v. West Virginia Coal Ass'n*, 248 F.3d 275 (4th Cir. 2001), the plaintiffs sued to enforce federally-approved state mining plans, arguing that the Surface Mining Control and Reclamation Act ("SMCRA") made those state plans enforceable by federal courts. The Third and Fourth Circuits both held that these claims were barred by *Pennhurst*. *Hess*, 297 F.3d at 323–30; *Bragg*, 248 F.3d at 296. Though the state plans had been approved by the federal government, this approval did not mean that the state plans had somehow been "incorporated or 'codified' into federal law." *Hess*, 297 F.3d at 326; *Bragg*, 248 F.3d at 297. As a result, the *Bragg* and *Hess* courts held that a federal court could not order state officials to abide by their own plans. *Id.*[6]

Plaintiffs' second request for relief is analogous to the impermissible claims in *Bragg* and *Hess*. Plaintiffs ask the court to make a declaration about *state* law, arguing that the Mississippi Constitution became enforceable against the State in federal court when it was approved by Congress in the Readmission Act.[7] Yet while a federal court can interpret the meaning of

---

[6] The court in *Hess* allowed two of plaintiffs' claims to move forward because those claims alleged violations of specific federal, not state, regulations, which "ha[d] no counterpart in state law." *Hess*, 297 F.3d at 331.

[7] The requested relief is not identical to *Hess* and *Bragg* in all respects. Plaintiffs ask the court to identify binding state law, but they do not seek a declaration that state officials

No. 19-60069

"school rights and privileges," it cannot transform century-old state law into a binding federal mandate. *See Bragg*, 248 F.3d at 297 (holding that a state's "dignity interest" in setting and enforcing its own law "does not fade into oblivion merely because a State's law is enacted to comport with a federal invitation to regulate within certain parameters and with federal agency approval").

"[T]he determinative question [under *Pennhurst*] is not the relief ordered, but whether the relief was ordered pursuant to state or federal law." *Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1023 (11th Cir 1989). Because plaintiffs' second requested declaration seeks an order compelling state officials to comply with a specific state law, we conclude that it is barred by *Pennhurst* and is thus invalid under *Ex parte Young*.

IV.

For the foregoing reasons, the judgment of the district court is AFFIRMED in part and VACATED and REMANDED in part.

---

have violated state law. We are not persuaded that this distinction is meaningful. As defendants note, "the requested relief would first tell state officials what state law is, and then have those officials conform their conduct to state law." This would constitute a major intrusion into state sovereignty, the primary justification for the Eleventh Amendment. The Readmission Act did not strip the state of its power to amend the Constitution; instead, it identified certain conditions that must guide the amendment process.