**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**DOROTHY HAYMER, on behalf of her minor child, D.S.;
PRECIOUS HUGHES, on behalf of her minor child, A.H.;      PLAINTIFFS
and SARDE GRAHAM, on behalf of her minor child, S.T.;**

**V.**                                    **CAUSE NO. 3:17-cv-404-HTW-LGI**

**TATE REEVES, in his official capacity as
Governor of Mississippi;
PHILIP GUNN, in his official capacity as
Speaker of the Mississippi House of Representatives;
DELBERT HOSEMANN, in his official capacity as
Lieutenant Governor of Mississippi;
MICHAEL WATSON, in his official capacity
as Secretary of State of Mississippi;
CAREY WRIGHT, in her official
capacities as State Superintendent of
Education and Executive Secretary of the      DEFENDANTS
Mississippi State Board of Education;
ROSEMARY AULTMAN, in her official
capacity as Chair of the Mississippi State
Board of Education; and
ANGELA BASS, RONNIE MCGEHEE, KAREN
ELAM, GLEN EAST, WENDI BARRETT,
MATT MILLER, MARY WENER, AND
BILL JACOBS, all in their official capacities
as Members of the Mississippi State Board
of Education**

---

## FIRST AMENDED COMPLAINT

---

## I.     INTRODUCTION

1.1      This lawsuit seeks a prospective declaration that Mississippi is failing to live up to

obligations it incurred in 1870 upon its readmission to full statehood. Mississippi's

readmission required it to maintain a "uniform system of free public schools," a

commitment enshrined in the state's 1868 Constitution intended to ensure that, going

forward, the former slaves of school age and their descendants would receive an

1

education equal to that received by white students. As a result of state officials' ongoing violations of the terms of Mississippi's readmission, Black students in the state are not receiving an education equal to that received by white students.

1.2     Although this lawsuit seeks only prospective relief from an ongoing violation of federal law, historical context is needed to understand the background of the Defendants' present violations.

1.3     On December 10, 1817, Congress admitted Mississippi into the United States of America. For the next half-century, slave labor drove Mississippi's economy. By 1860, 436,631 slaves lived in Mississippi – approximately 55 percent of the state's population.

1.4     On January 9, 1861, following Abraham Lincoln's election to the presidency, Mississippi became the second state to secede from the Union. Its "Declaration of the Immediate Causes which Induce and Justify the Secession of the State of Mississippi from the Federal Union" left no doubt as to its motivation:

> Our position is thoroughly identified with the institution of slavery – the greatest material interest of the world. Its labor supplies the product which constitutes by far the largest and most important portions of commerce of the earth. These products are peculiar to the climate verging on the tropical regions, and by an imperious law of nature, none but the black race can bear exposure to the tropical sun. These products have become necessities of the world, and a blow at slavery is a blow at commerce and civilization. That blow has been long aimed at the institution, and was at the point of reaching its consummation. There was no choice left us but submission to the mandates of abolition, or a dissolution of the Union, whose principles had been subverted to work out our ruin.

1.5     Less than a month later, Mississippi and five other states formed the Confederate States of America. On February 18, 1861, Jefferson Davis, a Mississippi slave owner who believed that African Americans were "our inferior, fitted expressly for servitude," was inaugurated as the president of the Confederacy.

1.6     Eighty thousand Mississippians fought in the Civil War to maintain slavery, and casualties were heavy. The war lasted four years and cost 620,000 American lives. On May 9, 1865, President Andrew Johnson declared that armed resistance and insurrection against the United States was "virtually at an end." On May 10, 1865, Jefferson Davis was captured. The Civil War was over.

1.7     On January 7, 1868, Mississippi assembled a constitutional convention to draft a new charter. African Americans, including former slaves, were among the delegates – the first time in the state's history that Black people participated in the political process. At the convention, delegates offered many proposals for the establishment of public schools. But in the end, the convention settled on the following education clause:

> As the stability of a republican form of government depends mainly upon the intelligence and virtue of the people, it shall be the duty of the Legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and shall, as soon as practicable, establish schools of higher grade.

Miss. Const. of 1868, art. VIII § 1.

1.8     The convention adopted the new Constitution, including the education clause, on May 15, 1868. By popular referendum, the Constitution was ratified on December 1, 1869.

1.9     Less than three months later, Congress passed Mississippi's Readmission Act and returned Mississippi to full statehood, but only on certain "fundamental conditions." One of these conditions was "[t]hat the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State." 16 Stat. 67 (1870).

1.10    History is replete with details of Mississippi's failure to keep its obligations. Within a generation, Mississippi jettisoned the 1868 Constitution in favor of a new constitution designed principally to re-subjugate African Americans.

1.11    Today, Mississippi officials' ongoing violations of the Readmission Act are depriving African-American children of the very school rights that Congress sought to protect. This lawsuit seeks prospective redress from those violations.

## II.    OVERVIEW OF LAWSUIT

2.1    This case seeks a prospective declaratory judgment to bring Mississippi officials into compliance with their federal obligation under the Readmission Act to protect the "schools rights and privileges" of Mississippi's children.

2.2    The reason for this lawsuit is simple:  "Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education. Such an opportunity, where the state has undertaken to provide it, is a right which must be made available to all on equal terms." *Brown v. Board of Education of Topeka*, 347 U.S. 483, 493 (1954).

2.3    This suit — which seeks to protect the promise set forth in *Brown v. Board of Education* and to end one of Mississippi's ongoing vestiges of Jim Crow — stems from

the Act of February 23, 1870, 16 Stat. 67 ("Readmission Act"), which forbade Mississippi from amending its 1868 constitution to deprive any class of children (and in particular African-American children) of their right to a uniform system of free public schools.

2.4     After the Civil War ended in 1865, Congress began readmitting the former Confederate states to full statehood one by one. To prevent these Southern states from drafting constitutions that failed to protect the rights of newly freed slaves, Congress enacted laws known as "Readmission Acts" that conditioned full reentry into the Union. In Mississippi's case, those conditions related to voting and education.

2.5     Mississippi was readmitted to full statehood on February 23, 1870, pursuant to the fundamental condition "[t]hat the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State." 16 Stat. 67 (1870).

2.6     The education clause of the Mississippi Constitution of 1868 – the clause that existed at the time that Mississippi was readmitted to the Union – provided as follows:

> As the stability of a republican form of government depends mainly upon the intelligence and virtue of the people, it shall be the duty of the Legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and shall, as soon as practicable, establish schools of higher grade.

