**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION**

**DOROTHY HAYMER, *et al.***                                    **PLAINTIFFS**

**V.**                                    **CAUSE NO. 3:17-cv-404-HTW-LGI**

**TATE REEVES, *et al.***                                    **DEFENDANTS**

---

**MEMORANDUM IN SUPPORT OF
RESPONSE IN OPPOSITION
TO MOTION TO DISMISS**

---

This is a simple case.

This case does not, in the State's words, ask "to effect a major federal restructuring of public school funding in Mississippi." *State's Memorandum in Support of Motion to Dismiss* [Docket No. 67] at 3. It seeks neither damages nor an injunction. Instead, this case requests something that federal courts issue all the time: a declaratory judgment that a state's actions violate federal law. *First Amended Complaint* [Docket No. 65] at ¶7.1 (Prayer for Relief). The case turns on a straightforward federal statute, which Mississippi officials have unambiguously violated for nearly a century. The merits of the case are clear.

For that reason, the State avoids the merits. Instead, it lodges three threshold objections. None of those arguments is availing. This simple case is a Section 1983 action seeking a declaration against a violation of federal rights. And in this case, like the countless Section 1983 cases before it in which courts have found these arguments to be no obstacle, the State's objections are no bar to reaching the merits.

The Motion to Dismiss should be denied.

# I.
## INTRODUCTION: THE READMISSION ACT

When Mississippi completed the terms of Reconstruction after the Civil War, Congress faced a dilemma: how to return Mississippi to full membership in the Union without endangering Black citizens' newly won civil rights. The solution that Congress chose was to exercise its constitutional powers under the Guarantee Clause[1] through the Readmission Act.  The Readmission Act also imposed on Mississippi three "fundamental conditions." Among those conditions was "[t]hat the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State." 16 Stat. 67 (1870).

At the time, Mississippi's state constitution contained a robust right to a public education. It imposed upon the Legislature a "the duty . . . to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years." Miss. Const. of 1868, art. VIII § 1. *See, e.g.*, *Bismarck Pub. Sch. Dist. No. 1 v. State ex rel. North Dakota Legislative*

---

[1] "The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence." U.S. Const., art. IV § 4. The historical record is unambiguous that the Guaranty Clause is the provision through which Congress enacted the Readmission Act. For example, during the Senate's debate of the Readmission Act, Senator Jacob Howard of Michigan remarked that the Guaranty Clause represented "a great trust conferred upon Congress . . . in order to secure in every State in the Union a republican form of government[.]" Congressional Globe, 41st Congress, 2nd Session, p. 1325 (Feb. 20, 1870). *See also id.* at 1281 ("But, sir, under what provision of the Federal Constitution do those who favor these fundamental conditions propose to act? Under the fourth section of the fourth article we find the language which is relied upon as giving that power: 'The United States shall guaranty to every State in this Union a republican form of government, and shall protect each of them against invasion.'") (speech of Sen. Thomas Bayard of Delaware).

*Assembly*, 511 N.W.2d 247, 262 (N.D. 1994) (construing uniformity guarantee to "right to equality of equal educational opportunities."

But in 1934, Mississippi officials began chipping away at the state constitution's education clause – and, in so doing, they began violating the Readmission Act's requirement "[t]hat the constitution of Mississippi shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State." 16 Stat. 67 (1870).

First, in 1934, the education clause was amended to exclude 5-year-olds from its protections.

More relevant here, in 1960, the clause was gutted. The 1960 amendment stripped the constitutional requirement of uniformity, replaced the Legislature's "duty" with "discretion," and altogether wiped away the state constitution's requirements concerning the minimum qualities of the public school system.

Most recently, in 1987, Section 201 was amended to its current form. It now instructs that the Legislature "provide for the establishment and maintenance and support of free public schools," but only "upon such conditions and limitations as the Legislature may prescribe." Miss. Const., art. 8 § 201.

No more than a passing glance at the changes to the education clause is necessary to see the merit of this suit:

**Article VIII, Section 201 of the Mississippi Constitution, 1868–Present**

| | | | | |
|---|---|---|---|---|
| As the stability of a republican form of government depends mainly upon the intelligence and virtue of the people, it shall be the duty of the Legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvements, by establishing a uniform system of free public schools, by taxation, or otherwise, for all children between the ages of five and twenty-one years, and shall, as soon as practicable, establish schools of higher grade. | It shall be the duty of the legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of five and twenty-one years, and, as soon as practicable, to establish schools of higher grade. | It shall be the duty of the legislature to encourage, by all suitable means, the promotion of intellectual, scientific, moral, and agricultural improvement, by establishing a uniform system of free public schools, by taxation or otherwise, for all children between the ages of six and twenty-one years, and, as soon as practicable, to establish schools of higher grade. | The Legislature may, in its discretion, provide for the maintenance and establishment of free public schools for all children between the ages of six and twenty-one years, by taxation or otherwise, and with such grades, as the legislature may prescribe. | The Legislature shall, by general law, provide for the establishment, maintenance and support of free public schools upon such conditions and limitations as the Legislature may prescribe. |
| **1868** | **1890** | **1934** | **1960** | **1987** |

**1870 Readmission Act**

There is no question that this erosion violates the Readmission Act. The merits of this case are beyond any serious dispute.

