IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

TATI ABU KING, et al.,
　　　　　　　Plaintiffs,

v.　　　　　　　　　　　　　　　　　　Civil Action No. 3:23cv408

GLENN YOUNGKIN, in his official capacity
as Governor of the Commonwealth of
Virginia, et al.,
　　　　　　　Defendants.

## OPINION

Article II, Section 1 of the Virginia Constitution automatically disqualifies all persons convicted of any felony from voting. Felons, including the individual plaintiffs, Tati Abu King and Toni Heath Johnson, may not vote unless and until their "civil rights have been restored by the Governor or other appropriate authority." *See* Va. Const. art. II, § 1 (1971). In their Amended Complaint, the plaintiffs assert that Article II, Section 1 of the Virginia Constitution violates both a federal statute—the Virginia Readmission Act ("VRA") of 1870—and the Eighth Amendment of the United States Constitution. They have sued several state and local officials, including Governor Glenn Youngkin and Secretary of the Commonwealth Kelly Gee. The plaintiffs ask the Court to issue a declaratory judgment in their favor and to enjoin the defendants from enforcing Article II, Section 1 against individuals convicted of crimes that were not felonies at common law in 1870.

The defendants have moved to dismiss the plaintiffs' Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). (ECF No. 76.) For the reasons discussed below, the Court will grant in part and deny in part the defendants' motion. First, because Bridging the Gap, Inc. ("Bridging the Gap") has not alleged an injury-in-fact, it lacks

EXHIBIT

1

exhibitsticker.com

standing to sue, so the Court will dismiss it from this case. Next, because *Ex parte Young* permits the plaintiffs to pursue their sought-after relief, none of the defendants may successfully assert their Eleventh Amendment immunity. Third, because the VRA does not create a private right enforceable under § 1983, the Court will dismiss Count One. But because the plaintiffs need not assert a private right in pursuing equitable relief, and the Amended Complaint plausibly presents an *Ex parte Young* action, the Court will not dismiss Count Two. Finally, because felon disenfranchisement is not a punishment under the Eighth Amendment, the Court will dismiss Counts Three and Four.

## I. BACKGROUND

### A. Virginia's Constitution and the VRA

Following the Civil War, Congress passed the VRA, which admitted Virginia

> to representation in Congress as one of the States of the Union upon the following
> fundamental condition[]: . . . That the Constitution of Virginia shall never be so
> amended or changed as to deprive any citizen or class of citizens of the United
> States of the right to vote who are entitled to vote by the [Virginia] Constitution
> herein recognized, except as a punishment for such crimes as are now felonies at
> common law . . . .

An Act to Admit the State of Virginia to Representation in the Congress of the United States, ch. 10, 16 Stat. 62 (1870). The VRA thus readmitted Virginia's representatives to Congress on the "fundamental condition" that Virginia never alter its Constitution to disenfranchise citizens who could vote under Virginia's then-controlling Constitution. *See id.* This condition came with one exception: the Virginia Constitution could be amended to disenfranchise those convicted of crimes that, in 1870, were common law felonies.[1]

---

[1] "[A]t common law[,] murder, manslaughter, arson, burglary, robbery, rape, sodomy, mayhem and larceny were felonies." *Jerome v. United States*, 318 U.S. 101, 108 n.6 (1943) (citing Wharton, Criminal Law § 26 (12th ed.)).

2

When Congress enacted the VRA, Virginia's Constitution disenfranchised specific "persons": those "convicted of bribery in any election, embezzlement of public funds, treason or felony." Va. Const. art. III, § 1 (1869). In 1902, Virginia amended its Constitution, disenfranchising "persons who, prior to the adoption of this Constitution, were disqualified from voting, by conviction of crime . . . whose disabilities shall not have been removed" and "persons convicted after the adoption of this Constitution . . . of treason, or of any felony, bribery, petit larceny, obtaining money or property under false preten[s]es, embezzlement, forgery, or perjury." Va. Const. art. II, § 23 (1902). Virginia's current Constitution, last amended in 1971, no longer specifies certain felony convictions that disqualify a prospective voter. Instead, it disenfranchises all persons "convicted of a felony" from voting; convicted felons may vote only if their "civil rights have been restored by the Governor." Va. Const. art. II, § 1 (1971).

### B. The Defendants' Role in Felon Disenfranchisement

The plaintiffs sue several state actors involved in the disenfranchisement process in their official capacity: Governor Youngkin; Secretary Gee; Chairman of the State Board of Elections John O'Bannon; Vice Chair of the State Board of Elections Rosalyn R. Dance; Secretary of the State Board of Elections Georgia Alvis-Long; Board of Elections member Donald Merricks; Board of Elections member Matthew Weinstein; Commissioner of the Department of Elections Susan Beals; General Registrar of Fairfax County, Virginia, Eric Spicer; and General Registrar of Smyth County, Virginia, Shannon Williams.