2.7     Congress approved the 1868 Constitution in 1869. If this education clause remained and were enforced today, as required by the Readmission Act, then it would be one of the nation's strongest guarantees of public education.

2.8     Mississippi, however, is currently in violation of its obligation not to amend the 1868 Constitution in a manner that deprives its citizens of the "school rights and privileges" guaranteed thereunder.

2.9     This sordid tale began in 1890, when Mississippi held a constitutional convention. The resulting Constitution of 1890 was adopted for the express purpose of returning political control to the white people of Mississippi. *See infra* at ¶¶5.1-5.26. In furtherance of this invidious purpose, the Convention's delegates crafted a scheme to tie voting rights to literacy and incorporated provisions in the 1890 Constitution to deprive African Americans of the very education they would need to meet the literacy and understanding requirements of the new Constitution.

2.10    From 1890 until the present day, Mississippi repeatedly has amended its education clause and uses those amendments to systematically and deliberately deprive African Americans of the education rights guaranteed to all Mississippi schoolchildren by the 1868 Constitution. This systematic and deliberate deprivation continues today.

2.11    For instance, in 1934, Mississippi amended Section 201 of the Constitution to exclude five-year-old children from its protection.

2.12    And again in 1960, Mississippi amended Section 201 to eliminate key education rights and to maintain segregation after the Supreme Court's decision in *Brown v. Board of Education*.

2.13    Finally, in 1987, Mississippi amended Section 201 to its current form: an empty shell of the guarantee that Congress obligated Mississippi to preserve in 1870 when it readmitted Mississippi to the Union.  The Constitution now grants the Legislature unfettered discretion to provide for public education as it sees fit:  "The Legislature shall, by general law, provide for the establishment, maintenance and support of free

public schools upon such conditions and limitations as the Legislature may prescribe." This is one of the weakest education clauses in America because its mandate creates virtually no obligations that the Legislature does not choose for itself.

2.14    Given this language, the present-day violations should be no surprise: Mississippi currently has one of, if not the most, inequitable and poorly resourced, poorly performing school systems in the nation. Mississippi has not come close to fulfilling its obligation to ensure a "uniform system of free public schools." *See infra* at ¶¶5.43-5.76. Indeed, African American children in Mississippi are receiving an education far inferior to white children.

2.15    Accordingly, this lawsuit requests a judicial finding that Section 201 violates the Mississippi Readmission Act. *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 739-40 (5th Cir. 2020).

### III.    PARTIES

**A.    <u>Plaintiffs</u>**

3.1    Dorothy Haymer, a low-income African American woman, is the mother of D.S. At the time this lawsuit was filed, D.S. was a 6-year-old girl who lives with her mother in Yazoo City, Mississippi. D.S. is now 10 years old. Ms. Haymer brings this action on D.S.'s behalf. At the time this lawsuit was filed, D.S. was in kindergarten at Webster Street Elementary School ("Webster"), which was part of the Yazoo City Municipal School District. At the time this lawsuit was filed, MDE rated Webster with a "D" letter grade, and it rated the Yazoo City Municipal School District with an "F" letter grade. D.S. now attends McCoy Elementary School in Yazoo City. Under MDE's most recent accountability ratings, McCoy is rated with an "F" letter grade.

3.2     Precious Hughes, a low-income African American woman, is the mother of A.H. At the time this lawsuit was filed, A.H. was a 6-year-old girl who lives with her mother in Jackson, Mississippi. Ms. Hughes brings this action on A.H.'s behalf. At the time this lawsuit was filed, A.H. was in kindergarten at Raines Elementary School, which is part of the Jackson Public School District. At the time this lawsuit was filed, MDE rated Raines with a "D" letter grade, and it rated the Jackson Public School District with an "F" letter grade. Today, A.H. is enrolled at Midtown Charter School in Jackson, which received a "D" letter grade under MDE's most recent accountability ratings.

3.3     Sarde Graham, a low-income African American woman, is the mother of S.T. At the time this lawsuit was filed, S.T. was a 7-year-old girl who lives with her mother in Yazoo City, Mississippi. Ms. Graham brings this action on S.T.'s behalf. At the time this lawsuit was filed, S.T. was in the first grade at Webster Street Elementary School, which was part of the Yazoo City Municipal School District. At the time this lawsuit was filed, MDE rated Webster with a "D" letter grade, and it rated the Yazoo City Municipal School District with an "F" letter grade. Today, S.T. is still enrolled at Webster Street Elementary School, which is now rated by MDE's most recent accountability ratings with an "F" letter grade.

**B.     Defendants**

3.4     Governor Tate Reeves is the Chief Executive of the State of Mississippi and is responsible for implementing the laws of the State of Mississippi. He is required to submit to the Legislature a proposed balanced budget every year. Miss. Code Ann. § 27-103-139. He also has announced reductions in state budget items, including to the Mississippi Adequate Education Program, which provides funding for elementary and secondary education in the state. *See, e.g.*, Miss. Code Ann. § 27-104-13; Miss. Code

Ann. § 37-151-1, *et. seq.* Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, he may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. He is sued in his official capacity.

3.5     Representative Philip Gunn is the Speaker of the Mississippi House of Representatives. Representative Gunn is the presiding officer of the Mississippi House of Representatives, which is constitutionally required to fund the State's obligations. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, he may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. He is sued in his official capacity.

3.6     Lieutenant Governor Delbert Hosemann presides over the Mississippi Senate, which is constitutionally required to fund the State's obligations. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, he may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. He is sued in his official capacity.

3.7     Michael Watson is the Secretary of State of Mississippi. He is responsible for certifying amendments to the Mississippi Constitution. Miss. Const. art. XV, § 273. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, he may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. He is sued in his official capacity.

3.8     State Superintendent of Public Education Carey Wright is the Chief
Administrative Officer of the Mississippi Department of Education, and is
constitutionally required to administer the MDE in accordance with the policies
established by the State Board of Education. She also is the Executive Secretary of the
Mississippi State Board of Education, which manages and invests school funds
according to law, formulates policies according to law for implementation by the State
Department of Education, and performs other duties as prescribed by law. Pursuant to
Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the
Mississippi Rules of Civil Procedure, she may be served with process in both her roles by
delivering a copy of the summons and complaint to the Attorney General of the State of
Mississippi. She is sued in her official capacities as both State Superintendent of
Education and Executive Secretary of the State Board of Education.