## II.
## THE CASE'S PROCEDURAL HISTORY

In 2017, a group of Black women – each with young, school-aged children – filed this lawsuit. With their children attending underperforming schools in underperforming school districts (the schools and districts all having near-total Black enrollment), they

sought a declaration that Mississippi officials were violating the Readmission Act, and that the 1868 state constitution's education clause remained binding on state officials. The State moved to dismiss and offered a smattering of arguments to support its request. *Motion to Dismiss* [Docket No. 23]. The district court granted that motion, but on one basis only: that the Parents' requested relief violated the Eleventh Amendment. *Opinion and Order* [Docket No. 31]. The Parents moved for reconsideration. *Motion for Reconsideration* [Docket No. 34]. The district court granted in part and denied in part, *Opinion and Order* [Docket No. 39], and entered an *Amended Final Judgment* [Docket No. 40].

The Parents appealed. In April 2020, the Fifth Circuit agreed that the Parents' second request for relief – a declaration that the 1868 state constitution's education clause itself remained in force – violated the Eleventh Amendment. But the panel also explained that the first request – a declaration that Mississippi officials were violating the Readmission Act – fell squarely within the *Ex parte Young* exception to Eleventh Amendment immunity. Therefore, the Court vacated the district court's judgment and remanded. *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 738-39 (5th Cir. 2020).

The State then began a series of procedural machinations that delayed this case a full year. First, they sought reconsideration *en banc*. The Parents explained to the *en banc* court that the panel's decision was unquestionably correct, and that most of the State's arguments — e.g., that there was no private right of action to enforce the Readmission Act's Education Clause — were not properly before the *en banc* Court because neither the district court nor panel resolved that question.  Indeed, the Parents did not even brief the merits of that argument at all.  Over a dissent, that request was denied. *Williams v. Reeves*, 981 F.3d 437 (5th Cir. 2020) (per curiam). Then, the State

moved to stay the issuance of the Fifth Circuit's mandate; that request also was denied. Next, the State moved for reconsideration of the decision not to stay the mandate; that motion too was denied. Finally, they sought a stay from the Supreme Court; and that request was denied by Justice Alito. *Reeves v. Williams*, 141 S.Ct. 2480 (2021).

With the case returned in earnest to district court, the State now urges a second *Motion to Dismiss* [Docket No. 66], which just repeats the arguments offered in the original motion to dismiss. Those arguments are (1.) that this case presents a nonjusticiable political question, (2.) that the Parents lack standing, and (3.) that no private right of action exists.

Each of these arguments is wrong. They each seek to contort this case into something that it is not: some wild-eyed, unprecedented power grab against state authority. That depiction is misplaced. This is a simple case, no different than the multitude of Section 1983 cases asserting violations of federal rights. It turns on the interpretation of a straightforward federal statute – an exercise that federal courts undertake every day. That statute explicitly creates federal rights, and the effort to vindicate those rights is brought on behalf of children in whom those rights are vested.

This is a simple case. The State's effort to paint it as something else are unfounded. Therefore, their Motion to Dismiss should be denied.

### III.
### ARGUMENT

**A.  THE CASE IS JUSTICIABLE.**

First, the State argues that the Parents' claim creates a nonjusticiable political question. For two reasons, the State is incorrect.

First, the political question doctrine does not apply in statutory cases.

The political question doctrine recognizes that the Constitution commits certain questions to the political branches rather than the judiciary. *Baker v. Carr*, 369 U.S. 186, 217 (1962). But the interpretation of statutes is a uniquely judicial responsibility. "This is a statutory case. The Supreme Court has never applied the political question doctrine in a case involving alleged statutory violations. Never." *El-Shifa Pharma. Indus. Co. v. United State*, 607 F.3d 836, 856 (D.C. Cir. 2010) (en banc) (Kavanaugh, J., concurring).

The Supreme Court's decision in *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189 (2012), is instructive. In *Zivotofsky*, parents gave birth to a child in Jerusalem. A federal statute allowed American citizens born in Jerusalem to list Israel as their nation of birth on a passport. But because of its policy against taking a position on Jerusalem's political status, the State Department declined to follow the statute. Zivotofsky's parents applied for a passport for their child and sought to have Israel listed as his nation of birth; when the State Department only listed Jerusalem as the place of birth, the parents sued. *Id*. at 191-93.