Virginia's Constitution proscribes those with felony convictions from voting unless and until Governor Youngkin or another "appropriate authority" restores their voting rights. *See id.* "The Secretary of the Commonwealth administers the process for the restoration of civil rights, including the right to vote." (ECF No. 58 ¶ 26.) "Individuals who have had their civil rights

3

taken away due to a felony conviction may apply to have their rights restored by the Governor," and Governor Youngkin uses discretion in assessing voting rights restoration applications. (*Id.* ¶ 24.) Governor Youngkin either grants or denies those applications, and Secretary Gee's office communicates with applicants once Governor Youngkin has reached a decision. If Governor Youngkin denies "an application to restore voting rights, [he] ensures that individuals who have been disenfranchised pursuant to Article II, Section 1 of the Virginia Constitution remain permanently disenfranchised." (*Id.*)

The Board of Elections "is authorized to prescribe standard forms for voter registration and elections, and to supervise, coordinate, and adopt regulations governing the work of local electoral boards, registrars, and officers of election." (*Id.* ¶ 28.) The Department of Elections "conducts the Board of Elections' administrative and programmatic operations and discharges the Board's duties consistent with delegated authority." (*Id.* ¶ 34.) In doing so, "[t]he Department of Elections is authorized to establish and maintain a statewide automated voter registration system to include procedures . . . to require cancellation of records for registrants no longer qualified." (*Id.*) The Department of Elections "requires the general registrars to delete from the record of registered voters the name of any voter who has been convicted of a felony." (*Id.* ¶ 35.) General registrars "process voter registration applications for residents in their particular locality . . . determining whether an applicant has ever been convicted of a felony, and if so, under what circumstances the applicant's right to vote has been restored." (*Id.* ¶ 37.) Within thirty days of learning that a registered voter has a felony conviction and has not had their voting rights restored, the general registrar must delete that voter from the record.

## C. The Plaintiffs' Injuries

Two individuals, King and Johnson, and a nonprofit organization, Bridging the Gap, allege that Virginia's Constitution unlawfully disenfranchises those convicted of felonies that were not common law felonies in 1870.

In 2018, King was convicted of a felony drug-possession offense and lost his voting rights. (ECF No. 58 ¶¶ 15–16.) After King completed his sentence, he submitted a voting rights restoration application to Secretary Gee's office. That application remains pending. In 2021, "Johnson was convicted of drug possession and distribution crimes, as well as child endangerment," and she, too, lost her right to vote. (*Id.* ¶¶ 20–21.) While on probation, Johnson submitted her voting rights restoration application. "Johnson learned in June 2023 that her restoration application ha[d] been denied." (*Id.* ¶ 21.)

Bridging the Gap's "mission is to empower formerly incarcerated persons and to help these individuals overcome barriers that hinder their effective transition into mainstream society following incarceration." (*Id.* ¶ 23.) The organization "focus[es] on three main areas: career training, civil rights/criminal justice advocacy, and housing resources." (*Id.* ¶ 82.) "As a central component of that work, Bridging the Gap assists previously incarcerated Virginians who have been disenfranchised—including Virginians disenfranchised because of convictions for crimes that were not felonies at common law in 1870 . . . [and] felonies more generally—in having their voting rights restored." (*Id.* ¶ 23.) "Due to the time and effort it has expended supporting thousands of individuals with rights restoration as a result of Defendants' conduct, Bridging the Gap has forgone investment into other core areas of its organizational goals and services, and even delayed or suspended other projects and programs vitally important to its mission." (*Id.* ¶ 86.) Specifically, the organization has reduced the frequency of its trainings for formerly

5

incarcerated individuals to learn how to install solar panels, and it "has substantially reduced the time and resources it puts toward connecting people leaving incarceration with transitional housing." (*Id.* ¶¶ 86–87.) Additionally, Bridging the Gap has forgone applying for "at least three grants . . . because of the time the organization has needed to spend countering Virginia's unlawful disenfranchisement regime." (*Id.* ¶ 88.)

## II. THE DEFENDANTS' 12(B)(1) MOTION[2]

### A. *Bridging the Gap Lacks Standing to Sue*

The plaintiffs bear the burden of establishing that Bridging the Gap has standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," and courts "accept as true [the plaintiffs'] allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (second alteration in the original) (first quoting *Lujan*, 504 U.S. at 561; then quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Courts "do not, however, apply the same presumption of truth to 'conclusory statements' and 'legal conclusions.'" *Id.* (quoting *Iqbal*, 556 U.S. at 678).

"[T]he irreducible constitutional minimum of standing contains three elements." *Lujan*, 504 U.S. at 560. "First, the plaintiff must have suffered an injury-in-fact—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) actual or imminent,

---

[2] A motion to dismiss under Rule 12(b)(1) usually places the burden on the plaintiff to prove the court has subject matter jurisdiction. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). A defendant's Rule 12(b)(1) motion may challenge subject matter jurisdiction facially, contending that the plaintiff's complaint fails to allege facts upon which the Court may base its subject matter jurisdiction. *Id.* "[W]hen a defendant asserts that the complaint fails to allege sufficient facts to support subject matter jurisdiction, the trial court must apply a standard patterned on Rule 12(b)(6) and assume the truthfulness of the facts alleged." *Kerns v. United States*, 585 F.3d 187, 193 (4th Cir. 2009). If the defendant asserts that the Eleventh Amendment bars a plaintiff's suit, however, the defendant bears the burden of proving its immunity under that Amendment. *See Hutto v. S.C. Ret. Sys.*, 773 F.3d 536, 542–43 (4th Cir. 2014).

not conjectural or hypothetical." *Id.* (internal quotations omitted). "Second, there must be a causal connection between the injury and the conduct complained of." *Id.* "Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 561 (internal quotations omitted). "[A] plaintiff can satisfy the injury-in-fact requirement for prospective relief either by demonstrating a sufficiently imminent injury in fact or by demonstrating an ongoing injury." *Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (2022) (alteration in original) (internal quotations omitted) (quoting *Deal v. Mercer Cnty. Bd. of Educ.*, 911 F.3d 183, 189 (4th Cir. 2018)).