3.9     Rosemary Aultman is the chair of the Mississippi State Board of Education,
which manages and invests school funds according to law, formulates policies according
to law for implementation by the State Department of Education, and performs other
duties as prescribed by law. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil
Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, she may be
served with process by delivering a copy of the summons and complaint to the Attorney
General of the State of Mississippi. She is sued in her official capacity.

3.10    Angela Bass is a member of the Mississippi State Board of Education, which
manages and invests school funds according to law, formulates policies according to law
for implementation by the State Department of Education, and performs other duties as
prescribed by law. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure
and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, she may be served with

process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. She is sued in her official capacity.

3.11    Ronnie McGehee is a member of the Mississippi State Board of Education, which manages and invests school funds according to law, formulates policies according to law for implementation by the State Department of Education, and performs other duties as prescribed by law. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, he may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. He is sued in his official capacity.

3.12    Karen Elam is a member of the Mississippi State Board of Education, which manages and invests school funds according to law, formulates policies according to law for implementation by the State Department of Education, and performs other duties as prescribed by law. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, she may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. She is sued in her official capacity.

3.13    Glen East is a member of the Mississippi State Board of Education, which manages and invests school funds according to law, formulates policies according to law for implementation by the State Department of Education, and performs other duties as prescribed by law. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, he may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. He is sued in his official capacity.

3.14    Wendi Barrett is a member of the Mississippi State Board of Education, which manages and invests school funds according to law, formulates policies according to law for implementation by the State Department of Education, and performs other duties as prescribed by law. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, she may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. She is sued in her official capacity.

3.15    Matt Miller is a member of the Mississippi State Board of Education, which manages and invests school funds according to law, formulates policies according to law for implementation by the State Department of Education, and performs other duties as prescribed by law. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, he may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. He is sued in his official capacity.

3.16    Mary Werner is a member of the Mississippi State Board of Education, which manages and invests school funds according to law, formulates policies according to law for implementation by the State Department of Education, and performs other duties as prescribed by law. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, she may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. She is sued in her official capacity.

3.17    Bill Jacobs is a member of the Mississippi State Board of Education, which manages and invests school funds according to law, formulates policies according to law for implementation by the State Department of Education, and performs other duties as

prescribed by law. Pursuant to Rule 4(j)(2)(B) of the Federal Rules of Civil Procedure and Rule 4(d)(5) of the Mississippi Rules of Civil Procedure, he may be served with process by delivering a copy of the summons and complaint to the Attorney General of the State of Mississippi. He is sued in his official capacity.

3.18    At all times relevant to this action, the Defendants have acted under color of state law.

## IV.    JURISDICTION AND VENUE

4.1    The Plaintiffs' cause of action arises under the Readmission Act of 1870, 16 Stat. 67 (1870), 42 U.S.C. § 1983, and 28 U.S.C. § 2201. Jurisdiction in this Court is proper pursuant to 28 U.S.C. §§ 1331 and 1343.

4.2    Venue is proper in the Southern District of Mississippi because a substantial part of the events or omissions giving rise to the claim herein stated occurred and continue to occur within the district, and because all Defendants reside in, maintain offices in, or are responsible for enforcing the laws relevant to this litigation in this district. 28 U.S.C. § 1391.

## V.    FACTUAL BACKGROUND

**A.    Mississippi's Readmission to the Union (1863-1890).**

5.1    Although this lawsuit seeks only prospective relief from an ongoing violation of federal law, historical context is needed to understand the background of the Defendants' violations.

5.2    When the Civil War ended in 1865, only elected officials from Union states were seated in Congress. Because the Confederate delegations had resigned before the War, there were no incumbent federal officeholders from Mississippi.

5.3     The Southern states had emphatically rejected the Fourteenth Amendment when it was proposed, and enacted a series of "Black Codes" circumscribing the rights and status of African Americans.

5.4     Given the protracted and bloody Civil War, it was far from obvious that insurrectionist states should be readmitted to the Union immediately and unconditionally. Accordingly, Congress faced a choice: to accept the permanent suppression of a now-freed people in the South, or to find an alternative method of preventing a return to the institutionalized racism of the antebellum South.

5.5     Against this backdrop, and as part of the process of "readmitting" the former Confederate states to the Union, Congress passed the Military Reconstruction Act in March 1867. The Military Reconstruction Act divided the South into districts that were under federal military command.

5.6     A state could end this supervision and be returned to full statehood, including regaining its right to seat delegates in Congress, only by: (1) ratifying the Fourteenth Amendment; (2) holding a constitutional convention; (3) adopting a new constitution consistent with the federal Constitution; and (4) having its new constitution approved by Congress.

5.7     To satisfy these requirements, Mississippi ratified the Fourteenth and Fifteenth Amendments to the U.S. Constitution. Mississippi also assembled a constitutional convention in January 1868 and produced a new state constitution, which was approved by Congress. Act of Apr. 10, 1869, ch. 17, 16 Stat. 40, 41 (authorizing referenda on new constitutions in Mississippi, Texas, and Virginia). The Constitutional Convention adopted this new Constitution in May 1868, and Mississippi ratified it by popular vote in December 1869. Article VIII, Section 1 of the Mississippi Constitution of 1868 provided:

> As the stability of a republican form of government depends mainly upon the intelligence and virtue of the people, it shall be the duty of the Legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and shall, as soon as practicable, establish schools of higher grade.

5.8     After satisfying the four federal requirements, on February 23, 1870, Congress returned Mississippi to full statehood by passing *An Act to admit the State of Mississippi to Representation in the Congress of the United States* (the "Readmission Act"). The Readmission Act is recorded in the Statutes at Large at 16 Stat. 67.

## B.     The Readmission Act.

5.9     In light of Mississippi's long history of oppressing African Americans, the Readmission Act imposes three requirements to put Mississippi on par with its sister states and to ensure the rights of full national citizenship for the newly freed slaves.  It provides:

> That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the constitution herein recognized, …That it shall never be lawful for the said State to deprive any citizen of the United States, on account of his race, color, or previous condition of servitude, of the right to hold office under the constitution and laws of said State, or upon any such ground to require of him any other qualifications for office than such as are required of all other citizens…*That the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State.*

16 Stat. 67 (emphasis added).

## C.     The Constitutional Convention of 1890.

5.10    When Congress passed the Readmission Act, Mississippi's Constitution required the Legislature to establish a uniform system of free public schools to ensure that all children in Mississippi – regardless of race – were educated.