The district court reasoned that "resolving [Zivotofsky's] claim on the merits would necessarily require the Court to decide the political status of Jerusalem," *id*. at 193, which the district court deemed a nonjusticiable political question. The D.C. Court of Appeals affirmed. But on *certiorari*, the Supreme Court reversed. The Supreme Court explained that the case did not require wading into a political thicket; instead, "[t]o resolve his claim, the Judiciary must decide if Zivotofsky's interpretation of the statute is correct, and whether the statute is constitutional. This is a familiar judicial exercise." *Id*. at 196. Even when a court's interpretation of a statute might reverberate through the halls of the political branches, "courts cannot avoid their responsibility merely 'because

7

the issues have political implications.'" *Id.* (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

This is such a case. As in *Zivotofsky*, resolving the Parents' claim does not require this Court to judge the wisdom of the Readmission Act, or to grapple with the political considerations that motivated it. All the claim requires is to "decide if [the Parents'] interpretation of the statute is correct . . . . This is a familiar judicial exercise." *Id.*

Moreover, *Zivotofsky*'s obvious implication is that the political question doctrine cannot apply to statutory claims. When one political branch's authority collides with the other's, courts rightly abstain from entering the fray. But Chief Justice Roberts explained in *Zivotofsky* that when a case turns on the interpretation of a statute, "[t]he federal courts are not being asked to supplant a foreign policy decision of the political branches," but rather to "enforce" the policy judgment that Congress *already* made. *Id.* That is why the Court concluded that Zivotofsky's claim only required "careful examination of the textual, structural, and historical evidence put forward by the parties regarding the nature of the statute and of the passport and recognition powers. This is what courts do." *Id.* at 201.

Indeed, that is what courts do in *every* statutory case. In such cases, courts do not make political judgments, because (as *Zivotofsky* explained) any relevant political judgments were made by the political branches when they enacted the statute. *Id.* at 195-96. Once the statute is enacted, then, all that remains for courts to do is to apply the law that Congress passed. "This is a familiar judicial exercise." *Id.* at 196.

Second, even if the political question doctrine could apply in statutory cases, the six tests articulated in *Baker v. Carr* confirm that this case is justiciable.

The six "independent tests" for detecting a political question are:

> [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Vieth v. Jubelirer*, 541 U.S. 267, 277-78 (2004) (listing six *Baker v. Carr* factors).

In this case, the Parents seek a common form of relief: a declaration that state action violates a federal statute. This happens all the time. Not surprisingly, then, this case fits none of the descriptions for a political question.

> *"A textually demonstrable constitutional commitment of the issue to a coordinate political department."*

This simple case requires the interpretation of a federal statute, and the review of a state constitution to determine whether the latter violates the former. This task – interpreting a statute, and applying it – is not committed to a political department. It is committed by the Constitution to the judicial department. *See Zivotofsky*, 566 U.S. at 197, 201; *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) ("[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and we cannot shirk this responsibility merely because our decision may have significant political overtones."). Therefore, the Parents' request is properly brought to the judiciary.

The State misconstrues this test. The State claims that *the Readmission Act's text* places it within Congress' exclusive purview. *Memorandum in Support of Motion to Dismiss* at 9-10. *But that is not the question that Baker v. Carr asks*. The question is not whether a statute's text or subject matter creates a political question. *See Zivotofsky*,

566 U.S. at 196. The question is whether *the Constitution* commits the issue to a political branch. And in this case, the issue at hand – the interpretation and application of a federal statute – simply is not a political question. It is a uniquely judicial task. "This is what courts do." *Id.* at 201.

To support their claim that the Readmission Act creates a political question, the State relies on two decisions: the Arkansas Supreme Court's decision in *Merritt v. Jones*, 533 S.W.2d 497 (Ark. 1976), and a Virginia district court's decision in *Butler v. Thompson*, 97 F. Supp. 17, 20 (E.D. Va. 1951). But the Arkansas decision offers no analysis under *Baker v. Carr* or any other political-question case; it simply cites *Butler v. Thompson* for the notion that Arkansas' readmission act was unenforceable. *Merritt*, 533 S.W.2d at 502.

That leaves the State relying on *Butler* – a shameful decision in which a district court blocked a Black woman from challenging Virginia's poll tax in 1951 so that she could register to vote. *Id.* at 19. That decision simply does not withstand modern scrutiny. For one thing, the poll tax that *Butler* excused is now unconstitutional. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663 (1966). For another, *Butler* preceded *Baker v. Carr* by more than a decade, and did not enjoy the benefit of that decision's guidance. Finally, *Butler* makes the same mistake that the lower courts made in *Zivotofsky*: it conflated the judicial task of applying a provision of law with the political considerations behind that provision's enactment. But as *Zivotofsky* explained, they are separate questions. 566 U.S. at 196. In the light of day, literally *all* of *Butler*'s legal conclusions are demonstrably incorrect.

Once the political branches have rendered their policy judgments via a statute, the Constitution leaves the task of applying that statute to the courts. That is the

constitutional commitment in this case. And it demonstrates that this case raises no political question.