The plaintiffs assert that automatic disenfranchisement impairs felons' successful transition to active citizenship and "hinders Bridging the Gap's mission 'to support the successful transition of formerly incarcerated persons to active citizenship.'" (ECF No. 78, at 12 (quoting ECF No. 58 ¶ 80).) They argue that Bridging the Gap has organizational standing because the defendants' "enforcement of Article II, Section 1 of the Virginia Constitution has 'perceptibly impair[ed]' [its] ability to carry out its mission and 'consequent[ly] drain[ed] . . . [its] resources.'" (*Id.* (quoting *N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295, 301 (4th Cir. 2020) (alterations in original)).) But "a mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient." *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972). And "[a]lthough a diversion of resources might harm the organization by reducing the funds available for other purposes, it results not from any actions taken by [the defendant], but rather from the [organization's] own budgetary choices." *Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012) (alterations in original) (internal citations omitted).

7

Bridging the Gap has simply made a budgetary choice among its focus areas. The organization therefore lacks standing, and the Court will dismiss Bridging the Gap it from this case.

### B. Sovereign Immunity Does Not Bar the Plaintiffs' VRA Claims

Sovereign immunity "protects a state's dignity and fiscal integrity from federal court judgments and acts as a limitation on the federal judiciary's Article III powers." *Beaulieu v. Vermont*, 807 F.3d 478, 483 (2d Cir. 2015) (citation omitted). Although the Eleventh Amendment provides that a state is immune from suit in federal court brought by "Citizens of another State, or by Citizens or Subjects of any Foreign State," the Supreme Court has extended its applicability to private citizens' suits against their own states. U.S. Const. amend. XI; *see, e.g., Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001).

A plaintiff may overcome a state's Eleventh Amendment immunity and sue a state in federal court if: (1) the state has expressly consented to suit, (2) Congress has abrogated the state's immunity from suit, or (3) the plaintiff seeks only prospective injunctive relief against the state's violation of federal law. *See Garrett*, 531 U.S. at 363; *Edelman v. Jordan*, 415 U.S. 651, 672 (1974); *Ex parte Young*, 209 U.S. 123, 159–60 (1908). The first and second routes around the Eleventh Amendment do not apply here, but the doctrine of *Ex Parte Young* does. "In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit [against a State], a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (second alteration in original) (internal quotation marks omitted). The *Ex parte Young* doctrine applies only to ongoing federal violations; it does not apply to suits in which a plaintiff asks the court to

8

compel a state to comply with state law. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106 (1984).

The defendants assert that *Pennhurst* controls because although the plaintiffs "characterize their claims as premised on a violation of federal law—the Virginia Readmission Act—they are state-law claims in substance." (ECF No. 77, at 18.) They contend that, "[i]n essence, Plaintiffs ask this Court to order Defendants to comply with the 1869 Virginia Constitution." (*Id.*) But the plaintiffs do not ask for such relief. They assert that the defendants are enforcing Article II, Section 1 of Virginia's Constitution. And they contend that such enforcement is in violation of a federal law's "fundamental condition" that Virginia never alter its Constitution to disenfranchise citizens who could vote under Virginia's 1869 Constitution, "except as a punishment for such crimes as are now felonies at common law." (ECF No. 78, at 10, 23); *see* An Act to Admit the State of Virginia to Representation in the Congress of the United States, ch. 10, 16 Stat. 62 (1870).

The plaintiffs aim to prevent the defendants from enforcing Article II, Section 1 of the Virginia Constitution against those convicted of felonies that were not felonies at common law in 1870 and request a declaratory judgment confirming their legal allegations. Thus, their sought-after relief is "properly characterized as prospective." *Verizon Md., Inc.,* 535 U.S. at 645. Accordingly, the plaintiffs' VRA claims fall squarely within the *Ex parte Young* exception to the defendants' Eleventh Amendment immunity, and the Court will deny the defendants' motion to dismiss on *Pennhurst* grounds.

### C. The Plaintiffs Have Alleged That Governor Youngkin and Secretary Gee Have a "Special Relationship" to Felon Disenfranchisement

"The *Ex parte Young* exception is directed at 'officers of the state [who] are clothed with some duty in regard to the enforcement of the laws of the state, *and* who threaten and are about

9

to commence proceedings . . . to enforce against parties affected [by] an unconstitutional act.'" *McBurney v. Cuccinelli*, 616 F.3d 393, 399 (4th Cir. 2010) (alterations in original) (quoting *Ex parte Young*, 209 U.S. at 155–56). Thus, courts must find a "'special relation' between the officer being sued and the challenged statute before invoking the exception." *Id.* A state actor has a "special relation" to a challenged state action if it has *"proximity to and responsibility for the challenged state action." Id.* (quoting *S.C. Wildlife Fed'n v. Limehouse*, 549 F.3d 324, 333 (4th Cir. 2008)).