5.11    Congress' commitment to the political empowerment of the freed slaves quickly bore fruit. By 1875, African Americans comprised one-third of the Mississippi Senate and 59 members of the Mississippi House of Representatives. African Americans were elected to serve as Lieutenant Governor, Secretary of State, State Superintendent of Education, and Speaker of the House of Representatives (an accomplishment not replicated since).

5.13    However, Mississippi's color-blind commitment to a uniform system of free public schools drew criticism from white politicians who strongly believed that school funds should be spent only on educating white students. In 1875, the state Superintendent of Education declared that the creation of public schools was "an unmitigated outrage upon the rights and liberties of the white people of the state. It [the creation of public schools] was enacted to demoralize our people and to proselyte our children in the interest of a political party hostile to the dignity, interests and sensibilities of the white people of Mississippi."

5.14    The Democratic Party returned to power in 1875 in an election so riddled with violence, intimidation, and fraud that it has been described as one of the darkest chapters in American history.

5.15    By the late 1800s, dissatisfaction with the 1868 Constitution had grown, springing from two broad viewpoints. Some white Mississippians wanted to legalize black disenfranchisement, rather than continuing to perpetuate it through violence alone. Other white Mississippians simply distrusted the 1868 Constitution, which they

considered the invention of the "aliens, strangers, carpetbaggers, and ignoramuses," the "wild and imported animals," and the "negroes, mulattoes and brazen adventurers of the white race" who drafted it.

5.16    To satisfy both views, Mississippi assembled a new constitutional convention in 1890 with a singular purpose: creating a legal framework for state-sanctioned white supremacy.

5.17    James K. Vardaman, governor of Mississippi from 1904-1908, described the Convention as follows:

> There is no use to equivocate or lie about the matter. Mississippi's constitutional convention of 1890 was held for no other purpose than to eliminate the nigger from politics; not the 'ignorant and vicious,' as some of those apologists would have you believe, but the nigger. . . . Let the world know it just as it is.

5.18    When the Convention was assembled in August 1890, a few counties went through the formalities of selecting African American delegates—to little avail. For instance, a few days after actively campaigning to be seated as a delegate, African American F.M.B. Cook was found dead, his body riddled with bullets. At the Convention, only one of the 134 convention delegates was African American.

5.19    To achieve the Convention's goal of eliminating the black vote, the delegates devised a literacy test subject to an "understanding clause." Under this clause, a potential voter would be required to read any section of the state constitution or "be able to understand the same when read to him, or give a reasonable interpretation thereof." Further, in case these suffrage measures were struck down by the courts, the delegates added two additional safeguards: legislative reapportionment to increase white-county representation, and a state Electoral College scheme to ensure white control of the governor's office.

5.20    In order for the "understanding clause" to achieve its goal of disenfranchising African Americans, it was critical that African Americans were denied a meaningful education. At the same time, delegates to the Constitutional Convention knew that they were bound by the Readmission Act's prohibition against depriving citizens of their school rights and privileges. To achieve their goal, rather than substantively changing the education clause, which contained the "school rights and privileges" protected by the Readmission Act, the 1890 delegates adopted a new constitution to create racially segregated schools and a new school funding mechanism that allowed districts to allocate a drastically disproportionate amount of tax revenue to white schools.

5.21    After making these changes, the delegates did not need to substantively change the 1868 Constitution's education clause. Rather, they simply deleted the preamble and retained the rest of the language so that the Section 201 of the Constitution of 1890 provided:

> It shall be the duty of the legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and, as soon as practicable, to establish schools of higher grade.

5.22    Although the 1890 version of Section 201 largely tracked the language used in Article VIII, Section 1 of the 1868 Constitution, the 1890 version must be read *in pari materia* with its companion provisions, collectively designed to disenfranchise African Americans in Mississippi going forward.

5.23    The 1890 change to the State Constitution was also marked by procedural chicanery. Article XIII of the 1868 Constitution required that any "change, alteration, or amendment" thereto be submitted to a popular vote. But in the late Nineteenth Century, Mississippi's population of African Americans far exceeded its white population. As a

result, despite the 1868 Constitution's requirement, the 1890 Constitution's framers never submitted their final product to a popular vote, providing further evidence that the drafters of the 1890 Constitution intended to subjugate the African American majority.

5.24    The Constitution of 1890 codified its education clause at Section 201. Throughout this Complaint, these various iterations may be referred to as "the education clause."

5.25    With the ratification of the Constitution of 1890, Mississippi ushered in an era of racism, disenfranchisement, and separation known as Jim Crow.

5.26    In 1899, the state superintendent of education stated: "It will be readily admitted by every white man in Mississippi that our public school system is designed primarily for the welfare of the white children of the state, and incidentally for the negro children."

5.27    Following the 1890 Constitution's enactment, the quality of public education afforded to African Americans under Section 201 fell disgracefully behind the quality given to white children. Through the destitute schools made possible under the 1890 version of Section 201, Mississippi's system of white supremacy was not merely legalized – it was entrenched.

**D.    The 1934 Amendment of Section 201.**

5.28    Mississippi amended Section 201 in 1934. This amendment raised the age of public school eligibility from five years to six, which directly contravened the 1868 Constitution's provision of school rights for children between five and twenty one. After this amendment, Section 201 provided:

> It shall be the duty of the legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or

19

otherwise, for all children between the ages of six and twenty-one years, and, as soon as practicable, to establish schools of higher grade.

**E.**   **The 1960 Amendment of Section 201**.

5.29   By the early 1950s, state administrators and legislators knew that a reversal of *Plessy v. Ferguson* was likely. George Owens, chairman of the Senate Education Committee, reasoned that if the Supreme Court invalidated Jim Crow schools, "the only possibility of maintaining a segregated system in Mississippi is by persuading the Negro to attend of his own volition schools provided for him." Such persuasion would be easier if separate but "adequate, respectable, and equal facilities are provided."

5.30   Thus, in 1952, Governor Hugh White called for a recess legislative study committee to document conditions in Mississippi's public schools "with the view of reorganizing, so as to provide equal and adequate educational opportunities for all children of the state." Governor White "urged the Committee to make a careful study of school attendance, school finance, teachers' salaries, transportation, and building facilities in order to equalize opportunities between the races." After almost a year of research the Committee concluded that "Mississippi is lagging behind most of its sister states in devising a program to equalize educational opportunity" for black and white students.