*"A lack of judicially discoverable and manageable standards for resolving it."*

Unless a statute is unintelligible, *see El-Shifa*, 607 F.3d at 856 n.4 (Kavanaugh, J., concurring), a statute will never present a lack of judicially discoverable and manageable standards. This is because legislation, by definition, provides manageable standards – even when the statutory text is "obtuse." *See Saudi Arabia v. Nelson*, 507 U.S. 349, 359-60 (1993) (a "term has to be given some interpretation;" a court does not "have the option to throw up [its] hands"); *Japan Whaling*, 478 U.S. at 230. When called upon to apply a statute, a court reviews its plain text – and, if necessary, calls upon the traditional canons of construction – before applying the statute to the facts of a case. That is all this case requires.

The State suggests this will be an awesome undertaking beyond the skill of this or any other court. *Memorandum in Support of Motion to Dismiss* at 12. Again, the State attempts to depict this simple case as something more gargantuan. It simply is not. This case will require the Court to read the Readmission Act's plain text, to review the Mississippi Constitution's education clause at the time the Readmission Act was enacted and today, and determine whether the current clause violates the Readmission Act's requirement that the State not deprive Mississippi's school children of the "school rights and privileges" that they previously enjoyed. The federal Readmission Act, in other words, is no different than a specific reference statute, which federal courts apply *all the time. See, e.g., Jam v. Int'l Fin. Corp.*, 139 S.Ct. 759, 767-68 (2019).

since the Readmission Act's enactment, and to determine whether those changes violate the Readmission Act's requirements. That's all.

The State next holds up Jones Jones' dissent from the Fifth Circuit's refusal to grant rehearing *en banc*. In that dissent, Judge Jones shared her view that the rights created by the Readmission Act are "too vague and amorphous for judicial resolution." *Williams v. Reeves*, 981 F.3d 437, 446 (5th Cir. 2020) (Jones, J., dissenting from denial of rehearing *en banc*). The State's argument fails three times over.  *First*, Judge Jones's dissent is just that: a dissent.  It does not reflect the views of the Fifth Circuit.  *Second*, Judge Jones issued her dissent without the benefit of briefing from the Parents.  That is because, as explained above, *supra* at 5, the Parents' argument at the *en banc* stage was that the State's collateral arguments were not properly before the Court.  We have an adversarial system of justice because courts benefit from the positions of both sides. Judge Jones's dissent did not.  Finally, had the State's arguments been properly presented, the Parents would have explained that her concerns are misplaced, for all of the reasons explained above.  The Readmission Act provides an objective benchmark that directs the Court to Mississippi's constitution. There is nothing unusual about the mode of analysis here.

> *"The impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion."*

This case calls for no judicial policy determination. The only relevant policy determination was the one made by Congress when it enacted the statute, and to hold the statute unenforceable would *disrespect* that policy choice. This point again confirms that the political question doctrine cannot apply to statutes. Congress enacts policy in statutes. The courts' sole job is to respect those policy determinations by enforcing the law as written. "This is what courts do." *Zivotofsky*, 566 U.S. at 201.

If the Parents were seeking to *alter* the Readmission Act's requirements – that is, if they sought new requirements, or sought to expand the existing ones – then clearly, that would invite this Court to make policy judgments that the Constitution reserves for Congress. But that is not what the Parents seek. The Parents are only asking the Court to apply the statute that Congress enacted after making its policy determinations.

In its suggestions to the contrary, the State makes the same mistake that riddles its Motion to Dismiss again and again – the same mistake that the Supreme Court counseled against in *Zivotofsky*: confusing a statute's application with the policy judgments that led to that statute's enactment. 566 U.S. at 196. As *Zivotofsky* explained, these are two separate questions. And when a litigant seeks only to apply a statute that Congress saw fit to enact, the task belongs to the judiciary: "This is a familiar judicial exercise." *Id.* at 193.

*The remaining Baker v. Carr factors.*

The State does not even argue that the fourth, fifth, or sixth *Baker v. Carr* factors apply in this case – nor could they, because like the other factors, they obviously do not evince a political question here.

The fourth factor is "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government." *Vieth v. Jubelirer*, 541 U.S. 267, 278 (2004). Determining whether the Mississippi Constitution's Twentieth Century changes violate the Readmission Act shows no disrespect for a political branch. On the other hand, avoiding a determination that Mississippi officials are violating the Act *would* show disrespect to a political branch by not affirming the rights that Congress created. "[C]ourts cannot avoid their

responsibility merely 'because the issues have political implications.'" *Zivotofsky*, 566 U.S. at 196 (quoting *INS v. Chadha*, 462 U.S. 919, 943 (1983)).