The defendants contend that "[n]either the Governor nor the Secretary of the Commonwealth play any role in enforcing Virginia's disenfranchisement of convicted felons. Rather, as Plaintiffs' allegations make clear, the Governor and Secretary play a role only in the re-enfranchisement of felons." (ECF No. 77, at 19.) But under Virginia's voting rights restoration scheme, these defendants may enforce the permanent disenfranchisement of certain individuals. Thus, on the record before the Court, the Governor and Secretary bear a "special relation" to the challenged law, and the Court will not dismiss Governor Youngkin and Secretary Gee from the case at this time.

### D. The Plaintiffs' VRA Claims Do Not Present a Political Question

The Court lacks jurisdiction to adjudicate political questions. *See Baker v. Carr*, 369 U.S. 186, 210 (1962). In *Baker*, the Supreme Court articulated six circumstances in which an issue could present a political question: (1) "a textually demonstrable constitutional commitment of the issue to a coordinate political department"; (2) "a lack of judicially discoverable and manageable standards for resolving it"; (3) "the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion"; (4) "the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate

10

branches of government"; (5) "an unusual need for unquestioning adherence to a political decision already made"; or (6) "the potentiality of embarrassment from multifarious pronouncements by various departments on one question." *Id* at 217. "Unless one of these formulations is inextricable from the case at bar, there should be no dismissal for non-justiciability on the ground of a political question's presence." *Id.* More recent cases focus on the first two factors and assess whether an issue reveals a textual commitment to a coordinate branch or a lack of judicially manageable standards. *See Zivotofsky v. Clinton*, 566 U.S. 189, 195 (2012); *Nixon v. United States*, 506 U.S. 224, 228 (1993).

As discussed above, the plaintiffs ask the Court to assess whether Virginia's Constitution violates a federal statue. Accordingly, neither a "textually demonstrable constitutional commitment of the issue to a coordinate political department," nor "a lack of judicially discoverable and manageable standards" exists. *See Baker*, 369 U.S. at 217. Indeed, "it goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts." *Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986). "[U]nder the Constitution, one of the Judiciary's characteristic roles is to interpret statutes, and [courts] cannot shirk this responsibility merely because [their] decision may have significant political overtones." *Id.* The Court therefore finds that the plaintiffs' VRA claims do not present a political question, and it will deny the defendant's motion to dismiss on justiciability grounds.[3]

---

[3] The defendants also argue that the canon of constitutional avoidance and the anticommandeering doctrine preclude the plaintiffs' VRA claims. (*See* ECF No. 77, at 26–31.) But "[t]he canon of constitutional avoidance 'comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction.'" *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018) (quoting *Clark v. Martinez*, 543 U.S. 371, 385 (2005)). The defendants seem to assert that, under the plaintiffs' theory, Congress violated the United States Constitution when it passed the VRA. But they have not identified any "statutory ambiguity" in the VRA necessary to trigger the Court's consideration of the constitutional-avoidance canon. *See United States v. Palomar-Santiago*, 593 U.S. 321, 329 (2021). The

## II. THE DEFENDANTS' 12(B)(6) MOTION[4]

### A. VRA Claims

#### 1. Section 1983 Provides No Remedy for Purported Violations of the VRA

The plaintiffs bring Count One under 42 U.S.C. § 1983,[5] asking the Court to (1) enjoin the defendants "from enforcing Article II, Section 1 of the Virginia Constitution with respect to citizens of the Commonwealth of Virginia convicted of crimes that were not felonies at common law when the [VRA] was enacted in 1870" and (2) issue a declaratory judgment that the defendants' enforcement of this Section violates the VRA. (ECF No. 58, at 31.) To seek such redress, the plaintiffs must establish that the VRA creates a private right enforceable under § 1983. In other words, they must "assert the violation of a federal *right*, not merely a violation of federal *law*." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 282 (2002) (quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (2007)). Because § 1983 "is not an independent source of substantive rights, but simply a vehicle for vindicating preexisting constitutional and statutory

---

anticommandeering doctrine is similarly inapplicable here: the plaintiffs ask the Court to enjoin the defendants from enforcing Article II, Section 1 of Virginia's Constitution, and they have not asked the Court to compel the defendants' action.

[4] A Rule 12(b)(6) motion gauges the sufficiency of a complaint without resolving any factual discrepancies or testing the evidentiary merits of the claims. *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering the motion, a court must accept all allegations in the complaint as true and must "draw all reasonable inferences in favor of the plaintiff." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 253 (4th Cir. 2009) (citing *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999)). The principle that a court must accept all allegations as true, however, does not extend to legal conclusions. *Iqbal*, 556 U.S. at 678. To survive a Rule 12(b)(6) motion to dismiss, a complaint must therefore state facts that, when accepted as true, state a claim to relief that is plausible on its face. *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

[5] "To state a claim under U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States and must show that the alleged deprivation of that right was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

12

rights," the Court must begin its analysis by identifying "the specific right that has been infringed." *Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017) (citing *Graham v. Connor*, 490 U.S. 386, 393–94 (1989)).