5.31   The 1952 Commission Report revealed publicly, for the first time, the dollars-and-cents disparities in Mississippi's dual, non-uniform system. In a county with a population that was 81 percent African American, the expenditure per white pupil was $270.69, and only $21.36 per African American student. One school district in the Delta, with 11,000 white students and 19,000 African American students, spent $464.49 per white pupil, and just 3 percent of that amount – $13.71 – per African American student.

5.32    In 1954, the U.S. Supreme Court declared school segregation to be unconstitutional in *Brown v. Board of Education of Topeka*, 347 U.S. 483 (1954). In 1955, in *Brown v. Board of Education of Topeka*, 349 U.S. 294 (1955) ("*Brown II*"), the Court clarified that school desegregation must be accomplished "with all deliberate speed."

5.33    Mississippi officials had no such intention. In 1960, the Mississippi Legislature declared *Brown* unconstitutional. It also enacted a statute allowing local boards to close schools and transfer students out of school districts in order to maintain "public peace, order or tranquility."

5.34    Governor White called on the Legislature to abolish the state's public schools, if necessary, to avoid integration. Legislators promised to fund schools for African Americans if Mississippi voters ratified a constitutional amendment to abolish the public schools if integration occurred, in favor of publically-supported "private schools." By more than a two-to-one margin, Mississippi voters ratified the ballot measure.

5.35    This dramatic amendment to Section 201 in 1960 gutted children's "school rights" and left both the quality and existence of public education to the unfettered discretion of the Legislature. The 1960 amendment provided:

> The Legislature may, in its discretion, provide for the maintenance and establishment of free public schools for all children between the ages of six and twenty-one years, by taxation or otherwise, and with such grades, as the legislature may prescribe.

5.36    This amendment eliminated the Legislature's "duty" to establish a uniform system of free public schools. The Legislature could now decide whether to provide any public schools *at all*. And even if the Legislature chose to provide public schools, uniformity was, and is, no longer required.

**F.      Section 201 today.**

5.38    By the 1980s, as Governor William Winter later wrote, it was clear that "[m]ost of the indicators reflecting student achievement did not shine favorably on Mississippi." Mississippi was the last state without a mandatory public kindergarten system and the last state without a compulsory school attendance law. Mississippi teachers were paid at or near the bottom on national salary scales. The State had no way of measuring the performance of its schools, and state oversight was very politicized — the state superintendent of education was elected statewide, and the state board of education consisted of the attorney general, the secretary of state, and the state superintendent.

5.39    In 1987, the Legislature amended Section 201 to its current form. It now provides:

> The Legislature shall, by general law, provide for the establishment, maintenance and support of free public schools upon such conditions and limitations as the Legislature may prescribe.

5.40    The 1987 amendment to Section 201, which is still in operation today, requires the Legislature to establish and maintain free public schools, but the Legislature has absolute discretion as to how it funds and oversees those schools.

5.41    This unfettered discretion directly conflicts with the 1868 Constitution's mandate that the Legislature establish a uniform system of free public schools for all children.

5.42    Mississippi's decades-long dilution of Section 201 of the Mississippi Constitution is summarized here:

**Article VIII, Section 201 of the Mississippi Constitution, 1868–Present**

| | | | | |
|---|---|---|---|---|
| As the stability of a republican form of government depends mainly upon the intelligence and virtue of the people, it shall be the duty of the Legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvements, by establishing a uniform system of free public schools, by taxation, or otherwise, for all children between the ages of five and twenty-one years, and shall, as soon as practicable, establish schools of higher grade. | It shall be the duty of the legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and, as soon as practicable, to establish schools of higher grade. | It shall be the duty of the legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of six and twenty-one years, and, as soon as practicable, to establish schools of higher grade. | The Legislature may, in its discretion, provide for the maintenance and establishment of free public schools for all children between the ages of six and twenty-one years, by taxation or otherwise, and with such grades, as the legislature may prescribe. | The Legislature shall, by general law, provide for the establishment, maintenance and support of free public schools upon such conditions and limitations as the Legislature may prescribe. |

| 1868 | 1890 | 1934 | 1960 | 1987 |

1870 Readmission Act

5.43    At the time this lawsuit was filed, the Mississippi Department of Education's statistics showed that, in schools whose student bodies were at least 70 percent African American, the average accountability rating was D. In contrast, schools with student bodies that were at least 70 percent white had an average accountability rating of B.

5.44    The erosion of the education clause, including but not limited to the lack of uniform educational opportunities caused by Mississippi's current education clause, injures all Mississippians. By nearly every objective measurement, public schools in

Mississippi established under Section 201 are among America's least effective. But the effects of Mississippi's conduct are felt most strongly by Plaintiffs, their children, and others on the short end of Mississippi's provision of disuniform public schools. They continue to be deprived of a uniform education as demanded by the Constitution of 1868; they have been and are being deprived of uniform opportunities; and they have been and are being deprived of the support (financial, technical, and otherwise) necessary to provide an education that is uniform to that afforded to white children.

5.45    The quality of educational opportunities provided in Mississippi's public schools depends almost entirely on whether a child's schoolmates are predominantly white. If a child's schoolmates are not white, the State is far less likely to provide that child with the education necessary to become an educated, productive citizen in the Twenty-First Century. This is not a uniform system of free public schools.

### G.    What Disuniformity in Public Schools Looks Like.

5.46    The schools attended by the Plaintiffs' children at the time this lawsuit was filed – Raines Elementary and Webster Street Elementary School – are emblematic of the lack of uniformity in Mississippi's public schools: their student bodies are predominantly African American, impoverished, and they suffer far worse conditions and outcomes than students at schools that are predominantly white.

**Profile of Raines Elementary and Webster Street Elementary**

| School | Student Body African-American | Students Receiving Free or Reduced-Price Lunch | Students Proficient in Reading | Students Proficient in Math | Teachers in First Year of Teaching |
|---|---|---|---|---|---|
| Raines Elementary *(Jackson Pub. Sch. Dist.)* | 99.1% | 98.8% | 10.6% *(ranked 606 of 642)* | 4% *(ranked 635 of 642)* | 20.0% |
| Webster Street Elementary *(Yazoo City Mun. Sch. Dist.)* | 96.8% | 98.7% | 10.1% *(ranked 613 of 642)* | 10.1% *(ranked 568 of 642)* | 16.0% |

**SOURCES:** U.S. Department of Education, Office of Civil Rights, Civil Rights Data Collection (2013-2014); Miss. Department of Education 2016 Accountability Report.