The fifth factor is "an unusual need for unquestioning adherence to a political decision already made." *Vieth*, 541 U.S. at 278. As one commentator has put it, dismissals under this factor "are rarely seen in the wild." *The Political Question Doctrine, Executive Deference, and Foreign Relations*, 122 Harv. L. Rev. 1193, 1197 (Feb. 2009). In this area of the political question doctrine, "[d]ominant is the need for finality in the political determination, for emergency's nature demands a prompt and unhesitating obedience." *Baker*, 369 U.S. at 213 (quotation omitted). For example, courts will "refus[e] to review the political departments' determination of when or whether a war has ended." *Id*. Clearly, this case does not seek to overturn a decision to end a war, or to overturn any political decision at all. On the other hand, the State's resistance to judicial review of a Congressional enactment *does* seek effectively to challenge a political branch's policy decisions.

Finally, the sixth factor reveals a political question when a case creates "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Vieth*, 541 U.S. at 278. The Parents' claim seeks no such pronouncement. The only pronouncement they seek is a declaration consistent with the Readmission Act's requirements. That request is consistent with the policy judgments Congress embodied in the Readmission Act. On the other hand, it would embarrass Congress's lawmaking prerogative to hold that courts have no authority to enforce or interpret a duly enacted law.

That outcome can be avoided by concluding what all of *Baker v. Carr*'s factors reveal: that this simple case is no different from the countless Section 1983 cases

14

challenging state action as inconsistent with federal law, and that it creates no political question.

*Conclusion: This case creates no political question.*

"Unless one of these [*Baker v. Carr*] formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence. The doctrine of which we treat is one of 'political questions,' not one of 'political cases.'" *Baker v. Carr*, 369 U.S. 186, 217 (1962).

It remains to be seen whether the declaration prayed for in the First Amended Complaint will have political ramifications. But six decades of Supreme Court precedent confirm that political ramifications do not, by themselves, evince a nonjusticiable political question. Likewise, a review of *Baker v. Carr*'s factors shows that this case presents no political question. It is a case challenging state action under federal law. "This is a familiar judicial exercise." *Zivotofsky*, 566 U.S. at 196.

The State's arguments to the contrary should be rejected.

## B. The Parents' Children Have Federal Rights that the State is Violating, and Their Educational Opportunities Suffer as a Result. Of Course They Have Standing.

Next, the State argues that the Parents do not have standing, even though they challenge a violation of federal law that is injuring their children. This suggestion strains credulity. *Of course* they have standing.

Surviving a standing challenge at the motion to dismiss stage requires no proof. A plaintiff need only plead allegations that satisfy three familiar elements of Article III standing: an injury in fact; traceable to the defendant's conduct; redressable by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Plaintiffs have done so. Their children are Black, and they attend some of Mississippi's

most underperforming schools. These children are *exactly* who Congress intended to protect with the Readmission Act.

*The Plaintiffs Have Suffered an Injury in Fact.*

First, the Plaintiffs have alleged an injury in fact. The First Amended Complaint alleges that the Plaintiffs in this case are currently receiving an inferior education that is not uniform with that provided to other students in Mississippi, particularly those who attend predominantly white schools. *First Amended Complaint* at ¶¶5.46-5.70. Providing a disuniform and inferior education is a "concrete and particularized" injury unto itself, *see, e.g., C.M. ex rel. Marshall v. Bentley*, 13 F. Supp. 3d 1188, 1201 (M.D. Ala. 2014), and is causing myriad other concrete injuries, including: a diminished ability to exercise the right to vote meaningfully; illiteracy; economic injuries, such as diminished lifetime earnings potential and increased likelihood of poverty; and non-economic injuries, such as diminished likelihood of attending and/or graduating college. *First Amended Complaint* at ¶6.9.

The State contends that the Parents are alleging only a generalized grievance, because they are injured alongside many other Black children who attend Mississippi's woefully disuniform schools. *Memorandum in Support of Motion to Dismiss* at 15-16. This argument is meritless. Mississippi's provision of a disuniform system of education is concretely and directly harming the Parents' children. That it may also harm others – in particular, other students in failing school districts – does not convert an individualized injury into a non-cognizable generalized grievance.[2] As the Supreme Court explained in *FEC v. Akins*, 524 U.S. 11 (1998): "where a harm is concrete, though

---

[2] Taken to its logical conclusion, the State suggests that it can avoid consequences for violating federal law, so long as it injures enough people in the process.

widely shared, the Court has found 'injury in fact.'" *Id.* at 24. Or, as the Fifth Circuit *en banc* has put it: "the fact that many persons suffer an injury does not mean that no person has suffered the requisite injury." *Doe by Doe v. Beaumont Indep. Sch. Dist.*, 240 F.3d 462, 466 (5th Cir. 2001) (en banc).

"Such a claim of standing is even stronger," in fact, "when the plaintiffs are students and parents of students attending public schools. Students and their parents enjoy a cluster of rights vis-à-vis their schools – a relationship which removes them from the sphere of 'concerned bystanders.'" *Id.* at 466-67. Thus, plaintiffs like those in this case "have often been found to have suffered an injury, albeit along with many other students and parents." *Id.*

If the State's generalized grievance argument were to be taken at face value — that there is no federal jurisdiction because the lawsuit (in the State's view) "is formulated as a broad, general indictment of Mississippi's public school system along racial lines" — then there would have been no standing in *Brown v. Board*. That is as wrong as it sounds.