To determine whether the plaintiffs have asserted a private right actionable under § 1983, the Court must look for "rights-creating language" in the text of the VRA. *See Alexander v. Sandoval*, 532 U.S. 275, 288 (2001). The Supreme Court identified three factors that courts should consider in assessing whether a statute creates a right enforceable under § 1983:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing*, 520 U.S. at 340–41 (citations omitted). The Supreme Court later clarified that, as to the first factor, "anything short of an unambiguously conferred right" cannot support a private remedy under § 1983; it is not enough for plaintiffs to fall "within the general zone of interest" of a federal statute. *See Gonzaga*, 536 U.S. at 283. If all "three factors are satisfied, there is 'a rebuttable presumption that the right is enforceable under § 1983.'" *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 696 (4th Cir. 2019) (quoting *Blessing*, 520 U.S. at 341).

Whether the VRA contains rights-creating language is an issue of first impression, and the parties dispute only whether the VRA satisfies the first and third *Blessing* factors. As to the first *Blessing* factor, the plaintiffs contend that the VRA "expressly refers to individual voting rights—*i.e.*, 'the Constitution of Virginia shall never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote.'" (ECF No. 78, at 22 (emphasis omitted) (quoting An Act to Admit the State of Virginia to Representation in the

Congress of the United States, ch. 10, 16 Stat. 62 (1870)).) They liken the VRA's language to the Medicaid Act's free-choice-of-provider provision, which states:

> A State plan for medical assistance must—provide that . . . any individual eligible for medical assistance . . . may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required . . . who undertakes to provide him such services . . . .

42 U.S.C. § 1396a(a)(23). The Fourth Circuit found that this provision "unambiguously gives Medicaid-eligible patients an individual right" because "Congress's use of the phrase 'any individual' is a prime example of the kind of 'rights-creating' language required to confer a personal right on a discrete class of persons." *Baker*, 941 F.3d at 696–97 (first quoting *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 974 (7th Cir. 2012); and then citing *Sandoval*, 532 U.S. at 288). The Fourth Circuit further explained that Congress had "left no doubt that it intended to guarantee each Medicaid recipient's free choice of provider." *Id.* at 697.

Although both the Medicaid Act's free-choice-of-provider provision and the VRA identify those who may benefit from the statute, the overall text and structure of the VRA differs greatly from that of the free-choice-of-provider provision. The VRA's sole purpose is clear: to readmit the Commonwealth's representatives into Congress upon certain fundamental conditions. The VRA, officially entitled the "Act to admit the State of Virginia to Representation in the Congress of the United States," first declares that Virginia's citizens had adopted a constitution "of State government which is republican; and . . . the legislature of Virginia elected under said constitution have ratified the fourteenth and fifteenth amendments to the Constitution of the United States; and . . . the performance of these several acts in good faith was a condition precedent to the representation of the State in Congress." An Act to Admit the State of Virginia to Representation in the Congress of the United States, ch. 10, 16 Stat. 62

14

(1870). The Act then explains that "Virginia is entitled to representation in the Congress of the United States," provided in part that Virginia's Constitution "never be so amended or changed as to deprive any citizen or class of citizens of the United States of the right to vote who are entitled to vote by the Constitution herein recognized, except as a punishment for such crimes as are now felonies at common law." *Id.*

Here, the plaintiffs contend that this language is "precisely the type of 'rights-creating' language" necessary to pursue relief under § 1983. (ECF No. 78, at 22.) But the defendants' argument—that the VRA "does not entitle any Virginian to vote, including any Virginia felons convicted of crimes that were not common-law felonies in 1870"—wins the day. (*See* ECF No. 82, at 16.) Although the VRA identifies "citizen[s]" who may benefit from the Act, the Supreme Court has explicitly cautioned courts against "allowing plaintiffs to enforce a statute under § 1983 so long as [they] fall[] within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U.S. at 283. Accordingly, the Court finds that the Act functions to impose conditions upon which Virginia legislators could participate in Congress, and it lacks language that explicitly confers any individual rights. *See id.* at 274, 286 ("[W]here the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit . . . ."). Because the VRA does not "unambiguously confer" rights on individuals such as the plaintiffs in this case, the Court need not analyze the second and third *Blessing* factors. The Court concludes that the VRA does not create a private right enforceable by an individual civil litigant under § 1983, and it will dismiss Count One.

### 2. *The Plaintiffs May Seek Prospective Relief Under* Ex parte Young

In Count Two, the plaintiffs ask the Court to, using its equitable powers, (1) enjoin the defendants "from enforcing Article II, Section 1 of the Virginia Constitution with respect to

15

citizens of the Commonwealth of Virginia convicted of crimes that were not felonies at common law when the [VRA] was enacted in 1870" and (2) declare that such enforcement violates the VRA. (ECF No. 58, at 34.) The defendants assert that Counts One and Two "ultimately collapse into one theory" and ask the Court to consider the plaintiffs' claims "as a single cause of action under § 1983 that must meet the requirements of § 1983 and *Ex parte Young*. (ECF No. 77, at 17 n.3.) Because § 1983 actions differ from equitable preemption suits, the Court declines the defendants' request and proceeds in analyzing Count Two.