5.47    An elementary school's accountability rating is determined by assessing student achievement and individual student growth. Factors include student performance on state standardized tests, whether students are demonstrating improvement year-to-year on state standardized tests, and the efforts a school is making to assist their lowest-achieving students progress towards proficiency. Elementary schools can earn a maximum total of 700 points based on: proficiency in reading (100 points), proficiency in math (100 points), proficiency in science (100 points), growth of all students in reading (100 points), growth of all students in math (100 points), growth of the lowest 25 percent of students in reading (100 points), and growth of the lowest 25 percent of students in math (100 points).

5.48    A-rated schools have reading, math, and science proficiency rates in the top quartile of performance; reading and math growth for all students is above the state median in a given year; and the lowest performing 25 percent of students earned at least 50 points in the reading and math growth component.

5.49    In contrast, D-rated schools are defined as schools whose reading, mathematics, and science proficiency rates are below the state median for the given year; reading or mathematics growth for all students is below the state median in a given year; and the lowest performing 25 percent of students did not earn at least 50 points in the reading or mathematics growth component. The total score for a D-rated school can range from 277-329 points.

5.50    At the time this lawsuit was filed, at Raines Elementary School ("Raines") in Jackson, African American children made up 99.1 percent of the student body. Raines is in the Jackson Public School District, and at the time this lawsuit was filed, had 320 children enrolled in pre-Kindergarten through fifth grade. At the time this lawsuit was filed, Raines was rated a "D" school by MDE, with a total of only 310 points. At the time this lawsuit was filed, only 10.6 percent of Raines students were proficient in reading, and only 4 percent of Raines students were proficient in math. In 2013 (the most recent year for which data was available at the time this lawsuit was filed), 20% of all Raines teachers were in their first year of teaching, compared to a district-wide average of 11 percent. That same year, the student-teacher ratio at Raines was 21.85 students per teacher, far higher than the district average of 16.96 students per teacher.

5.51    Plaintiff Hughes, whose daughter, A.H., attended Raines, describes the school as "old, dark, and gloomy — like a jail." The ceilings are covered in wet spots, and the paint is chipping off the walls. The school building is too small to accommodate all the children, even with the two portable classrooms permanently located outside the school building.  Shortly before this lawsuit was filed, A.H. came home covered with painful fire ant bites, which she got on the playground at Raines. A.H. frequently asked her mother why other elementary schools have nicer facilities and better playgrounds than Raines.

5.52    At the time this lawsuit was filed, Ms. Hughes was very concerned that A.H. was not receiving a quality education at Raines because the teaching staff was inexperienced and teacher absenteeism at the school was very high. As a result, instructional quality is inconsistent. A.H.'s classroom lacked textbooks, reading books, and basic supplies. There were not enough textbooks for all of the students, so the students worked from photocopies when they were available.  There are only computers at Raines during state testing weeks, and there were no iPads.  Twice a year, Ms. Hughes was asked to provide soap and paper towels to the school.

5.53    At the time this lawsuit was filed, Ms. Hughes would have liked to enroll A.H. in a better school, but she cannot afford to move to a different neighborhood that is served by a better school.

5.54    At the time this lawsuit was filed, at Webster Street Elementary School ("Webster") in Yazoo City, African American children made up 96.8 percent of the student body.  Webster was in the Yazoo City Municipal School District, and had 467 children enrolled in pre-Kindergarten through first grade. At the time this lawsuit was filed, Webster was rated a "D" school by MDE, with a total of only 303 points. Only 10.1 percent of Webster students were proficient in reading, and only 10.1 percent of students were proficient in math. In 2013 (the most recent year for which data was available when this lawsuit was filed), 16 percent of all Webster teachers were in their first year of teaching, compared to a district-wide average of 10 percent. That same year, the student-teacher ratio at Webster was 19.72 students per teacher, while the district average was 18.85 students per teacher.

5.55    Plaintiff Graham, whose daughter, S.T., attended Webster at the time this lawsuit was filed, describes the school as "horrible" and "needs to be torn down."  The portable

classrooms outside the school have been in place since Ms. Graham herself was an elementary school student at Webster. The bathroom toilets and sinks are often broken, and parents have to supply toilet paper, hand sanitizer, and disinfectant spray. If the parents don't provide these materials, the students will be forced to go without. S.T. has returned from school sick because she avoided using the bathroom at Webster.

5.56    The teachers at Webster are inexperienced and ineffective.  S.T.'s classes do not have enough textbooks for each student. The library has books that are old, damaged, and defaced, and the computer lab is outdated. The school offers no afterschool tutoring or extracurricular activities. By contrast, prior to moving to Yazoo City, Ms. Graham lived in Nashville, Tennessee, where the school building was clean and safe, the teachers were effective, and each student had an iPad.

5.57    Ms. Graham knows that S.T. is not receiving a quality education and would like to send her to another school, but she cannot afford to move to a different neighborhood that is served by a better school.

5.58    Plaintiff Haymer, whose daughter, D.S., attends Webster, is deeply concerned that the school is over-crowded, under-staffed, and poorly resourced.  The school is old and dingy with peeling paint and water stains on the ceilings.  Ms. Haymer attended elementary school in the same building when she was a child, and the building was in use when Ms. Haymer's mother was a child. The bathroom stalls do not lock, and there is rarely soap or paper towels for the children to wash their hands. Parents are expected to donate bottles of hand sanitizer, paper towels, Lysol wipes, and Kleenex throughout the year. Ms. Haymer spent nearly $100 on these supplies throughout the school year.

5.59    There are 26 students in D.S.'s kindergarten class, with one teacher and one teacher's assistant. As a result of this overcrowding, D.S. rarely receives the

individualized instruction that she needs. There are few experienced teachers at the school, and Webster does not offer music, art, or drama class. There are no afterschool enrichment programs, sports, or tutoring programs. The school "library" needs books, and there are no computers or iPads in the classrooms.

5.60    Ms. Haymer believes that most white parents choose to send their children to other schools because the quality of education at Webster is so poor.

5.61    In stark contrast to these schools, Mississippi's highest-performing schools serve student bodies that are overwhelmingly white.