*The Plaintiffs' Injuries are Traceable to the State's Conduct.*

To survive a standing challenge from a motion to dismiss, a plaintiff need only allege the three elements of standing – including traceability. *Lujan*, 504 U.S. at 560-61. The Parents' First Amended Complaint does that. It alleges that violations of the Readmission Act (namely, the Twentieth Century amendments to the Mississippi Constitution's education clause) legalized a disuniform school system, under which their children receive an inferior education – which, in turn, is causing injuries to their children. *First Amended Complaint* at ¶¶6.8-6.9. It would be hard to imagine an allegation more traceable than that.

In its Motion to Dismiss, the State does not truly dispute that the Parents' children are injured by their disuniform schools. Instead, the State claims that the children's injuries "are just as conceivably attributable to any number of factors unrelated to educational quality (e.g., socioeconomic factors, lack of parental involvement, preexisting health conditions, etc.)."[3] *Memorandum in Support of Motion to Dismiss* at 17. At best, these arguments demonstrate the existence of a fact question, which precludes dismissal.

To support its argument, the State cites only one case: *Moore v. Bryant*, 205 F. Supp. 3d 834 (S.D. Miss. 2016), which the State claims supports the idea that injuries are not "fairly traceable" if "the alleged harm could just as conceivably have resulted from 'any number of factors' other than those attributable to the conduct of the defendant." *Memorandum in Support of Motion to Dismiss* at 16 (quoting *Moore*, 205 F. Supp. 3d at 855).

The State's argument quotes *Moore* too selectively. In *Moore*, a Black attorney challenged the constitutionality of Mississippi's state flag – which, at the time of the lawsuit, still contained the Confederate battle emblem. The attorney alleged that he suffered from a series of ongoing injuries, including hypertension, insomnia, and abnormal EKGs, and that the stage flag "has probably contributed to or caused the exacerbation of [his] medical ailments." 205 F. Supp. 3d at 853.

The district court was not convinced. The court did indeed note that "any number of factors" could contribute to the sorts of chronic health problems that the attorney

---

[3] This suggestion cannot pass without noting how insulting it is. Accusing Black mothers of causing their children's injuries through "lack of parental involvement" should be beneath the dignity of the State. This is the second time that the State has chosen to paint these families as broken homes. *See Memorandum in Support of Motion to Dismiss* [Docket No. 24] at 21. That the State would give voice to this ugliness again is remarkable.

identified. *Id.* at 855. But the district court's opinion went on to explain that the problem with the attorney's claim was not that his injuries might have multiple causes – but rather that his allegations simply were not plausible. *Id.* ("Moore offers no plausible allegation that these physical injuries are directly attributable or even exacerbated by the state flag, when there are so many other competing explanations of their cause."). The implausibility of the claims in *Moore* simply is not present here.  It is plausible that if the school officials were required to provide a uniform system of public schools, the Parents' children would not be set at a lifelong educational disadvantage relative to their peers.

Moreover, the State's reading of *Moore* is in patent conflict with Fifth Circuit precedent, which teaches that an injury's "fairly traceable" cause need not be its *only* cause. So long as a complaint alleges that "the Defendants significantly contributed to the Plaintiffs' alleged injuries, Plaintiffs have satisfied the requirement of traceability." *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010). This is because "[t]racing an injury is not the same as seeking its proximate cause." *Id.* The traceability requirement is satisfied even if the defendant's conduct merely contributes to the injury – even "an indirect causal relationship will suffice." *Campaign for Southern Equality v. Miss. Dep't of Human Servs.*, 175 F. Supp. 3d 691, 707 (S.D. Miss. 2016) (Jordan, J.) (quoting *Toll Bros., Inc. v. Township of Readington*, 555 F.3d 131, 142 (3rd Cir. 2009)). Here, though, the injury is direct: if the Defendants provided a uniform system of public schools, the Parents' children would not be set at a lifelong competitive disadvantage relative to students in predominantly white schools.

Therefore, even if the State is correct that the injuries suffered by the Parents' children might have other contributing causes, the Parents' allegations still satisfy the traceability requirement.

*The Injuries Suffered by the Parents' Children Will Be Redressed by a Favorable Ruling.*

As with the issue of traceability, a motion to dismiss challenging redressability presents a plaintiff with a "relatively modest" hurdle. *Campaign for Southern Equality*, 175 F. Supp. 3d at 701 (quoting *Bennett v. Spear*, 520 U.S. 154, 170-71 (1997)).

The law presumes that when public officials are apprised of their legal obligations, they will follow those obligations. *United States v. Chemical Found., Inc.*, 272 U.S. 1, 14-15 (1926) ("The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."). Here, if this Court issues a declaration that the Defendants are violating the Readmission Act, the law presumes that Defendants will provide a uniform system of free public schools, thus redressing the injury. Redressability is as simple as that.