The Supreme Court long ago recognized an equitable exception to Eleventh Amendment immunity, permitting plaintiffs to seek prospective relief against state officials who violate federal law. *Ex parte Young*, 209 U.S. at 123; *see supra* Part II.B. And although the defendants are correct in asserting that the Supremacy Clause "is not the source of any federal rights," they incorrectly argue that "the Readmission Act can be privately enforced, if at all, only through 42 U.S.C. § 1983." (ECF No. 82, at 16 & n.2 (first quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015)).) Indeed, the Supreme Court has "long recognized [that] if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted." *Armstrong*, 575 U.S. at 326 (citing *Ex parte Young*, 209 U.S. at 155–56). Importantly, "the principles that [the Supreme Court] ha[s] developed to determine whether a statute . . . is enforceable through § 1983[] are not transferable to the *Ex parte Young* context." *Id.* at 340 (Sotomayor, J., dissenting).

Rather than pointing to rights-creating statutory language, litigants pursuing relief under *Ex parte Young* rely on a Court's equitable powers that are "subject to express and implied statutory limitations." *Id.* at 327 (majority opinion). To assess Congress's "'intent to foreclose' equitable relief," courts should (1) consider whether Congress had provided a "sole remedy . . .

16

for a State's failure to comply with [a federal statute]" and (2) assess whether the provision at issue has a "judicially unadministrable nature." *Id.* at 328 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 647 (2002)). Thus, the plaintiffs may seek equitable relief under *Ex parte Young* unless the Court determines that (1) the VRA provides a sole remedy for the Commonwealth's failure to comport with federal law, and (2) it is "judicially unadministrable." *See id.*[6] The defendants have not argued the presence of, and the Court does not find, any identifiable remedy within the text of the VRA. And unlike the "broad and nonspecific" provision at issue in *Armstrong*, the VRA states that Virginia may not alter its Constitution "to deprive any citizen . . . of the right to vote who are entitled to vote by [Virginia's 1869 Constitution] except as a punishment for such crimes as are now felonies at common law." *Compare* 575 U.S. at 333 (Breyer, J., concurring in part and concurring in the judgment), *with* An Act to Admit the State of Virginia to Representation in the Congress of the United States, ch. 10, 16 Stat. 62 (1870). As discussed above, Count Two falls squarely within the doctrine of *Ex parte Young*. *See supra* Part II.B. Applying the "straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective," the Court concludes that the plaintiffs appropriately seek equitable relief. *See Verizon Md.*, 535 U.S. at 645 (alteration in original) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., concurring in part and concurring in

---

[6] Before *Armstrong*, the Supreme Court held that courts confronted with a "detailed remedial scheme" in a federal statute "should hesitate" before exercising their equitable powers. *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996) ("[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*."). It is unclear whether *Armstrong* supplants—or simply clarifies—the "detailed remedial scheme" test set forth in *Seminole Tribe*. Here, the VRA lacks language suggesting Congress's intent to foreclose equitable relief, as it does not present a remedy and certainly does not reveal a "detailed remedial scheme." *See id.*

17

judgment)). Specifically, the plaintiffs allege that Virginia's Constitution has been amended to disenfranchise persons who could have voted under the 1869 Constitution, and that the defendants' ongoing enforcement of Article II, Section 1 of Virginia's Constitution thus violates the VRA. The Court will allow Count Two to proceed to summary judgment.

### B. Eighth Amendment Claims

#### 1. Richardson v. Ramirez *Does Not Foreclose the Plaintiffs' Eighth Amendment Claims*

In Counts Three and Four of the Amended Complaint, the plaintiffs contend that the defendants' role in felon disenfranchisement violates the Eighth Amendment. As an initial matter, the defendants argue that *Richardson v. Ramirez*, 418 U.S. 24 (1974), forecloses the plaintiffs' Eighth Amendment claims. In *Richardson*, the Supreme Court ruled that "the exclusion of felons from the vote has an affirmative sanction in § 2 of the Fourteenth Amendment." 418 U.S. 24, 54 (1974). There, the Court explained that § 1 of the Fourteenth Amendment "could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which § 2 [of the Fourteenth Amendment] imposed for other forms of disenfranchisement." *Id.* at 55. In other words, because § 2 of the Fourteenth Amendment implicitly authorizes felon disenfranchisement, § 1 could not be interpreted to prohibit it. But this holding addresses only whether felon disenfranchisement is constitutional in the abstract, and the Supreme Court has "rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another. . . . The proper question is not which Amendment controls but whether either Amendment is violated." *See United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49–50 (1993).

18

The Supreme Court's subsequent decision in *Hunter v. Underwood* illustrates that, following *Richardson*, courts may hold unconstitutional a felon disenfranchisement provision of a state's constitution. 471 U.S. 222, 233 (1985). There, the Court explained that,

> [w]ithout again considering the implicit authorization of § 2 to deny the vote to citizens 'for participation in rebellion, or other crime,' *see Richardson v. Ramirez . . .* , we are confident that § 2 was not designed to permit the purposeful racial discrimination attending the enactment and operation of [the felon disenfranchisement provision of Alabama's 1901 Constitution] which otherwise violates § 1 of the Fourteenth Amendment. Nothing in our opinion in *Richardson v. Ramirez, supra,* suggests the contrary.