**Profile of Madison Station Elementary, Hernando Elementary, and Bayou View Elementary**

| School | Student Body African-American | Students Receiving Free or Reduced-Price Lunch | Students Proficient in Reading | Students Proficient in Math | Teachers in First Year of Teaching |
|---|---|---|---|---|---|
| Madison Station Elementary School *(Madison Co. Sch. Dist.)* | 17.0% | 14.6% | 72.6% *(ranked 3 of 642)* | 70.5% *(ranked 13 of 642)* | 8.9% |
| Hernando Elementary School *(DeSoto Co. Sch. Dist.)* | 11.7% | 39.0% | 71.7% *(ranked 4 of 642)* | 78.7% *(ranked 1 of 642)* | 2.9% |
| Bayou View Elementary School *(Gulfport Sch. Dist.)* | 13.5% | 36.1% | 66.3% *(ranked 9 of 642)* | 76.5% *(ranked 4 of 642)* | 0.0% |

**SOURCES:** U.S. Department of Education, Office of Civil Rights, Civil Rights Data Collection (2013-2014); Miss. Department of Education 2016 Accountability Report.

5.62    Madison Station Elementary ("Madison Station"), which is located 18 miles from Raines Elementary and 36 miles from Webster Street Elementary, is an "A" rated school in the Madison County School District, which is an "A" rated district.  At the time this

lawsuit was filed, Madison Station served 967 students in Kindergarten through fifth grade, and the student population was 70.11 percent white.

5.63   Madison Station is a 2010 National Blue Ribbon School. At the time this lawsuit was filed,, 72.6 percent of Madison Station students were proficient in reading, and 70.5 percent were proficient in math. In 2013 (the most recent year for which data was available at the time this lawsuit was filed), only 8.9 percent of Madison Station teachers were in their first year of teaching. That same year, the student-teacher ratio at Madison Station was only 16.79 students per teacher.

5.64   In 2000, Madison Station partnered with the Mississippi Arts Commission to train teachers to integrate the arts into every aspect of the curriculum. Since then, over $500,000 has been spent on arts initiatives at Madison Station. At the time this lawsuit was filed, Madison Station also had a 3rd-5th grade art teacher, 5th grade drama club, and special arts instruction for younger grades.

5.65   At the time this lawsuit was filed, Madison Station also had a history of excellence in physical education, with physical education teachers who have been recognized throughout the state for their innovative approach to helping children stay fit. Madison Station students have participated in and scored well in the Presidential Fitness Challenge program.

5.66   Hernando Elementary is an "A" rated school in the DeSoto County School District, which is an "A" rated district.  At the time this lawsuit was filed, Hernando Elementary served 616 students in pre-Kindergarten through first grade, and the student population was 75.65 percent white.  At the time this lawsuit was filed, 71.7 percent of Hernando Elementary students were proficient in reading, and 78.7 percent were proficient in math. In 2013, the most recent year for which data was available at

the time this lawsuit was filed, only 2.9 percent of Hernando Elementary teachers were in their first year of teaching. That same year, the student-teacher ratio at Hernando Elementary was 19.44 students per teacher. At the time this lawsuit was filed, Hernando Elementary had an iPad e-Reader library. At the time this lawsuit was filed, Hernando Elementary hosted a Spring Fling and school carnival, and it offered enrichment classes in computers, art, music, physical education, and library. At the time this lawsuit was filed, students used a Nintendo Wii device to learn dances in physical education class; students engaged in hands-on learning activities with classroom guests, including a beekeeper and a wildlife ranger. Hernando Elementary also holds a College Day, family literacy events, and ice cream Fridays.

5.67    Bayou View Elementary is an "A" rated school in the Gulfport School District, which is an "A" rated district.  At the time this lawsuit was filed, Bayou View served 621 students in Kindergarten through fifth grade. At the time this lawsuit was filed, the student population was 76.97 percent white. Bayou View is a National Blue Ribbon School. At the time this lawsuit was filed, 66.3 percent of Bayou View students were proficient in reading, and 76.5 percent were proficient in math. At the time this lawsuit was filed, all Bayou View students received instruction in all the standard academic disciplines, as well as the extracurricular disciplines of art, music, library sciences, and physical education. At the time this lawsuit was filed, fourth- and fifth-grade students were permitted to enroll in strings class, which was taught two days per week, and fed into the district's internationally acclaimed secondary orchestra program. In 2013 (the most recent year for which data was available at the time this lawsuit was filed), *no* Bayou View teachers were in their first year of teaching. That same year, the student-teacher ratio at Bayou View Elementary was only 15.02 students per teacher.

5.68    This lack of uniformity is not limited to a handful of schools; it is affecting and will continue to affect children statewide. At the time this lawsuit was filed, the vast majority of schools receiving "A" ratings in MDE's accountability report had student bodies that were at least 70 percent white. Likewise, at the time this lawsuit was filed, nearly all of the schools receiving "F" ratings in MDE's accountability report had student bodies that were at least 70 percent black.



**Data Source:** Superintendent's Annual Report (2016), 2016 Accountability Report, Mississippi Department of Education.

5.69    The Defendants are causing the injuries suffered by the Plaintiffs and their children, by failing and continuing to fail to fund, maintain, and administer the uniform

system of quality public schools required by the Constitution of 1868. By cutting what meager resources the Legislature has chosen to appropriate to public schools, Governor Reeves, Lieutenant Governor Hosemann, and Speaker Gunn have caused and continue to cause injuries to the Plaintiffs and their children. By certifying constitutional amendments that violate the Readmission Act and sanction this disuniform system of schools, the Secretary of State has caused and continues to cause injuries to the Plaintiffs and their children. And by administering a statewide system of public schools that falls short of the uniform system called for by the Constitution of 1868, the State Board of Education and its members, the Mississippi Department of Education, and Superintendent Wright have caused and continue to cause injuries to the Plaintiffs and their children.

5.70    The effects of disuniformity in the schools attended by the Plaintiffs' children at the time this lawsuit was filed continue at their current schools, and will continue.

## VI.    CLAIM FOR DECLARATORY JUDGMENT

6.1    The foregoing paragraphs are incorporated by reference and reasserted as if restated fully herein.

6.2    At all times relevant to this action, the Defendants have acted under color of state law.

6.3    The Plaintiffs raise this claim for prospective declaratory relief pursuant to Section 1983, the Readmission Act, and the Declaratory Judgment Act.

6.4    The Readmission Act established that the school rights memorialized in the education clause of the Mississippi Constitution of 1868 were a legal floor beneath which amendments thereto could not retrogress.