The State paints a more troubling picture. The State represents that, even if it loses this case, it will not change anything – not the Mississippi Constitution, nor the disuniform system of public schools that the Mississippi Constitution now allows. It would not be the first time that Mississippi officials have violated federal court orders concerning public institutions of learning. *See Meredith v. Fair*, 328 F.2d 586 (5th Cir. 1962). And obviously, if the State follows through on its threat, then the Parents will have to evaluate their legal options for compelling compliance.

But the law requires them to cross that bridge only when they get to it. For now, the law presumes that the State will follow through on its legal obligations – and if the law presumes it, then the Parents must presume it as well.[4] To be very precise, the State need not amend its constitution if it loses its case because amendment striking the uniformity guarantee would have been invalid, and again the law presumes that Defendants will follow valid law.  The fact that legislation *might* be necessary to ensure that Defendants actually provide a uniform system of education is, by contrast, irrelevant.  How the State chooses to provide a uniform system of free public schools is its own choice — whether it wants to do so by legislation or otherwise is its prerogative. But the mechanics of state compliance with federal law is irrelevant to the question of standing; otherwise, a state could always avoid litigation by arguing that it can only comply with federal law by enacting statutes of its own.

### C.  The Readmission Act Is Privately Enforceable

The right of action in this simple case is identical to the right of action in the countless other cases against state officials for violating federal rights: Section 1983. One of the "principal purpose[s]" of allowing enforcement of federal statutes through Section 1983 "was to ensure that federal legislation providing specifically for equality of rights would be brought within the ambit of civil litigation authorized by that statute." *Maine v. Thiboutot*, 448 U.S. 1, 7 (1980) (quotation omitted). This is precisely that sort of litigation: a case to vindicate rights from "federal legislation providing specifically for equality of rights." *Id.* And the Supreme Court's requirements for bringing Section 1983

---

[4] Taken to its logical conclusion, the State's strategy – threatening not to follow through on federal courts' decisions, as a way to challenge standing – would have perverse consequences. Should *Brown v. Board* have been dismissed for lack of standing, simply because the defendants resisted its holding?

cases for violations of federal statutes demonstrate that the Parents have a right of action.

When determining whether Section 1983 allows private enforcement of a federal statute, courts ask whether the statute in question (in this case, the Readmission Act) is "phrased in terms of the persons benefitted." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 274 (2002). This review requires "looking at the language of the statute itself." *Cannon v. Univ. of Chicago*, 441 U.S. 677, 689 (1979). A statute "which expressly identifies the class Congress intended to benefit" creates a privately enforceable federal right. *Id.*

The Readmission Act satisfies that standard. In relevant part, it provides "[t]hat the constitution of Mississippi shall never be so amended or changed as to deprive *any citizen or class of citizens* of the United States *of the school rights and privileges* secured by the constitution of said State." 16 Stat. 67 (1870) (emphases added). This provision does everything that *Gonzaga* requires: it creates federal "rights," and it identifies the enactment's intended beneficiaries ("citizens," and in particular school-age children).

The State completely avoids this provision of the Readmission Act. In fact, instead of starting with the text of the provision in question, as *Gonzaga* requires, the State devotes the majority of its argument to the Readmission Act's "purpose." Purposive arguments cannot trump plain text, even assuming (counterfactually) that the State were right about the statute's purpose.

Next, the State looks elsewhere in the Readmission Act's text. It focuses on the portion of the statute contemplating the return of Mississippi's congressional delegation. *Memorandum in Support of Motion to Dismiss* at 25. This is unsurprising, since the language of the Readmission Act's third condition clearly vests a right in an

identified class of beneficiaries. But the text of the statute must guide this analysis. *Gonzaga*, 536 U.S. at 274. And in this case, the statute's language is unambiguous. Ironically, the State also argues that "Congress could not *possibly* have intended for the Act to be enforceable under [Section 1983] 'for the obvious reason that the Readmission Act was enacted before Congress adopted § 1983 as part of the Civil Rights Act.'" *Memorandum in Support of Motion to Dismiss* at 26 (quoting *Reeves*, 981 F.3d at 445 n.9 (Jones, J., dissenting) (emphasis in original)). But *Gonzaga* is clear that Congress' intent to create (or not) a federal right, enforceable through Section 1983, must be demonstrated on the face of the statute. 536 U.S. at 286. And in this case, it is: there can be no clearer evidence that Congress intended to create a right than by using the word "right" in the statute. The Readmission Act does that.

Moreover, the fact that the Readmission Act preceded the enactment of the Civil Rights Act (and what is now Section 1983) is of no consequence. If legal rights created before the Civil Rights Act's passage were unenforceable through Section 1983, then there would be no Section 1983 suits for violations of the Bill of Rights. And yet, there are – because *Gonzaga* turns only on whether a federal right exists, rather than when it came into existence.