*Id.* Thus, *Richardson* does not preclude the plaintiffs' assertion that felon disenfranchisement is cruel and unusual punishment in violation of the Eighth Amendment.

### 2. *Felon Disenfranchisement Is Not a "Punishment"*

The Eight Amendment provides: "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "Because the Clause only regulates 'punishments,'" the Court must first determine whether felon disenfranchisement is a "punishment." *See Doe v. Settle*, 24 F.4th 932, 945 (4th Cir. 2022). "[U]nless it is a punishment, the Eighth Amendment does not apply." *Id.*

"The Supreme Court has created a two-part test for determining whether a statute [or constitutional provision] imposes punishment. First, [a court] must ask if the legislature intended to inflict punishment, which is a question of statutory interpretation." *Id.* (citing *Smith v. Doe*, 538 U.S. 84, 92 (2003)). If the court finds punitive intent, "that is the end of the inquiry." *Id.* But if it finds no punitive intent, that court "must look to the effects of the law." *Id.* "If the effects are punitive, they may override the legislature's intent, but [a court] must give deference to the legislature on this point, and [it] will require 'the clearest proof' to overturn those intentions." *Id.* (citing *Smith*, 538 U.S. at 105).

19

Accordingly, the Court begins its analysis by considering the Virginia legislature's intent behind Article II, Section 1 of the Virginia Constitution. If the purpose of this Section "is to designate a reasonable ground of eligibility for voting," then it is "a nonpenal exercise of the power to regulate the franchise." *Trop v. Dulles*, 356 U.S. 86, 97 (1958) (plurality opinion). To assess the Virginia legislature's intent, the Court considers this Section's "text and its structure." *See Smith*, 538 U.S. at 92. Article II of the Virginia Constitution, entitled "Franchise and Officers," addresses every corner of the voting process, from voters' and elective candidates' necessary qualifications to the General Assembly's power to establish a voter registration system and regulate elections. Va. Const. art. II (1971). Section 1 of this Article, entitled "Qualifications of Voters," explains,

> In elections by the people, the qualifications of voters shall be as follows: Each voter shall be a citizen of the United States, shall be eighteen years of age, shall fulfill the residence requirements set forth in this section, and shall be registered to vote pursuant to this article. No person who has been convicted of a felony shall be qualified to vote unless his civil rights have been restored by the Governor or other appropriate authority. As prescribed by law, no person adjudicated to be mentally incompetent shall be qualified to vote until his competency has been reestablished.

Va. Const. art. II, § 1 (1971). The felon disenfranchisement provision of Article II, Section 1 immediately follows several nonpunitive requirements for the franchise, including citizenship, age, residency, and registration. And it precedes another nonpunitive provision that disqualifies all persons "adjudicated . . . mentally incompetent . . . until [their] competency has been reestablished." *Id.* The plain text of Article II, Section 1 suggests no intent to sanction those who may not vote in Virginia. Instead, it simply provides how a Virginian can qualify to vote. The Court thus concludes that the Virginia legislature ratified this Section to "designate a reasonable ground of eligibility for voting" and intended it to be a nonpenal regulation of the franchise. *See Trop*, 356 U.S. at 97. Finding no punitive intent, the Court must next assess

20

whether the disenfranchisement provision's "punitive effect is so overwhelming that it negates the State's intentions." *See Settle*, 24 F.4th at 947.

"To assess punitive effect, [courts] look to the list of seven factors first compiled in *Kennedy v. Mendoza-Martinez*, 372 U.S. [144, 168–69 (1963)] . . . . These factors have been used in a handful of constitutional contexts – Ex Post Facto Clause, Sixth Amendment, and Eighth Amendment – and they create a framework for a general, constitutional theory of a 'punishment.'" *Settle*, 24 F.4th at 947. The *Mendoza-Martinez* factors are: (1) whether a sanction "involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as punishment"; (3) "whether it comes into play only on a finding of scienter"; (4) whether it operates to promote "retribution and deterrence"; (5) whether it applies to behavior that "is already a crime"; (6) whether it rationally relates to a nonpunitive purpose; and (7) whether it "appears excessive" compared to that alternative purpose. 372 U.S. at 168–69. The Court addresses each factor in turn.

First, the plaintiffs contend that "disenfranchisement constitutes 'an affirmative disability' because it permanently severs individuals from the body politic, strips them of their right to participate in governance, and precludes them from enjoying full citizenship." (ECF No. 78, at 31.) But Article II, Section 1 does not include "an affirmative disability or restraint as that term is normally understood." *See Thompson v. Alabama*, 65 F.4th 1288, 1306 (11th Cir. 2023) (internal quotation marks omitted) (quoting *Hudson v. United States*, 522 U.S. 93, 104 (1997)). Indeed, it "imposes no physical restraint, and so does not resemble the punishment of imprisonment, which is the paradigmatic affirmative disability or restraint." *See id.* at 100; *cf. Smith*, 538 U.S. at 101–02 (finding that the affirmative duty of registration imposed on sex offenders does not constitute an affirmative restraint). In *Thompson v. Alabama*, the Eleventh

21

Circuit likened felon disenfranchisement to occupational disbarment because "[b]oth remove the civil rights of individuals due to their criminal behavior as part of the State's regulatory power" before explaining that the Supreme Court has found occupational disbarment to be nonpunitive.[7] The Court finds the *Thompson* court's reasoning persuasive and thus concludes that this factor weighs in favor of finding that Article II, Section 1 is nonpunitive in effect.