6.5     The Mississippi Constitution's education clause is in ongoing violation of the Readmission Act's fundamental condition that Mississippi's Constitution never be amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the then-existing Mississippi Constitution.

6.6     Through this violation of the Readmission Act, the Defendants have deprived and continue to deprive the Plaintiffs' children of the education rights that Congress intended to preserve, thereby causing and continuing to cause injuries to the Plaintiffs' children.

6.7     Specifically, the Readmission Act obligates Defendants to preserve for Mississippi's citizens, including the Plaintiffs' children, the "school rights" existing in the Constitution of 1868. The "school rights" that are not being made available to the Plaintiffs' children due to the education clause's amendments and Defendants' actions include, but are not limited to, the following:

     a.     a "uniform" system of public schools supported by taxation or otherwise;

     b.     an obligation for the Legislature to "encourage" the promotion of public education "by all suitable means;"

     c.     the Legislature's duty to establish a core curriculum of "intellectual, scientific, moral, and agricultural improvement;"

     d.     the right to attend a public school for all children ages five through twenty-one; and

     e.     a right to judicial review of the Legislature's mandate to provide these school rights.

6.8     The Defendants are causing the Plaintiffs' children injuries by:

     a.     maintaining a system of public schools that is not uniform;

b.    devising and maintaining a system of public education that is subject to the Defendants' unfettered discretion;

c.    failing to provide an amount of support (financial, technical, and otherwise) that maintains a system of free public schools that promotes intellectual, scientific, moral, and agricultural improvement;

d.    failing to maintain a system of revenue (taxation or otherwise) reasonably calculated to support a system of public schools that provides an education that promotes intellectual, scientific, moral, and agricultural improvement on par with the education being afforded to white children.

e.    certifying constitutional amendments that violate the Readmission Act and sanction Mississippi's disuniform system of public schools.

6.9    By acting in accordance with the amended or changed language in the Mississippi Constitution's education clause, in violation of the Readmission Act, and by continuing to deny the Plaintiffs' children the "school rights" that Congress intended to preserve through the Readmission Act, the Defendants are causing injuries to the Plaintiffs' children.  These injuries include:

a.    The Defendants' deprivation of the "school rights" protected by the Readmission Act and the Constitution of 1868 has caused, is causing, and will continue to cause the Plaintiffs' children to languish in failing schools located in failing school districts;

b.    The Defendants' deprivation of the "school rights" protected by the Readmission Act and the Constitution of 1868 has caused, is causing, and will continue to cause the Plaintiffs' children to suffer illiteracy, diminished likelihood of graduating from high school, diminished

likelihood of attending and/or graduating from college, diminished

lifetime earnings potential, increased likelihood of poverty, increased

likelihood of adverse health consequences, increased likelihood of

incarceration, diminished life expectancy, and other economic and non-

economic injuries.

c.      The Defendants' deprivation of the school rights protected by the

Readmission Act and the Constitution of 1868 has caused, is causing, and

will continue to cause the Plaintiffs' children to attend school in unsafe,

unequal, out-of-date, and dilapidated facilities that are not conducive to

learning.

d.      The Defendants' deprivation of the school rights protected by the

Readmission Act and the Constitution of 1868 has caused, is causing, and

will continue to cause the Plaintiffs' children to attend schools with

resources that are insufficient for providing an education that is uniform

with that provided to white children that promotes intellectual, scientific,

moral, and agricultural improvement.

e.      The Defendants' deprivation of the school rights protected by the

Readmission Act and the Constitution of 1868 has caused, is causing, and

will continue to cause the Plaintiffs' children economic and non-economic

injuries by failing to provide them with an education that is uniform with

that provided to white children and is necessary to become an educated,

productive citizen in the Twenty-First Century: a knowledge of the

political process and an appreciation of cultural heritage sufficient to

prepare the Plaintiffs' children for their future roles as citizens of a diverse

state, participants in the political system, and contributors to the economy

of their state and country. In so doing, the Defendants are assuring that

the trajectories of the Plaintiffs' children's lives will continue the cycle of

multi-generational poverty that has afflicted Black communities for

decades.

f.      The Defendants' deprivation of the school rights protected by the

Readmission Act and the Constitution of 1868 has, is, and will

substantially diminish Plaintiffs' children's ability to exercise the

franchise;

6.10   The Plaintiffs are entitled to a purely prospective declaratory judgment that

Section 201 of the Mississippi Constitution is in violation of the Readmission Act.

6.11   This claim for prospective declaratory relief presents a pure question of law.

## VII.   PRAYER FOR RELIEF

7.1   WHEREFORE, Plaintiffs request the following relief:

a.      A prospective declaratory judgment finding that Section 201 of the

Mississippi Constitution is violating the Readmission Act;

b.      An award of attorney's costs and fees; and

c.      Such other relief to which the Plaintiffs are entitled as the Court deems

just and appropriate, including but not limited to general relief.

RESPECTFULLY SUBMITTED this Nineteenth day of July 2021.


 /s/ *Will Bardwell*
Will Bardwell
Attorney for the Plaintiffs

**OF COUNSEL:**
William B. Bardwell (Miss. Bar No. 102910)
Christine Bischoff (Miss. Bar No. 105457)
Southern Poverty Law Center
111 E. Capitol Street, Suite 280
Jackson, Mississippi  39201
Phone:          (601) 948-8882
Facsimile:     (601) 948-8885
E-mail:         will.bardwell@splcenter.org
E-mail:         christine.bischoff@splcenter.org

Rita L. Bender (*pro hac vice*)
William J. Bender (*pro hac vice*)
Skellenger Bender, P.S.
Rainier Tower
1301 Fifth Avenue, Suite 3401
Seattle, Washington  98101
Telephone:    (206) 623-6501
Facsimile:     (206) 447-1973
E-mail:         wbender@skellengerbender.com
E-mail:         rbender@skellengerbender.com

Anton Metlitsky (*pro hac vice*)
O'Melveny & Myers LLP
Times Square Tower, 33rd Floor
7 Times Square
New York, New York  10036
Telephone:    (212) 326-2000
Facsimile:     (212) 326-2061
E-mail:         ametlitsky@omm.com

. . .

## CERTIFICATE OF SERVICE

I, Will Bardwell, hereby certify that, simultaneous with its filing, a copy of the

foregoing *First Amended Complaint* was served on all counsel of record via the Court's

electronic filing system.

SO CERTIFIED this Nineteenth day of July 2021.

   */s/ Will Bardwell*
Will Bardwell