Rather than face that provision, the State turns to *Planned Parenthood of Greater Texas Family Planning and Preventative Health Services, Inc. v. Kauffman*, 981 F.3d 347 (5th Cir. 2020) (en banc). In that case, a federal statute allowed Medicaid beneficiaries to receive care from qualified providers; when the State of Texas found certain providers unqualified, Planned Parenthood and individual Medicaid beneficiaries filed suit under Section 1983. *Id.* at 351-52. But the *en banc* Fifth Circuit explained that the Medicaid provision created no individual rights: it required Medicaid

23

state plans to "provide that any individual eligible for medical assistance . . . may obtain such assistance from any institution . . . qualified to perform the service or services required." 42 U.S.C. § 1396a(a)(23). But like the statute in *Gonzaga*, the statute at issue in *Kauffman* merely obligated a state to do something – rather than creating individual rights. *Kauffman*, 981 F.3d at 357. The Readmission Act is a completely different creature: it evinces Congress' intent to create a right by using the word "rights," and it identifies the beneficiaries of that right. If the statute at issue in *Kauffman* had done what the Readmission Act does, then *Kauffman* would have turned out differently. It is inapposite to this case.

The State also argues that the Readmission Act's terms are too imprecise to allow for enforcement. *Memorandum in Support of Motion to Dismiss* at 27-28. This is the same argument that the State raises concerning the political question doctrine, and it is no more persuasive here. *Supra* at 10. The critical terms in the Readmission Act – the ones on which violation or compliance turn – are that "the constitution of Mississippi *shall never be so amended or changed* as to deprive any citizen or class of citizens of the United States of the school rights and privileges secured by the constitution of said State." 16 Stat. 67 (1870) (emphasis added). And all this Court must do to determine whether that change happened is to compare the Reconstruction-era education clause to the modern education clause; if the key protections in the Reconstruction-era clause have been stripped away (and obviously, they have been) to allow State officials not to provide a uniform system of free public schools, then the statute has been violated. This comparison is a simple judicial exercise in a simple case. The State's effort to complicate it is unavailing.

*Gonzaga* does not allow turning a blind eye to statutory text that a litigant finds inconvenient. And in this case, the Readmission Act's text clearly creates a federal right and identifies that right's beneficiaries. It is enforceable under Section 1983.

Finally, the State argues that the Readmission Act creates no *implied* right of action. That is inconsequential. The Act is enforceable through Section 1983. *Gonzaga*, 536 U.S. at 274. That is enough to allow this case to move forward.

### D. The State is Violating the Readmission Act.

The Readmission Act explicitly required that Mississippi "never" weaken its children's constitutionally guaranteed school rights. Mississippi did exactly what the Act forbade. Because of this violation of federal law, schools across the state have been witness to generations of legally sanctioned disuniformity, where race determines a child's chance at a meaningful education. No lawsuit can undo that injustice. This one does not try.

This lawsuit does not seek an injunction instructing the State how to ameliorate those injustices, and it does not seek damages to compensate for those injuries. It seeks only a declaration of the obvious: that the State is obligated to maintain the school rights and privileges that the Mississippi Constitution embodied in 1870, and that it is not doing so. It is a simple request. The State can succeed only by misrepresenting it as something more complicated. That effort should be turned away. The Motion to Dismiss should be denied.

RESPECTFULLY SUBMITTED this Fourteenth day of October 2021.

 /s/ *Will Bardwell*
William B. Bardwell
Counsel for the Plaintiffs

25

**OF COUNSEL:**
William B. Bardwell (Miss. Bar No. 102910)
Southern Poverty Law Center
111 E. Capitol Street, Suite 280
Jackson, Mississippi  39201
Telephone: (601) 948-8882
Facsimile: (601) 948-8885
E-mail: will.bardwell@splcenter.org

Rita L. Bender (*pro hac vice*)
William J. Bender (*pro hac vice*)
Skellenger Bender, P.S.
Rainier Tower
1301 Fifth Avenue, Suite 3401
Seattle, Washington  98101
Telephone: (206) 623-6501
Facsimile: (206) 447-1973
E-mail: rbender@skellengerbender.com
E-mail: wbender@skellengerbender.com

Anton Metlitsky (*pro hac vice*)
O'Melveny & Myers LLP
Times Square Tower, 33rd Floor
7 Times Square
New York, New York  10036
Telephone: (212) 326-2000
Facsimile: (212) 326-2061
E-mail: ametlitsky@omm.com

. . .

## CERTIFICATE OF SERVICE

I, Will Bardwell, hereby certify that, contemporaneous with its filings, a true and correct copy of the foregoing *Memorandum in Support of Response in Opposition to Motion to Dismiss* was served on all counsel of record via the Court's electronic filing system. SO CERTIFIED this Fourteenth day of October 2021.

_/s/ Will Bardwell_
William B. Bardwell
Counsel for the Plaintiffs

26