"The second factor, whether felon disenfranchisement has been historically regarded as punishment, is neutral." *Thompson*, 65 F.4th at 1306. Some courts have determined that felon disenfranchisement does not function as a penalty. *E.g.*, *Simmons v. Galvin*, 575 F.3d 24, 45 (1st Cir. 2009) ("[F]elon disenfranchisement has historically not been regarded as punitive in the United States, as the Supreme Court indicated in *Trop v. Dulles*."). Others have noted that "[f]elon disenfranchisement laws are unlike other voting qualifications. These laws are deeply rooted in this Nation's history and are a punitive device stemming from criminal law." *E.g.*, *Johnson v. Gov. of Fla.*, 405 F.3d 1214, 1228 (11th Cir. 2005).

The plaintiffs contend that the third factor—whether a sanction requires a finding of scienter—weighs in favor of finding felon disenfranchisement's punitive effects. They argue that "in Virginia almost all felonies require proof of criminal intent." (ECF No. 78, at 25.) But "[t]here is no scienter requirement for felon disenfranchisement; it is sufficient that the person be convicted of a disqualifying felony." *Thompson*, 65 F.4th at 1307. Relatedly, "felon disenfranchisement only sanctions behavior that is already criminal." *Id.* The fifth factor thus

---

[7] *Thompson*, 65 F.4th at 1306; *see Hudson*, 522 U.S. at 95–96 (concluding that occupational disbarment does not impose an "affirmative disability or restraint" because disbarment is "certainly nothing approaching the infamous punishment of imprisonment" (internal quotation marks omitted) (quoting *Flemming v. Nestor*, 363 U.S. 603, 617 (1960)); *see also Simmons v. Galvin*, 575 F.3d 24, 44 (1st Cir. 2009) ("Disenfranchisement during the period of incarceration imposes no additional term of imprisonment and is not as enduring as permanent occupational debarment, which the Court has held is nonpunitive." (internal citations omitted)).

also weighs against a finding that felon disenfranchisement punitive because a "tie[] to criminal activity" is "insufficient to render [the provision] punitive." *See United States v. Usery*, 518 U.S. 267, 292 (1996).

As to the fourth, sixth, and seventh factors, the defendants concede that disenfranchisement may "promote[] the traditional aims of punishment." (ECF No. 77, at 35 (quoting *Settle*, 24 F.4th at 947).) But they assert that felon disenfranchisement nonetheless has "a strong 'rational connection to a nonpunitive purpose,' namely to regulate the franchise by excluding individuals who have shown a disregard for the law—the very output of the political process in which they would otherwise be participating." (*Id.*) And although the plaintiffs admit that disenfranchisement of certain felons "may be rationally connected to regulating the franchise," they argue that "automatically banishing people from the civic body for life" following a felony conviction "is excessive." (ECF No. 78, at 25 n.22.) The Court finds that Article II, Section 1 "has a rational connection to a nonpunitive purpose"—regulating the franchise—and is not "excessive with respect to this purpose." *See Smith*, 538 U.S. at 97. "[I]t can scarcely be deemed unreasonable for a state to decide that perpetrators of serious crimes shall not take part in electing the legislators who make the laws, the executives who enforce these, the prosecutors who must try them for further violations, or the judges who are to consider their cases." *Green v. Bd. of Elections of N.Y.*, 380 F.2d 445, 451 (2d Cir. 1967). This Section excludes from the franchise certain persons who have broken laws "sufficiently important to be classed as felonies," *see Shepherd v. Trevino*, 575 F.2d 1110, 1115 (5th Cir. 1978), until Governor Youngkin or another "appropriate authority" restores their voting rights. *See* Va. Const. art. II, § 1 (1971). Thus, these three factors reveal the nonpunitive effect of Article II, Section 1.

Taken together, the *Mendoza-Martinez* factors weigh in favor of finding that the felon disenfranchisement provision within Article II, Section 1 of Virginia's Constitution demonstrates no punitive effect, "especially considering the deference [the Court] must give to the legislature's intent." *See Settle*, 24 F.4th at 953. The Court thus concludes that the felon disenfranchisement provision in Article II, Section 1 of the Virginia Constitution is not a "punishment" under the Eighth Amendment. Accordingly, the Court will dismiss the plaintiffs' Eighth Amendment claims.

### III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part the defendants' motion to dismiss. (ECF No. 76.) First, because Bridging the Gap lacks standing, the Court will dismiss it from this action. Second, because the VRA does not contain rights-creating language, the Court will dismiss Count One. Third, because felon disenfranchisement is not "punishment" for purposes of the Eighth Amendment, the Court will dismiss Counts Three and Four. Accordingly, Count Two, which asks the Court to use its equitable powers to review the defendants' alleged violation of the VRA, is the sole remaining count.

The Court will issue an appropriate Order.

Let the Clerk send a copy of this Opinion to all counsel of record.

/s/
John A. Gibney, Jr.
Senior United States District Judge

Date: 18 March 2024
Richmond, VA

24